Order accordingly.

---

THE METROPOLITAN ELEVATED RAILWAY COMPANY, Plaintiff, *against* THE MANHATTAN ELEVATED RAILWAY COMPANY *et al.*, Defendants.

[SPECIAL TERM.]

(Decided April, 1884.)

Where an action of an equitable nature is brought to cancel a tripartite agreement, by which the parties thereto assumed to modify previously existing leases and agreements between them by reducing the amount of the rents fixed by such leases, and making other changes, the fact that the plaintiff might have brought an action as lessor for rent reserved in one of such leases, in which action the agreement sought to be cancelled could be attacked upon the same grounds, and in which a final recovery of rent notwithstanding that agreement would be as effectual as any final judgment in the equitable action, could be, does not preclude him from maintaining such equitable action where one of the parties to the tripartite agreement, who is therefore a necessary party to any action seeking to avoid it, being in no way liable for the rent reserved to plaintiff, could not be brought in as a party in an action for such rent.

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

An action by a corporation to set aside an agreement made by its directors without authority, or fraudulently, may be maintained notwithstanding the corporation itself is, by the use of its name by its directors, a party to the agreement it seeks to repudiate.

Such an action may be maintained without a disaffirmance by the stockholders of such agreement if the directors had no authority to make the agreement; but if it is impeached because of fraud, the contract being a voidable one, due diligence must be used in electing to avoid it. The timely commencement of a suit by one or more stockholders asserting the rights of stockholders as a class may be sufficient; it is not requisite that each particular stockholder should sue. And a party who has by injunction restrained the bringing of such suits cannot object to delay of stockholders to sue while so restrained.

Acts of a board of directors of a corporation, done by them on behalf of the corporation, but in excess of their authority, or in violation of their trust, may be impeached by a board of directors subsequently elected.

The mere commencement of an action in the nature of a bill of peace, brought to determine all questions relating to, and to restrain bringing any action on account of certain agreements, the subject of dispute, does not prevent one of the defendants therein from maintaining such an action, until the right to an injunction has been established, either preliminarily or by final judgment.

The doctrine of *res adjudicata* does not apply to interlocutory judgments or orders which may be vacated or modified by the court which rendered them.

A judgment against a corporation involving the validity and effect of an agreement made in the name of the corporation by its directors, which judgment is not founded on proofs, but wholly on admissions of facts by the same directors, is not a bar to a subsequent action by the corporation to set aside the agreement. Such a judgment is nothing more than a judgment by consent; and its nullity, though it has not been set aside or reversed, may be established in another action. The denial of a motion to vacate such a judgment adds nothing to the force or effect of the judgment.

The plaintiff in an action to rescind a void or voidable agreement is not to be denied relief because he cannot restore the other parties to such agreement to the same position which they occupied before they entered into the agreement, where such other parties put themselves in the position in which they find themselves with full knowledge that plaintiff claimed the agreement to be void and fraudulent, and after every means to restrain the wrong had been taken at once, by those who had the right, on plaintiff's behalf, to question the legality of the transaction.

The rule that, if any party to an agreement sought to be rescinded has, in consequence of it, done anything which cannot be undone, or has omitted to do anything which he might have done, no rescission can be had, does not apply to things done or left undone by such a party who had knowledge, before anything was done or omitted to be done, that the agreement was repudiated, either by the other party or by those who had a right to contest its validity on his behalf.

The rule that to retain any part of what has been received upon a contract is incompatible with its rescission, does not apply where, if the contract sought to be rescinded had never been made, the party rescinding would have been entitled to receive more than what was received under the contract. In such a case no offer to return is necessary, nor is it proper for the court to order restitution. It is only where the party rescinding has no claim to what has been received, except by force of the contract sought to be rescinded, and therefore its retention is incompatible with the rescission, that a return or offer to return is necessary.

In May, 1879, the New York Elevated Railroad Company, and the Metropolitan Elevated Railway Company, each being the owner of elevated railways in the City of New York then in operation, though not fully completed, which it was desirable for the interest of the companies and of the public should be completed and operated under one management, entered into a tripartite agreement for that purpose with the Manhattan Elevated Railway Company, by which each of the former companies was to execute a lease of its roads, etc., to the latter, and certain agreements were made respecting outstanding contracts for construction, etc., to be assumed by the Manhattan company, and respecting various payments to be made by the others ; and the Manhattan company agreed to assume payment of the principal and interest of the first mortgage bonds of each of the other companies, to pay, as rental, to each a certain sum annually and an annual dividend of ten per cent. upon the stock of each of them, and to issue bonds of the Manhattan company for a large amount, convertible into its own stock, to the other companies ; the amount of the sums so to be assumed and paid, of the dividends guaranteed, and of the bonds to be issued by the Manhattan company being the same for each of the other companies. Pursuant to the terms of such tripartite agreement, the leases and agreements provided for were executed and carried into effect, and bonds were issued by the Manhattan company, which were converted into its stock, and the stock was distributed by the other companies among their stockholders. It was soon ascertained that great miscalculations had been made as to the cost of completing the various lines, and the completion of the Metropolitan structure absorbed a sum much greater than had been anticipated ; the net income derived from the business of the roads fell far below the anticipations of the parties, the cost of operating the roads having greatly increased and the amount of travel, especially upon the Metropolitan lines, being much less than had been expected ; the properties of the corporations were subjected to taxation, which, under the leases, the Manhattan company was bound to pay, to an extent which had not at all entered into the calculations fixing the rental ; and many actions were brought and claims made against the companies for injuries to private property from the construction and operation of the roads. In consequence the Manhattan company, early in 1881, was admitted by its president to be hopelessly insolvent, unless relieved from the taxes imposed on it ; the revenues derived from the roads were found insufficient to meet the engagements it had undertaken in the leases, the Metropolitan company earning barely sufficient to pay the fixed charges

on its road, and the New York company earning sufficient to pay its fixed charges and also a dividend to stockholders; and on July 1st, 1881, the Manhattan company made default in the payment of interest on the bonds of the other companies and of the dividends of their stock. Suits founded on the insolvency of the Manhattan company were brought against it by bondholders of the other companies, and injunctions asked and obtained restraining payments by it to stockholders of those companies ; suits on the same ground were brought against it by the attorney-general, in which temporary receivers of its property were appointed; and an action was brought and other proceedings taken by the New York company to recover possession of its property from the Manhattan company and the receivers, by reason of the insolvency of that company and its defaults in payments under the lease. On the other hand claims were made and an action brought by and on behalf of stockholders of the Manhattan company to recover from the other companies the par value of its stock, received by them and distributed among their stockholders, on the ground that it had received no value for the stock ; and this claim was also asserted by the Manhattan company and its receivers in the proceedings by the New York company to recover its property. Meantime negotiations were pending for a settlement of these various matters of difference, and for modifications of the leases which would enable the Manhattan company to continue the operation of the roads, on the basis of concessions by the other companies; and in October, 1881, an agreement for that purpose was entered into between them, whereby the tripartite agreement and leases of May, 1879, were modified, the principal changes being a reduction of the dividend rentals from ten to six per cent., and a provision that the dividend rental to the New York company should be paid before that to the Metropolitan company; and each of the three companies released the others from all actions, claims and demands except such as were embraced in and created by the agreement and leases as modified and by the new agreement. By a supplemental agreement made at the same time, the rental dividends to the New York company were made cumulative, and its claims under the leases were to be paid up to October 1st, 1881. These October agreements were executed, on the part of the Metropolitan company, by authority of its board of directors, without the assent of the stockholders, and were never ratified by the latter in any manner; and suits to set aside these agreements were immediately brought by individual stockholders. Subsequently, and soon after the election of a new board of directors of the Metropolitan company, a suit was brought by them in the name of the company to set aside the October agreements on various grounds, among them violation of trust and fraud on the part of certain members of the former board of directors in entering into the scheme to benefit themselves at the expense of their corporation.

*Held,* that upon the evidence, the charge of fraud was not sustained; that in view of the importance of keeping the properties under one management, for which the Manhattan company afforded the best means, the necessity of making some concessions for that purpose, the difference in

the relative values of and profits realized and to be anticipated from the respective properties, the claim made by the Manhattan company against the others, and the claim of the New York company to recover possession of its property, under all the circumstances the settlement might be approved as the best solution of the existing controversies, and that it involved no unjust discrimination against the Metropolitan company; that no fraudulent intent on the part of the former directors of that company, whose action was attacked, was to be deduced from the proofs as to their respective interests in the properties and their acts and conduct in connection with the making of the agreements; and that subsequent acts by them, in carrying into effect the agreements and further promoting their general purpose, although tending to show subsequent fraudulent intent and bad faith toward the stockholders, were not sufficient to establish an original fraudulent intent at the time of the making of the agreements themselves.

In order that a fraudulent intent in an original act—as, the making of an agreement—may be deduced from subsequent acts, they must be inconsistent with anything but a fraudulent intent originally, and not relate to any subsequent fraudulent intent. A fraudulent intent formed after an agreement has been executed and delivered, although formed for the purpose of aiding the carrying into effect the terms of the agreement, cannot relate back to the original agreement.

A provision in the charter of a corporation that the directors are to manage the business and affairs of the company, does not confer on them the right to exercise every corporate power, but merely to manage the ordinary business and affairs of the company for the carrying on of which it was organized, leaving the right remaining in the shareholders composing the company to set in motion or confirm corporate action within the corporate powers, but extraordinary or unusual in its nature. Acts making organic or fundamental changes in the character or business of the corporation cannot be done either by the directors alone or the stockholders alone; both the executive and administrative officers must unite with the shareholders. *So held,* in regard to a lease of the entire railway and other property of a railway company for a long term of years.

The principle of the rule that every contract entered into by a director with his corporation may be avoided by the corporation within a reasonable time, irrespective of the merits of the contract itself, extends to the case of a contract between two corporations, of whose directors some hold that office in each corporation, so that they contract as directors of the one, with themselves as directors of the other. But, *it seems,* this disqualification of common directors does not extend to common shareholders, so as to render them incompetent to ratify agreements between their companies; the disability rests entirely upon the fiduciary relationship.

And where one of the corporations seeks to rescind such a contract, the fact that the number of its directors who voted for the contract was sufficient to constitute a majority even if all the common directors had voted against the contract, does not cure the infirmity. The corpora-

tion is entitled to all the knowledge and skill which each and every director can bring to bear upon the subject before the directors. If there is even one director who is disqualified, the whole action of the board is subject to repudiation.

Neither would it affect the question, that the shareholders of the company seeking to rescind knew, at the time of electing such directors, that they were also directors of the other company; if the shareholders had not then any reason to suppose that any such contract was to be made.

In order that an agent or trustee may act for two principals, the principals must each know, not only that he is the agent of each, but also that action by the agent is contemplated, in which such agent is to represent the hostile interests of both principals, and if such knowledge is not shown, the principals may repudiate.

The evidence of a party may be disregarded by a jury or a court trying questions of fact, although it is in no wise impeached or affected; notwithstanding the different rule obtaining in respect to the evidence of disinterested witnesses.

TRIAL of an action to set aside certain tripartite agreements between the plaintiff and defendants.

In April, 1866, the legislature of this state passed an act supplementary to the General Railroad Act of 1850, by which it provided for the incorporation of railways to be operated by means of a propelling rope or cable, attached to stationary power.

Under this statute, in the summer of the above year, articles of association were filed by the West Side and Yonkers Patent Railway Company, which contemplated the building of a railway from the southerly extremity of the City of New York, through said city, to the village of Yonkers, in the county of Westchester, and state of New York.

In April, 1867, the legislature passed an act to provide for the construction of an experimental line of railway in the counties of New York and Westchester.

By this act, the West Side and Yonkers Patent Railway Company were authorized to construct an elevated (so-called) railway, in the counties of New York and Westchester, in the manner and upon the route therein specified.

This act provided that the railway should be operated exclusively by means of propelling cables attached to stationary engines.

The act provided for the construction of an experimental line of railway within one year from the passage of the act, commencing at the southern extremity of Greenwich Street, and running along Greenwich Street, for half a mile, and that if the structure, plan and operation of the railway should be approved by certain commissioners, to be appointed as provided in the act, the company might extend its line of elevated (so-called) railway along Greenwich Street to Ninth Avenue, and along Ninth Avenue and streets west of Ninth Avenue to the Harlem River. But, if the commissioners should not approve of the railway, and its plan of construction and operation, then the constructing company should proceed immediately to remove the experimental structure.

Subsequently, in the same month, the legislature passed an act, that the corporate existence of any company formed under the General Railroad Act of 1850, should cease if it did not, within five years from incorporation, begin the construction of its road, and expend thereon ten per cent. on the amount of its capital, or finish its road and put it in operation in ten years from such incorporation.

In 1868, the legislature passed an act extending the time for the construction of the experimental line of railway six months, and provided for the payment of five per cent. of the net income of the railway for the purpose of being expended in the improvement of the condition and appearance of the streets through which the railway should be constructed, and authorized the company to amend its corporate title.

The experimental railway having been built subsequently, in the same year, the commissioners duly appointed approved of the structure, plan and operation of the same.

In July, 1868, the corporate name of the West Side and Yonkers Patent Railway Company was duly changed to the " West Side Elevated (patented) Railway Company (of New York City)."

In 1868, the said company mortgaged its road and franchises and property, from the southerly extremity of Green-

wich Street, to West Thirtieth Street, to secure the payment of bonds to the amount of $750,000, and in August, 1870, executed a further mortgage upon its road, franchises and property from the southern extremity of Greenwich Street to Sixtieth Street, to secure the payment of bonds to the amount of two and one-half millions of dollars.

On the 15th day of November, 1870, the sheriff sold to Mr. Francis H. Tows, all the right, title and interest of the West Side Elevated Railroad Company, which they had on the 30th day of August, 1870, to their railroad, as constructed, from the Battery to Thirty-first Street, and in the equipment thereof.

In February, 1871, the commissioners, in pursuance of the Act of 1868, gave the permission for the use of a dummy engine upon the Greenwich Street railway.

On the 27th day of October, 1871, the articles of association of the New York Elevated Railroad Company were filed, fixing the capital at ten millions of dollars, (of which six and one-half millions have been issued), and routes from the Battery, by a line through the westerly part of the City of New York to Westchester County, and through the westerly part of said county to Putnam County, and also from said Battery by a line through the central part of said city, and through the central part of Westchester County to Putnam County. And also from said Battery by a line through the easterly part of said city, and through the easterly part of Westchester County to Portchester, in the said county.

Actions having been instituted for the foreclosure of the above-mentioned mortgages, a judgment of foreclosure upon the second mortgage was entered, August 22d, 1871, and upon the first mortgage September 8th, 1871; and the referee appointed in the latter suit, conveyed all the property mortgaged to Mr. James A. Cowing, by deed dated October, 1871.

The referee appointed in the first action above-mentioned, duly conveyed the property mentioned in the second mortgage to the New York Elevated Railroad Company, by deed dated December 7th, 1871; and in January, 1872, Mr. James

A. Cowing conveyed the property deeded to him, as above-mentioned, to The New York Elevated Railroad Company.

In June, 1872, the legislature passed an act to incorporate the Gilbert Elevated Railway Company, with a capital stock of three and one-half millions of dollars, which was subsequently increased to six and one-half millions of dollars, the whole of which was issued.

The act, provided, among other things, that " the business and offices (affairs probably meant) of said company, should be managed by at least seven directors, and that the corporation should be empowered to construct and maintain an elevated railway over, through and along such streets, avenues, etc., in the City of New York, etc., as should be designated by a Board of Commissioners appointed by said act, except such streets, etc., as were situate between the easterly line of the Third Avenue and the easterly line of the Sixth Avenue."

The commissioners having designated the route of the Gilbert Elevated Railway, the legislature, in 1873, passed an act prohibiting the use of a certain portion of the route thus designated, and authorizing a commission to designate a new route.

Such commission subsequently reported as the route designated by them, the following:

" Commencing on the south shore of the Harlem River at Kingsbridge, thence along River Street to Eighth Avenue; thence along Eighth Avenue to One Hundred and Tenth Street; thence along One Hundred and Tenth Street to Ninth Avenue; thence along Ninth Avenue to Fifty-third Street; thence along Fifty-third Street to Sixth Avenue; thence along Sixth Avenue to Amity Street; thence along Amity Street to South Fifth Avenue; thence along South Fifth Avenue to Canal Street; thence crossing Canal Street into West Broadway; thence along West Broadway to Chambers Street; thence across Chambers Street into College Place; thence along College Place to Murray Street; thence along Murray Street to Church Street; thence along Church Street to New Church Street; thence along New

Church Street to and across Morris Street; thence through private property to Bowling Green; thence around Bowling Green into Beaver Street; thence along Beaver Street to Pearl Street; thence along Pearl Street and New Bowery to Division Street; thence along Division Street to Allen Street; thence along Allen Street and First Avenue to Twenty-third Street; thence along Twenty-third Street to Second Avenue; thence along Second Avenue to Harlem River; then along River Street to Eighth Avenue. Also a connecting line through and along Chambers street, from West Broadway to Chatham Street; thence through Chatham Street to Division Street.

"Also an extension from the junction of Fifty-third Street through and along Sixth Avenue to Fifty-ninth Street."

Thereupon, in 1874, the legislature passed an act fixing the time within which the company should construct its roads as re-located.

On June 2d, 1875, the legislature duly passed an act confirming the New York Elevated Railroad Company in its charter and acquired powers, and authorizing and requiring it to construct and complete at least one track within five years.

The act further provided, that the commissioners appointed in respect to the West Side and Yonkers Patent Railway Company, should have the same powers in respect to the New York Elevated Railroad Company, and that the latter company might make and adopt such alterations and improvements in structure, motive power, sideways, crossings, etc., as the commissioners should approve.

On June 18th of the same year the legislature passed what is called the Rapid Transit Act, by which it was provided, that where it appeared by the application of fifty reputable householders and tax-payers of any county in this state, that there was need in such county of a steam railway or railways for the transportation of passengers, mails or freight, if such proposed railway be wholly within the limits of any city within the state, the mayor should appoint five commissioners who should within thirty days after their

organization, determine upon the necessity of such steam railway or railways, and if they found them to be necessary, within sixty days fix and determine their routes, which they should have exclusive power to locate, provided that the consent of the owners of one-half in value of the property bounded on, and the consent also of the local authorities, having charge of the streets, etc., was first obtained, or in case the consent of such property-owners could not be obtained, the determination of three commissioners appointed by the General Term of the Supreme Court, in the district of the proposed construction, confirmed by the court, that such railway or railways ought to be constructed, was to be taken in lieu of the consent of such property-owners.

The said commissioners were also empowered, not more than ninety days after their organization, to decide upon the plan or plans for the construction of such railway or railways, and fix and determine the time within which such railways or portion of the same should be constructed, and the maximum rates of fare, and the time during which special cars or trains should be run at reduced rates of fare ; and also to fix the amount of the capital stock of the company, to be formed for the purpose of constructing, maintaining and operating such railway or railways. The act further provided that the commissioners should prepare appropriate articles of association for the company, which should contain certain stipulations, in the act mentioned.

The act then provides for the organization of this company, under the supervision of the commissioners, for the election of directors, defines the liabilities of the stockholders, regulates the manner in which the capital stock may be increased, gives the company power to acquire and hold real estate, regulates the manner of acquiring title, and gives the power to enter upon the streets and avenues for the purpose of construction.

The act further provides that " whenever the route or routes determined upon by said commissioners coincide with the route or routes covered by the charter of an existing corporation formed for the purpose provided for by this

act, provided that said corporation has not forfeited its charter or failed to comply with the provisions thereof, requiring the construction of a road or roads within the time prescribed by its charter, such corporation shall have the like power to construct and operate such railway or railways, upon fulfillment of the requirements and conditions imposed by said commissioners as a corporation specially formed under this act, and the said commissioners may fix and determine the route or routes by which an elevated steam railway or railways now in actual operation may connect with other steam railways, or the depots thereof, or with steam ferries, upon fulfillment by such elevated steam railway company, so far as it relates to such connection, of such of the requirements and conditions, imposed by said commissioners under section four of this act, as are necessary to be fulfilled in such cases under section eighteen of article three of the constitution of this state, and such connecting railway shall in such cases possess all the powers conferred by section twenty-six of this act; and when any connecting route or routes shall be so designated, such elevated railway company may construct such connection, with all the rights, and with like effect as though the same had been a part of the original route of such railway."

Proper proceedings having been taken therefor, Rapid Transit commissioners were duly appointed by the mayor of the City of New York, who entered upon their duties; and on the 2d day of September, 1875, located the route of the New York Elevated Road as follows:

"Beginning at the intersection of Greenwich Street and Battery Place, to, over and across Battery Place to the edge of the Battery and State Street; thence over, through and along the edge of the Battery and State Street to Whitehall Street; thence over, through and along Whitehall Street to and connecting with the South Ferry, Hamilton Avenue Ferry, and Staten Island Ferry; and from the intersection of State Street, and Whitehall Street, over and across Whitehall Street to Front Street; thence over, through and

along Front Street to Coenties Slip; thence over, through, along and across Coenties Slip to the intersection of Coenties Slip and Pearl Street; thence over, through and along Pearl Street to Hanover Square; thence over, through and along Hanover Square and Pearl Street to John Street; thence over, through and along John Street and Burling Slip to, over, along and across South Street to and connecting with the Fulton Ferry; and from the intersection of John Street and Pearl Street, crossing John Street over, through and along Pearl Street and Franklin Square to New Bowery; thence over, through and along New Bowery and Chatham Square to the Bowery; thence over, through and along the Bowery to Third Avenue; thence over, through and along Third Avenue to East Thirty-fourth Street; thence over, through and along East Thirty-fourth Street to and connecting with the Thirty-fourth Street Ferry; and from the intersection of East Thirty-fourth Street and Third Avenue crossing East Thirty-fourth Street, over, through and along Third Avenue to East Forty-second Street; thence over, through and along East Forty-second Street to and across Fourth Avenue to and connecting with the depot known as the 'Grand Central,' occupied by the New York Central and Hudson River Railroad Company, the New York and Harlem Railroad Company, and the New York, New Haven and Hartford Railroad Company; and from the intersection of East Forty-second Street and Third Avenue, and crossing East Forty-second Street, over, through and along Third Avenue to Ninety-second Street; thence over, through and along East Ninety-second Street to and connecting with the Astoria Ferry; and from the intersection of Third Avenue and East Ninety-second Street, crossing East Ninety-second Street, over, through and along Third Avenue to East One Hundred and Twenty-ninth Street (there connecting with the ferries having landings at or near Harlem Bridge); thence over, through and along East One Hundred and Twenty-ninth Street to the intersection of East One Hundred and Twenty-ninth Street and the Harlem River;

thence over and along the Harlem River to First Avenue; thence over and across the Harlem River, connecting with the depot of the Portchester branch of the New York, New Haven and Hartford Railroad; and from the intersection of Third Avenue and East One Hundred and Twenty-ninth Street, over and across Third Avenue, and over, through and along East One Hundred and Twenty-ninth Street to Lexington Avenue; thence over, through and along Lexington Avenue to River Street and the Harlem River; thence over, through and along River Street and the southerly shore of the Harlem River to and connecting with the railway of the New York and Harlem Railroad at Fourth Avenue; with a branch and turnout from the intersection of New Bowery and Chatham Square, over, through and along Chatham Square to Chatham Street; thence over through and along Chatham Street to Park Row; thence over, through and along Park Row to Tryon Row (there to connect with the railway to be laid over the East River Bridge for cars to be propelled or operated by steam); thence over, through and along, or in front of and around Tryon Row to the Park; thence along the Park and over, through and along Centre Street to Park Street; thence over, through and along Park Street to Mott Street, crossing over Mott Street; thence over and through the block to Doyer Street, crossing into Doyer Street; thence over, and through the block to Pell Street, crossing over Pell Street; thence over, through and along Pell Street and intersecting the route hereinbefore fixed and determined over, through and along the Bowery; and with a siding for a turn round, commencing at the intersection of Coenties Slip and Water Street; thence over, through and along Water Street to Whitehall Street; thence over, through and along Whitehall Street to and intersecting the route hereinbefore fixed and determined at the intersection of Front Street and Whitehall Street; and also a route of connection beginning at the intersection of Ninth Avenue and West Ninety-second Street, over, through and along West Ninety-second Street to Eighth Avenue; thence over, through and along Eighth Avenue

to River Street and the Harlem River; thence over, through and along River Street, and over and along the Harlem River, over and crossing the Harlem River at or near High Bridge, to and connecting with the New York, Boston and Montreal Railroad, or the depot thereof, and to and connecting with the Spuyten Duyvil and Port Morris Railroad, or the depot thereof."

The commissioners at the same time also located the route of the Gilbert Elevated Railroad Company, as follows:

"Commencing on the south shore of Harlem River, at Kingsbridge; thence running through and along River Street to Eighth Avenue; thence over, through and along Eighth Avenue to Ninety-second street; then over, through and along Ninety-second Street to Ninth Avenue; thence over, through and along Ninth Avenue to Fifty-third Street to Sixth Avenue; thence over, through and along Sixth Avenue to Amity Street; thence over, through and along Amity Street to South Fifth Avenue; thence over, through and along South Fifth Avenue to Canal Street; thence over, through and across Canal Street into West Broadway; thence over, through and along West Broadway to Chambers Street; thence over, through and across Chambers Street into College Place; thence southerly over, through and along College Place to Murray Street; thence easterly over, through and along Murray Street to Church Street; thence southerly over, through and along Church Street to New Church Street; thence southerly over, through and along New Church Street to, through over and across Morris Street to a point on the southerly line of Morris Street, sixty-five feet from the southeasterly corner of Greenwich Street and Morris Street; thence southerly over and through private property parallel to the easterly line of Greenwich Street, a distance of thirty-five feet; thence over and on a curve of one hundred and eighty feet radius, intersecting the building line on the westerly side of Broadway, two-hundred and two feet from the southerly corner of Morris Street and Broadway to Bowling Green, west of the westerly line of Broadway to and around Bowling

Green Park into Beaver Street; thence over, through and along Beaver Street to Pearl Street; thence over, through and along Pearl Street and New Bowery to Division Street; thence over, through and along Division Street to Chrystie Street; thence over through and along Chrystie Street and Second Avenue to Harlem River; thence through and along River Street to Eighth Avenue.

" Also, an extension from the junction of Fifty-third Street over, through and along Sixth Avenue to Fifty-ninth Street.

" Also, an extension from the junction of East Twenty-third Street and Second Avenue, over, through and along Twenty-third Street to the Third Avenue.

" Also, an extension from the junction of East Forty-second Street and Second Avenue, over, through and along East Forty-second Street to the Third Avenue; thence to connect with the Grand Central Depot."

On the 4th of October, 1875, the commissioners decided upon the plans for the construction of the railways upon the routes in the locations named.

On the 2d day of September, 1875, The New York Elevated Railroad Company and The Gilbert Elevated Railway Company entered into an agreement, reciting the fact, among others, that some portions of the routes of the respective companies might be located in common ; and whereby they agreed that the New York company should have the right to construct so much of such common routes as lay on the easterly side of the city, between the South Ferry and Chatham Square, and that whenever the Gilbert company should desire to use such part so constructed, it should have the right to do so, upon payment of one half the cost. As to so much of their routes as might be located in common on Ninth Avenue between Fifty-third Street and High Bridge, on the Harlem River, the agreement provided that the road should be constructed jointly, or either company could construct the same, but the other company should not have the right to use the same without first paying one half its cost. The agreement also contained provisions regulating the division of the earnings.

Metropolitan Elevated R. R. Co. *v.* Manhattan Elevated R. R. Co.

On the 27th of October, 1875, the commissioners adopted the form of articles of association for the company to be organized under chapter 606, Laws of 1875, called it the Manhattan Railway Company, fixing the capital stock at $2,000.000.00, and designating routes coincident with those previously fixed for the New York Elevated Railroad Company and the Gilbert Elevated Railway Company; and on the 29th of October, opened books for subscriptions to the stock of the company to be organized—previous announcement of the intention so to do having been given.

Twenty thousand shares were subscribed for by twenty-six subscribers in various amounts, and one hundred thousand dollars were immediately paid in; and on November 10, pursuant to notice by the commissioners, the stockholders met and elected nine directors of the company. The balance of the one hundred thousand dollars of cash paid in upon the stock subscription remaining after the payment of the expenses of the Rapid Transit Commissioners was paid over to the Manhattan company.

On the 1st of December, 1875, the New York Elevated Railroad Company presented its petition to the General Term of the Supreme Court, held in and for the First Department, alleging the refusal of more than one half in value of the owners of property along their route to give the consent required by law, and that the consent of the local authorities had been duly obtained, and asking for the appointment of three commissioners to determine whether or not such railway ought to be constructed. The court thereupon appointed three commissioners, one of whom having resigned, his vacancy was duly filled, who, after hearing the parties interested, reported on the 4th of March, 1876, that the road upon the route fixed by the Rapid Transit Commissioners ought to be built, except that part which was called a route of connection, beginning at the intersection of Ninth Avenue and West Ninety-second Street, which report was duly confirmed by the court on the 15th day of April, 1876.

On the 1st of January, 1876, the New York Elevated

Railroad Company duly executed a mortgage upon its franchise and property, to secure bonds to be issued, to the amount of twelve millions of dollars and interest at seven per cent., payable on the 1st days of January and July in each year; and upon this mortgage, bonds have been issued to the amount of eight and one half millions of dollars.

On the 21st of December, 1877, the New York Elevated Railroad Company and the Gilbert Elevated Railway Company entered into another agreement in furtherance of the agreement of September 2d, 1875, in which they provided, among other things, " That the following portions of the railway structures of the two companies are to be owned or used in common, viz: The line from the intersection of Beaver and Pearl Streets, along Pearl Street, through the New Bowery and part of Chatham Square, to and including the intersection of this line with the line of the Gilbert Elevated Railway coming through Division Street; the line along a part of the line of the Gilbert Elevated Railway, coming through Division Street, to and including the intersection of this line with the line of the Gilbert Elevated Railway coming through Chambers Street and a line on the Ninth Avenue, from Fifty-third Street to One Hundred and Tenth Street."

The agreement further provided for the building of the common structures, and determined the manner in which payments were to be made for the same.

This agreement was guaranteed by the New York Loan and Improvement Company, as owners of the stock of the Gilbert Elevated Railway Company.

On the same day another agreement was made by the railway companies, and guaranteed by the New York Loan and Improvement Company, whereby the New York Company contracted to build the structure on Ninth Avenue, from Fifty-third Street to Sixty-first Street.

In March, 1878, the two companies made another agreement in respect to the tracks on Ninth Avenue, which was guaranteed by the Loan and Improvement Company.

On the 6th day of June, 1878, the corporate name of the

Gilbert Elevated Railway Company was changed to the Metropolitan Elevated Railway Company.

On the 10th of July, 1878, the Metropolitan Railway Company executed a mortgage upon its franchises and property to secure certain bonds to be issued, bearing six per cent. interest, payable on the 1st day of January and July in each year, and of which ten millions eight hundred and eighteen thousand dollars have been issued.

During this summer both of the roads were put into operation, although they were not fully completed.

At this time the Directors of the New York company were :

W. T. Pelton, C. W. Field, A. S. Barnes, David Dows, H. R. Bishop, E. M. Field, Josiah M. Fiske, John D. Mairs, A. H. Barney, D. A. Lindley, J. A. Cowing, Benj. Brewster, John H. Hall; and of the Metropolitan Company : Wm. R. Garrison, John Baird, Wm. Foster, Jr., Geo. M. Pullman, Horace Porter, J. F. Navarro, Geo. J. Forrest, Wm. Adams, Jr., John P. Kennedy, Fausto Mora, Chas. H. Clayton ; and of the Manhattan they were : Wm. T. Pelton, C. W. Field, David Dows, George M. Pullman, Horace Porter, J. F. Navarro, C. K. Garrison, A. H. Barney.

In January, 1879, the following were elected Directors of the New York company :

David Dows, C. W. Field, John H. Hall, A. H. Barney, C. J. Canda, Benj. Brewster, A. S. Barnes, Nathan Guildford (vice Cowing, resigned February 5th), J. D. Mairs, D. A. Lindley, E. M. Field, Heber R. Bishop, Josiah M. Fiske.

It being found desirable by the managers of both the elevated railroad companies that the elevated railroad system should be under one management, not only for the interest of the companies, but also for the interest of the public, a scheme was devised by which the charter of the Manhattan company (whose capital stock was increased for that purpose to thirteen millions of dollars), was to be made use of, and an agreement was entered into between the three companies on the 20th day of May, 1879, called the tripartite agreement.

This agreement recites that the said three companies, for the purpose of avoiding the dangers of crossing elevated railway tracks upon the same level, and otherwise securing to the public of New York the advantage of safer and more rapid transit through the action of one directing body, had agreed as follows:

1st. That the New York and Metropolitan companies should execute leases to the Manhattan company, and after making certain agreements in reference to outstanding contracts, and to payments to be made by the New York and Metropolitan companies, and to the issue of certain additional first mortgage bonds by the Metropolitan company. The agreement provided as follows:

10. In consideration of the premises the "Manhattan company, in addition to assuming payment of the principal and interest of the first mortgage bonds of the New York and Metropolitan companies, as above provided, and the payment of cash rental and guaranteed dividend as provided in the lease, hereby agrees to issue and deliver to the New York and Metropolitan companies its two bonds, each for six millions five hundred thousand dollars, payable on demand, one to James A. Cowing, as trustee for the stockholders of the New York company, and the other to John Baird, as trustee for the stockholders of the Metropolitan company, with authority to the trustees respectively to use the same, if they see fit, in payment for stock of the Manhattan company at par."

Leases were duly executed, bearing date May 20th, 1879, by which the New York company leased its road, etc., to the Manhattan company, and the Manhattan company agreed to pay, by way of rental, the sum of ten thousand dollars annually to the New York company, and to pay the principal and interest upon the first mortgage bonds issued by the New York company, amounting to eight millions five hundred thousand dollars, and also a dividend annually of ten per cent. upon the six and one half millions issued by the New York company, and also all taxes and assessments, etc., of every kind and nature.

The said lease further provided, in case of a failure of the Manhattan company to pay the above amounts, or should it fail to keep and perform any of the covenants and agreements therein contained, that the New York company should have the right to re-enter.

Upon the same day, the Metropolitan company executed a similar lease of its road, etc., to the Manhattan company, containing substantially the same provisions as those contained in the lease by the New York company.

The Manhattan company, upon the delivery of these leases, duly issued its bonds for six and one half millions dollars each, convertible into stock, to Messrs. Cowing and Baird, as trustees, as provided for by the tripartite agreement; and on the 13th of June, 1879, Cowing and Baird surrendered these bonds to the Manhattan company, and each received 65,000 shares of the Manhattan stock. Cowing transferred the stock issued to him to the shareholders of the New York company, and Baird transferred the stock issued to him to the shareholders of the Metropolitan company. The leases by the Metropolitan company to the Manhattan company and the tripartite agreement were duly approved by the stockholders of the Metropolitan company, on the 28th of May, 1879, and also by the stockholders of the New York company.

On the first day of November, 1879, the Metropolitan company made a new mortgage, to secure bonds to the amount of four millions of dollars, with six per cent. interest, payable in May and November—two millions of which bonds were issued.

In July, 1879, the following persons were elected Directors of the Metropolitan company : Wm. R. Garrison, Wm. Foster, Jr., Geo. M. Pullman, Wm. Adams, Jr., J. F. Navarro, John P. Kennedy, Horace Porter, Fausto Mora, Chas. H. Clayton, John Baird, George J. Forrest.

Pursuant to an act of the legislature, passed during this year, the number of directors of the Manhattan company was increased to thirteen, and at the election held in November, 1879, six were taken from the New York Board

of Directors, and six from the Metropolitan Board of Directors, and one was named who was disconnected with either company.

The following persons were elected directors of the Manhattan company :

Wm. R. Garrison, C. W. Field, Geo. M. Pullman, A. H. Barney, J. F. Navarro, Benj. Brewster, Horace Porter, Nathan Guildford, Robert Harris, John Baird, George J. Forrest, Heber R. Bishop, Josiah M. Fiske, Mr. Harris being the thirteenth director, and not connected with either road.

In January, 1880, the following persons were elected directors of the New York company :

Cyrus W. Field, David Dows, A. H. Barney, John H. Hall, Josiah M. Fiske, Jesse Hoyt, A. S. Barnes, J. D. Mairs, H. R. Bishop, Benj. Brewster, D. A. Lindley, E. M. Field, N. Guildford.

And in July, 1880, the following persons were elected directors of the Metropolitan company :

John Baird, Wm. R. Garrison, Geo. J. Forrest, William Foster, Jr., John P. Kennedy, J. F. Navarro, Horace Porter, Geo. M. Pullman, Wm. Adams, Jr., Chas. H. Clayton, Mortimer Ward.

And in November, 1880, the following persons were elected directors of the Manhattan company :

C. K. Garrison, Wm. R. Garrison, George J. Forrest, A. V. Stout, John P. Kennedy, J. F. Navarro, Horace Porter, E. F. Winslow, Arthur Leary, Wm. Foster, Jr., Mortimer Ward, R. M. Gallaway, H. F. Dimock, none of whom were directors in the New York company, and six of whom were directors in the Metropolitan company.

In January, 1881, the following persons were elected directors of the New York company, none of whom were in either of the other boards :

David Dows, A. H. Barney, Josiah M. Fiske, Jesse Hoyt, A. S. Barnes, C. W. Field, John D. Mairs, E. M. Field, H. R. Bishop, Benj. Brewster, D. A. Lindley, John H. Hall, J. A. Cowing.

From the time of the leases above mentioned, the Manhattan company continued to operate the roads, but the result not proving satisfactory to the parties interested in the elevated roads, and probably foreseeing the disasters which subsequently beset the Manhattan company, the directors of both the New York and Metropolitan companies were desirous of effecting a complete union or merger of these corporations with the Manhattan company, and negotiations were had between the companies, during the early part of 1880; but in consequence of the great divergence in the views of the persons interested, as to the values which should be affixed to the respective properties in the scheme of the merger, but little progress was made in the settlement of the difficulties.

In July, 1880, however, all the parties agreed that the following questions, namely:

"What are the comparative rates, under all the circumstances, of the stocks of the New York Elevated Railroad Company and of the Metropolitan Elevated Railway Company to be taken as the basis of merging with the Manhattan Railway Company, under Chapter 503 of the Laws of 1879, to be submitted at the office of the Manhattan Company on Thursday, the 5th of August, at 10 A. M., each company to have four hours for producing evidence, and one hour for any argument it may choose to submit by counsel or other representatives, the relative rates of said stocks to be expressed in percentages, so that the sum of the two shall be 200?" should be submitted to Mr. John A. Stewart, President of the United States Trust Company, Mr. R. G. Rolston, President of the Farmers Trust and Loan Company, and Mr. Henry F. Spaulding, President of the Central Trust Company, who should hear the parties and their evidence, and determine the same as arbitrators; and the various boards of directors stipulated to abide by the decision, so far as to recommend it to the stockholders for approval. The arbitrators met, took a large amount of evidence, heard the parties; and on the 15th of September 1880, made the following report:

"Award of John A. Stewart, R. G. Rolston and Henry F. Spaulding, arbitrators :

"The subscribers, to whom as arbitrators has been submitted by the New York Elevated Railroad Company and the Metropolitan Elevated Railway Company, the question:

"'What are the comparative rates, under all the circumstances, of the stock of the New York Elevated Railroad Company and of the Metropolitan Elevated Railway Company, to be taken as a basis of merging with the Manhattan Railway Company, under chapter 503, Laws of 1879.'"

"Having heard and weighed the testimony presented by both companies, and having given due consideration to the matter, decide :

"That the comparative rate at which the stock of the New York Elevated Railroad Company shall be taken is 110; and that the comparative rate at which the stock of the Metropolitan Railway Company shall be taken as 90, as the basis of merging with the Manhattan company, under Chapter 503, Laws of 1879.

"JOHN A. STEWART,
"R. G. ROLSTON,
"HENRY F. SPAULDING,
"Arbitrators.

"New York, September 15, 1880."

This decision was accepted by the directors of the companies, and recommended to the stockholders to be carried into effect.

Stockholders' meetings were held, but the scheme seems to have had no vitality, and was allowed to drop, and no action was taken.

The profits arising from the elevated roads, not by any means meeting the great expectations which had been indulged in, and taxes having been levied upon the properties of the New York and Metropolitan companies, as well as upon the Manhattan, which do not seem to have been anticipated, the Manhattan company, in the early part of the year 1881, found that it would be impossible, from the revenues derived from the roads, to meet the various en-

gagements which they had undertaken in the leases above mentioned, and that company became insolvent and unable to meet its obligations—the Metropolitan roads earning barely sufficient to pay all fixed charges upon the road leaving nothing for a dividend to the stockholders, while the New York road earned sufficient to pay its fixed charges and also a dividend to its stockholders.

In April, 1881, Mr. Gallaway, the President of the Manhattan company, sent an open letter to the Mayor of the City of New York, arguing that some measures should be taken to relieve the Manhattan company of the load of taxes which had been imposed upon it, otherwise it would be driven into hopeless insolvency. Upon this confession being brought to the notice of the Attorney-General of this state, he, on the 18th of May, 1881, upon a bill alleging many of the facts above mentioned, and that the Manhattan company, at the time of the making of the leases above mentioned, was not a *bona fide* existing corporation, and that it was hopelessly insolvent, obtained an order to show cause, from one of the judges of this department, returnable on the 27th day of May, 1881, why a receiver of the property of the Manhattan company should not be appointed. This motion was adjourned from time to time, and finally, on the 8th day of July, 1881, an order was entered discontinuing the said action.

In the meantime, and on the 29th day of June, 1881, Frank M. Weiler, by Lawrence & Waehner, his attorneys, commenced an action in the Court of Common Pleas, against the Manhattan Railway Company, the Metropolitan Railway Company, and the Central Trust Company of New York, claiming to be the holder of five of the first mortgage bonds of the Metropolitan Railway Company, and after alleging certain facts and the insolvency of the Manhattan Company, in his complaint demanded, among other things, that the said companies be enjoined from paying out any moneys to the stockholders of the Metropolitan company. This complaint was verified by Mr. Frank R. Lawrence, and an order to show cause, with a preliminary injunction, was granted

thereon, returnable on the 6th day of July, and was adjourned to July 27th, when the motion was argued; and on the 6th of October, a consent to discontinue was duly given, and the motion never decided.

On the said 29th of June, 1881, an action was commenced in the said Court of Common Pleas, by Mr. George S. Lespinasse, claiming to be a bondholder of the New York company, by a summons and complaint alleging default in the payment of interest upon the bonds and the insolvency, etc., of the Manhattan company, and praying that the defendant companies might be restrained from distributing any of the income derived from the New York road among the stockholders of the New York company, and an order to show cause returnable July 6th, 1881, was granted, with an injunction in the meantime, restraining the companies from distributing any of the income derived from the New York company's properties among the stockholders of said company. I cannot find any evidence as to what became of this order, but the injunction seems still to have existed at the time of the answer served in the Superior Court suit, hereinafter mentioned, and was probably argued at the same time as the motion in the Weiler suit, as it seems to have been adjourned to the same day.

On the 30th of June, 1881, Mr. S. H. Kneeland, a stockholder in both the Manhattan and Metropolitan companies, sent the Manhattan company the following letter:

"NEW YORK, June 30, 1881.

" *To the Board of Directors of the Manhattan Railway Company :*

" The undersigned, a stockholder of the Manhattan Railway Company, for himself and others similarly interested, now formally propose to your company to buy one million, par value, of an income bond to be created by the Manhattan Railway Company, secured by its property and franchises, bearing cumulative interest warrants at the rate of six per cent. per annum, to be paid out only from the income of the Manhattan Railway Company, the length of

the bond and other details to be arranged to mutual satisfaction, and to pay for the same at sixty per cent. of the par value of said bonds. This offer is upon the conditions following :

" 1.—That the said bonds be first offered upon reasonable notice for subscription to stockholders of the Manhattan Railway Company, the undersigned and his associates obligating themselves to take all the bonds not subscribed for by the stockholders.

" 2.—That you will arrange that seven persons, stockholders of the Manhattan Railway Company, to be nominated by the undersigned and his associates, shall, immediately after the creation of such bond, be elected to the Board of Directors of the Manhattan company.

" In view of this crisis in the affairs of the company, it is important that we have immediate action upon this request.

(Signed)     S. H. KNEELAND."

Mr. Kneeland was very positive that this letter was sent at a much earlier date, but the judge before whom the case was tried held that it was proven with reasonable certainty, that June 30th was the true date. This proposition seems to have been deemed entirely inadmissible, and was not accepted.

On the 1st day of July, the Manhattan company made default in the payment of the interest on the bonds of the New York and Metropolitan companies, and also in the payment of the dividends upon the stock. The interest upon the bonds was, however, paid out of moneys loaned to the New York and Metropolitan companies, by friends of the companies.

The time for the election of a board of directors for the Metropolitan company was early in July, 1881, and Mr. Kneeland, a large stockholder in the Metropolitan company, and the holder of proxies from numerous stockholders deeming a change in the direction advisable, consulted with Mr. Sage as to the persons whom it would be best to secure, and Mr. Gould was mentioned, either by Mr. Sage or Mr.

Kneeland, as a desirable person to interest in the elevated railroad enterprise; and Mr. Kneeland saw Mr. Gould, and after repeated interviews with Mr. Gould and Mr. Sage, it was agreed that Mr. Gould and his friends, Mr. Sloan, Mr. Sidney Dillon, Mr. G. M. Dodge, and Mr. W. E. Connor (the latter of whom was a partner of Mr. Gould), and also Mr. Sage, should become directors, making a majority of the board, and Mr. Kneeland duly qualified Mr. Sloan, Mr. Dillon, and Mr. Dodge, by transferring stock in their names, and on the 5th day of July, 1881, the following were elected directors of the Metropolitan company : Jay Gould, Russell Sage, Samuel Sloan, Sidney Dillon, Wm. R. Garrison, Horace Porter, J. F. Navarro, S. H. Kneeland, J. S. Stout, G. M. Dodge, W. E. Connor, three of whom, Messrs. Garrison, Porter and Navarro, were directors in the Manhattan company.

On the 2d day of July, 1881, the Attorney-General commenced a second action, in the county of Albany, on behalf of the people, against the Manhattan Railway Company, alleging the insolvency of said company, the complaint in which action was verified by Mr. Frank R. Lawrence. Upon this complaint and certain affidavits thereto annexed, Mr. Justice WESTBROOK, on the 5th of July, granted an order requiring the Manhattan company to show cause, on the 13th of July, at Kingston, Ulster County, why a receiver should not be appointed.

On the 13th day of July, the motion was duly heard, and Messrs. John F. Dillon and Amos Lawrence Hopkins were appointed receivers of the Manhattan Railway Company. The receivers duly qualified, and entered upon the discharge of their duties.

On the 3d of July, 1881, the New York company commenced its action in the Superior Court of this city against the Manhattan company and the Metropolitan company, claiming the right to take into its possession again, its property delivered to the Manhattan company under the lease and tripartite agreement, because of the insolvency of the Manhattan company. Upon this complaint and

affidavit annexed, an order to show cause was granted, returnable on the 6th day of July, 1881, why the property of the plaintiff, held by the Manhattan company, should not be delivered over to it; which motion was adjourned by several adjournments to November 28th, 1881.

The Metropolitan company, on or about the 16th day of July, 1881, put in its answer, setting up the proceedings in the courts as a reason why the relief asked for by the plaintiff should not be granted, and on the 25th of July the Manhattan company also answered.

On the 22d day of July, 1881, the New York company presented its petition to the court, in the second action by the People against the Manhattan company, alleging the defaults of the Manhattan company, and praying that the Manhattan company and its receivers might be directed to deliver up the property of the New York company to that company.

About this time it began to be rumored that the Manhattan company had a claim for $13,000,000 against the New York and the Metropolitan companies, because of the issue to these companies of $13,000,000 of the Manhattan stock, and for which these companies had paid nothing; and in August certain philanthropists applied to Mr. Justice Emott and Messrs. Allison & Shaw for their opinion upon the question, and opinions were given that the claim was well founded, because the Manhattan company had received no value for its stock.   That while there was no doubt but that a corporation might issue its shares for property, yet the shares would be paid only to the extent of the true value of the property received in exchange for them, and if that property was entirely valueless, then not to any extent.   That the leases in question possessed no value, because of the large rental reserved in them, and that in point of fact the attempt to pay the charges provided for in these leases had reduced the Manhattan company to insolvency, and a letter was sent by a Mr. Earl, claiming to be a stockholder of the Manhattan company, to that company, requiring the enforcement of this claim.   The

company replied that the claim was a doubtful one, as they were advised, and its enforcement might involve a great deal of costly labor, and that they would prefer that the claim should be enforced by any stockholder who desired so to do.

About the 1st of September, 1881, one John C. Watson, of Boston, filed his bill in the United States Circuit Court for the Southern District of New York, as a stockholder of the Manhattan company, against the New York, Metropolitan and Manhattan companies, and Messrs. Dillon and Hopkins, as receivers, claiming that the Manhattan company should recover from the New York and Metropolitan companies, thirteen millions of dollars, the par value of the Manhattan stock issued to the New York and Metropolitan companies, and divided amongst their stockholders, as above stated.

On the 27th of September, 1881, the board of directors of the Manhattan company passed a resolution requesting the receivers to issue certificates, in order to provide means to meet any deficiency that had arisen, or might arise, in the amounts due to the two lessor companies, and on the 29th of September, an application was made, by the receivers of the Manhattan company, to Mr. Justice WESTBROOK, upon a petition alleging that there had been default in the making of the payments under the leases, and that the period was fast approaching when the New York and Metropolitan companies could re-take possession of their property, by reason of this default, according to the terms and provisions of these leases, and asked leave of the court to issue receivers' certificates at a rate of interest not exceeding twelve per cent. per annum, upon which to raise sufficient money to make the payments as to which default had been made.  The New York company opposed this application upon the ground of inexpediency, and because it would be creating a new lien upon their property, in derogation of liens already existing.

The following action was taken by the Metropolitan board, on September 28th, 1881:

" On motion of Mr. S. Sloan, seconded by Mr. Sidney Dillon, it was *Resolved* unanimously, that it is not expedient for this company to appear in the application made by the receivers of the Manhattan Railway Company for the issue of certifiates."

The minutes continue, as follows:

" The board had under discussion the relation of this company to the New York and Manhattan companies generally. No conclusion was arrived at. A committee, consisting of Messrs. Russell Sage, Jay Gould, and Jose F. Navarro, was appointed to take legal advice if necessary, and such steps as may be expedient to protect the best interests of this company; on motion of Mr. Dillon, seconded by Mr. Sloan, and carried unanimously."

Affidavits were also read in opposition to this motion, made by Mr. Gould, Mr. Sage and Mr. Connor, all of whom concurred in the opinion that the Manhattan company was hopelessly and irretrievably insolvent, and that the granting of the prayer of the petition would simply prolong, for a few months, a hopeless struggle on the part of the Manhattan company for a continuance of its existence.

Mr. Justice WESTBROOK granted an order for receivers' certificates, not to exceed in amount one million of dollars, but refused to attempt to make them a lien prior to the liens already existing upon the various properties. These certificates could not be negotiated, and no money was raised by their means.

The petition of the New York company to get back its road was brought to a hearing on the 14th of September, and had not been decided, when on the 30th day of September the New York company presented a supplementary petition, setting forth that the ninety days mentioned in the leases had elapsed, that the payments reserved by the leases had not been made; that they had demanded possession of their property from the Manhattan company; and they claimed that they were entitled to the possession of their property, and as it was in the possession of the court, they asked that it might be surrendered to them.

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

The receivers of the Manhattan company answered on the 8th of October, 1881, setting up the fact of the existence of the Watson suits, hereinbefore mentioned, and stating the claim which was being attempted to be enforced in that action against the New York company, and that the legal rights and equities of the petitioning company and the Manhattan company were involved in that cause; and that this was another attempt to enforce a forfeiture summarily, and not by the pursuit of a proper remedy by an action at law; and that the New York company had then an action pending in the Superior Court of the City of New York, to enforce the alleged forfeiture. The Manhattan company also answered, setting up its claim for $6,500,000 against the New York company, on account of the Manhattan stock issued to it. Messrs. Porter, Lowery, Soren & Stone, had been acting as counsel for the Metropolitan company, but at this time, pursuant to directions received from Mr. Sage, president of that company, Messrs. Lawrence & Waehner were substituted as attorneys for the Metropolitan company, in that action. This motion was denied on the 14th of October, 1881, Mr. Justice WESTBROOK delivering an elaborate opinion, in which he adverts to the claim of the Manhattan company against the New York and Metropolitan companies, and suggests that the claim of the Manhattan company may be well founded in law.

During the progress of the hearing upon this motion, in September, a suggestion was made by the Attorney-General, that the parties interested ought to arrange a settlement of the various matters of difference between these companies, and negotiations were commenced between the parties; various propositions were broached and discussed, and various modifications of the leases which would enable the Manhattan company to continue the operation of the roads were proposed. It seemed to have been conceded, early in the negotiations, that some settlement must and would be made, upon the basis of concessions to be made by both the New York and Metropolitan companies; but there was a great difference of opinion as to how great these concessions

were to be, and whether in the new arrangement, the New York company, in view of its large earnings, should not have some preference, both in amount of rental and in order of payment.    This claim of the New York company was resisted by the Metropolitan company, Mr. Kneeland, one of the directors, persisting that this disparity of earnings did not exist, and that the prospects for the future were much more brilliant for the Metropolitan company than for the New York company, whose limit of accommodation had been reached.    Mr. Kneeland also claimed that portions of the Metropolitan road, particularly that on the Second Avenue, were operated in such a manner—being stopped at Chatham Square and not running during the night—as to divert travel to the Third Avenue road, and that this was one of the reasons why the earnings of the Second Avenue line seemed so small.    The officers of the Manhattan company claimed that no unjust discrimination against any portion of the Metropolitan roads was observed, and that the Second Avenue line, when it ran through to South Ferry, made no better showing after due allowance made for the passengers transferred to the Third Avenue line at Chatham Square.

It was claimed, by the New York company and the Manhattan company, that the Second Avenue line could not pay its way in years, if ever, because of the height of the stairs by which the stations were reached, which were very much longer than those upon the Third Avenue road.    Mr. Kneeland also claimed that the future of the Second Avenue line was much greater than that of the Third, because it could accommodate four tracks, and that some connection could be made across the Harlem River, with the surface roads coming to the city at that point, and that their engines and cars could be run as through express trains, over the Second Avenue structure, down to Twenty-third Street.    It is very doubtful if there was any foundation for this expectation, for the reason that the Second Avenue structure was not strong enough to sustain the heavy engines and cars used on surface roads, and certain other difficulties, not now necessary to mention.

The Manhattan company also urged its claim for thirteen millions against the New York and Metropolitan companies as a reason why large concessions should be made in case that claim was abandoned.

These negotiations finally resulted, on the 13th day of October, 1881, in the appointment of conference committees by each of the three companies.   The members of the committee appointed by the Metropolitan company were Mr. Russell Sage, the President of the Metropolitan company, Mr. Jay Gould, Mr. Samuel Sloan, and Mr. Sylvester H. Kneeland.   The Manhattan company appointed its President, Mr. Galloway, Mr. Navarro, General Porter, and Mr. Forrest, as its committee, two of whom, Mr. Navarro and General Porter, were directors in the Metropolitan company; and the New York company appointed its President, Mr. Cyrus W. Field, Mr. Hall and Mr. Bishop its committee. These committees had two meetings at Delmonico's, at one of which meetings, according to Mr. Kneeland's testimony, the lunch provided was discussed with much more earnestness than the subject which brought them together, and there was no special discussion of any terms of settlement. The other members of the committee, however, state that a meeting of the conference committee was held on the 13th day of October, 1881, at which all the members were present, and that at that time Mr. Cyrus W. Field, of the New York company, submitted the following proposition, as a settlement of the controversies, differences and claims between the three companies:

## "PROPOSITION.

"*First.*—Discontinuance of all suits and payment to the New York company of all moneys due and unpaid it on lease to date, and payment to Metropolitan company of interest due on its bonds July 1, 1881, this payment to be made from cash now on hand and first moneys received from the operation of the railways after payment of operating expenses.

"*Second.*—Lease to the Manhattan company to be mod-

ified, so that all moneys received by it from the operation of the roads shall be used, (1) for the payment of operating expenses and maintenance of structures; (2) taxes and assessments; (3) interest on bonds of the New York and Metropolitan companies; (4) payment to the New York company of six per cent. per annum, payable quarterly, on its capital stock; (5) payment of four per cent. per annum, payable quarterly, on the capital stock of the Metropolitan company from the income derived by the Manhattan company from the operation of the lines of railway owned by the Metropolitan company, if earned, after payment of taxes thereon, operating expenses thereof and interest on its bonds; (6) all income remaining after payments, as hereinbefore provided, to be distributed among the stockholders of the Manhattan company until such distribution shall amount to four per cent. per annum on its capital stock, the balance over such four per cent. to be equally divided between the New York and Metropolitan companies and the Manhattan company.

" *Third.*—The three companies to execute an agreement to make the above modification;" that this proposition was discussed by the members, and the meeting adjourned to meet at one o'clock on the next day, October 14th. Upon the morning of the 14th, meetings were held of the boards of directors of all three companies, at which the above proposition of Mr. Field was submitted.

The minutes of the Metropolitan company, in respect to the action of its board of directors, are as follows:

" The proposition was discussed fully and freely by the board. The sense of the board generally favored the acceptance in the main of so much as is set forth in the first and third paragraphs, and also what is contained in sections 1, 2, 3, and 4 of the second paragraph; but that it was desirable to amend sections 5 and 6 of the said paragraph. On motion of Mr. Samuel Sloan, seconded by Mr. Sidney Dillon, it was *Resolved* that the whole matter of the aforesaid proposition be referred to the same committee, Messrs. Sage, Gould, Kneeland, and Sloan, with power."

The minutes of the New York company show the following action by its board of directors:

"After a full discussion of the subject, it was moved by Mr. Barnes, and seconded by Mr. Dows, that the following resolution be adopted:

"*Resolved*, That the above proposition, suggested by Mr. Field, the President of this company, at a meeting of the representatives from the boards of directors of the New York, Metropolitan and Manhattan companies, held October 13th, 1881, is hereby ratified and approved, subject to ratification of the stockholders of all three companies; and the president of this company is hereby authorized to execute any and all papers necessary to carry the same into effect, provided the same is ratified by the shareholders of all three companies as soon as it can be legally done."

Seven of the directors voting in favor of this resolution, and three, Messrs. Barney, Bishop, and Brewster, voting against it.

The following appears to have been the action of the directors of the Manhattan company:

"The committee appointed October 13th to adjust the differences between the three elevated companies, reports that a meeting had been held and no action taken yet.

"On motion of Mr. Dimock, seconded by Mr. Kennedy, the committee were continued with the same full powers."

Subsequent to these meetings of the boards of directors, on the same day, the conference committees had another meeting, and the following resolution was adopted by the votes of all the members of the conference committees, except Mr. Kneeland.

"*Resolved*, That the proposition of the New York company be and is hereby approved, provided the Metropolitan and Manhattan companies shall be at liberty to adjust what shall be the share of their respective properties in the division, such settlement not to affect the allotment named in the plan proposed by the New York company to that company. All to be signed and agreed to on or before the first of November."

Mr. Kneeland, during all this time, contended that the Metropolitan company was entitled to better terms than those which were offered, and the Metropolitan company did not assent to the propositions which had been agreed to by the conference committees.

On the 22d of October, 1881, at a meeting of the board of directors of the New York company, the resolution of the 14th of October, 1881, was rescinded, and the following resolution adopted:

"*Resolved*, That the president of this company be, and he hereby is authorized and requested to appoint an additional member of the committee heretofore appointed, to settle all matters of difference between this company and the Manhattan company. That said committee be authorized to negotiate with the Manhattan company and the Metropolitan company for a modification of the tripartite agreement and lease from this company to the Manhattan company upon such terms as to the committee shall seem best. That the president and secretary of this company be, and they hereby are authorized and empowered to execute and deliver in triplicate, to the Manhattan and Metropolitan companies, any and all contracts containing the terms and conditions of the modification of said tripartite agreement and lease, as shall be agreed upon between said committee and said Manhattan and Metropolitan companies, and which may be necessary to carry said agreement into effect.

" The president appointed Mr. George S. Scott a member of such committee."

Negotiations had been continued by the committees, and, finally, on or about the said 22d day of October, 1881, the parties settled upon the form of an agreement, which is called the agreement of October 22d, 1881, as the basis upon which all differences were to be settled and adjusted; the principal changes made in the tripartite agreement and leases of May 20th, 1879, being a reduction of the dividend rental from the ten to six per cent., and a provision that the dividend rental to the New York company should be paid before that to the Metropolitan company.

Upon the same day, October 22d, a meeting of the board of directors of the Metropolitan company, at which all were present, except Mr. Garrison and Mr. Navarro, was held, and the following action was taken, as appears by the minutes of that company.

" The President, on behalf of the committee of four, with power, having charge of the proposition set forth at the last meeting of this board, reported that an agreement had been made between the three companies, which was read to the board and submitted for approval. Having been discussed at length, on motion of Mr. Sloan, seconded by Mr. Gould, it was *Resolved*, That the agreement now read between this company, the Manhattan company, and the New York Elevated Railroad Company, dated October 22d, 1881, be and the same is hereby ratified and approved, and that the president and secretary be and they hereby are instructed to subscribe the said tripartite agreement with the corporate name of this company, to attach the corporate seal thereto, duly attested, and deliver the same as the acts and deeds of this company, in exchange for a duly executed triplicate of said agreement on the part of the said Manhattan and New York companies; which resolution was carried. Eight directors—Messrs. Sage, Gould, Dillon, Connor, Dodge, Porter, Sloan, and Stout—voted aye ; one director, Mr. Kneeland, voted no."

The plaintiffs claim that the vote of Mr. Stout is not correctly entered upon the minutes, that he also voted no.

The board of directors of the Manhattan company held a meeting on the same day, and the following action was taken :

" President Gallaway, from the committee appointed October 13th, reported that said committee, after careful deliberation, had entered into an agreement with the other two elevated companies, dated October 22d, 1881, for the full adjustment of the differences between them, which agreement he submitted to the board.

" On motion of Gen. Winslow, the report of the committee was received, and the agreement ordered entered in full on the minutes of the company.

" Upon reading the foregoing agreement, and after a due and careful consideration thereof, it was, on motion of Gen. Porter, seconded by Mr. Dimock, unanimously *resolved*, That the said agreement between the three elevated companies, above recorded, bearing date October 22d, 1881, be and the same is hereby adopted, ratified and confirmed by this board.

" *Resolved*, Further, that the president of this company be and he is hereby authorized and instructed to sign said agreement on behalf of the company, and the secretary is hereby directed to attach thereto the seal of this corporation, and attest the same."

On the 24th of October, 1881, the board of the Metropolitan company met. Present, Mr. Sage in the chair, and Messrs. Gould, Dillon, Navarro, Connor, Dodge, Kneeland, Stout, Porter and Garrison; and the following proceedings were had:

" The minutes of the last meeting were read and approved. The secretary informed the board that after the signing and sealing of the aforesaid agreement by the president and secretary, an amendment was proposed in certain particulars which was duly considered by the committee, and being deemed for the interest of the company, they were agreed to, and the agreement amended in the following form, with the supplementary agreement thereto appended, and duly signed, sealed and delivered by the president and secretary in exchange for a duly executed triplicate of said agreement by the New York and Manhattan companies.

" It was *Resolved*, That the execution and delivery by the officers of the company of the foregoing agreement, dated October 22d, 1881, between the New York Elevated Railroad Company, the Manhattan Railway Company and this company, with the supplementary agreement of like date thereto annexed, be and the same is hereby ratified, approved and confirmed;

"And *Resolved*, That the counsel of the company (under direction of the president) take such measures as may be necessary to carry the said agreements into effect, to procure

the railways, property and moneys now in possession of the receivers of the Manhattan Railway Company to be restored to the possession of the said company, and to procure the Manhattan Railway Company to be relieved from any injunction, order or legal restraint, which now prevents or interferes with the perfect discharge by said company of any of its functions, or restrains it from carrying on its business.

" Eight directors, Sage, Gould, Dillon, Navarro, Connor, Dodge, Porter and Garrison, voted aye ; one director, Mr. Kneeland, voted no ; one director, Mr. Stout, declined to vote, and the resolution was carried."

By the supplemental agreement, the rental dividends to the New York company were made cumulative, and its claim under the leases were to be paid up to and including October 1, 1881.

On the same day the directors of the New York company met, and the following action was taken :

" The minutes of the meeting of October 22d were read and approved.  Mr. Field reported the result of the negotiation of the committee with the Manhattan and Metropolitan Railway companies, and the execution and delivery by him to them of the contract modifying the tripartite agreement and lease made May 20th.  Mr. Field presented the opinion of the Hon. Geo. F. Comstock upon the question of the right of the directors of this company to make an agreement modifying the tripartite agreement of May 20th, 1879, without submitting the same to the stockholders.  His opinion was addressed to the counsel of the company, Mr. E. R. Bacon, who concurred in the same.  Mr. Field also read a letter from Judge Comstock, in which he stated that he considered the settlement a fair and judicious measure under all the existing circumstances.  After a full discussion of the subject, it was, upon motion of Mr. Cowing, seconded by Mr. Lane, unanimously *resolved*, That the report of said committee be accepted, and that the execution and delivery of said contracts of October 22, 1881, be and the same are hereby in all things approved, ratified and affirmed."

This agreement was never ratified in any manner by the stockholders of the Metropolitan company, which was considered by the counsel of the respective parties, viz.: Judge Comstock, Mr. David Dudley Field, Mr. E. R. Bacon, Messrs. Lawrence & Waehner, and Messrs. Alexander & Green, as unnecessary.

On the 25th of October there was a meeting of the directors of the Metropolitan company, at which the following action was taken:

"The minutes of the last meeting were read and confirmed.

"Mr. Sloan proposed the following resolution, which was seconded by Mr. Connor and carried:

"*Whereas*, The modified agreements require new certificates, therefore, under the advice of counsel, it is hereby *Resolved*, That the transfer books be closed forthwith and remain closed from this date until the first day of November next."

The interest of the various directors of the Metropolitan company in the shares of the several companies on the 22d of October, 1881, seems to have been as follows:

Mr. Gould held twenty-five hundred shares of the stock of the Metropolitan company, bought in September; also five thousand shares of the stock of the New York company, bought in September and October; also twenty thousand shares of the Manhattan company, bought, as appears by the following statement:

"Statement of the amount of Manhattan Railroad Company's shares held by Jay Gould up to and including October 21st, 1881, showing the amount held at the close of each day, the stock being bought at the market rate from day to day, as per statement:

| | | |
|---|---|---|
| September | 30 | 600 |
| October | 1 | 3,250 |
| " | 4 | 4,900 |
| " | 5 | 4,950 |
| " | 6 | 5,350 |

Metropolitan Elevated R. R. Co. *v.* Manhattan Elevated R. R. Co.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| October | 7 | . | . | . | . | . | 10,000 |
| " | 8 | . | . | . | . | . | 12,500 |
| " | 13 | . | . | . | . | . | 16,250 |
| " | 14 | . | . | . | . | . | 18,200 |
| " | 17 | . | . | . | . | . | 18,950 |
| " | 21 | . | . | . | . | . | 20,000 |

Mr. Sloan held 100 shares in the Metropolitan, 100 shares in the New York, and 100 shares in the Manhattan company.

Mr. Russell Sage held, at the time of the election, in July, over 2,000 shares of Metropolitan, about 200 shares in New York, and was short of Manhattan; and on the 21st of October was short of Manhattan 5,200 shares; on October 22d he bought 3,000 shares of Manhattan; October 24th, 200; October 25th, 2,300, and sold, October 25th, 100 shares. On the 22d of October, 1881, he held 1,200 shares of Metropolitan, and about 900 shares of New York.

Mr. Sidney Dillon held, October 22d, 1881, no Metropolitan, 100 shares of Manhattan and 100 shares of New York.

Mr. William R. Garrison held, October 22d, 1881, 518 shares of the Metropolitan company, 300 shares of the Manhattan company.

Gen. Horace Porter held, in October, 1881, about 100 shares of Metropolitan, and on October 22d, 1881, ten shares of Manhattan, having purchased 1,000 shares September 9th, and sold them September 28th and 29th, and 1,000 shares on the 3d and 4th of October, and sold them October 7th.

Mr. Navarro held, on the 22d of October, 1881, 1,000 shares of the Metropolitan, 6,100 shares of the Manhattan, and 4,000 shares of the New York company.

Mr. Kneeland held, on the 22d of October, 1881, about 13,000 shares of the Metropolitan, and 7,100 shares of the Manhattan company, which he sold out subsequently at a profit of about $70,000.

Mr. J. S. Stout, according to the stock ledger, held on the 22d day of October, 1881, 4,002 shares of Metropolitan and 300 shares of Manhattan.

Mr. Dodge does not seem to have held any stock in any of the companies on the 22d of October, 1881.

Mr. Connor, according to the stock ledger, held on the 22d of October, 1881, 100 shares of the Metropolitan company, and 1,100 shares of the Manhattan company.

The firm of W. E. Connor & Co. had standing in its name, on October 8th, 1881, 12,400 shares of the Metropolitan company, a large portion of which it claimed was borrowed stock, and transferred for the purposes of the election.

But little reliance is to be placed upon the evidence of the ledger, as to the condition of the holdings of any particular individual, at any given time, as all the stock appearing upon the ledger may have been sold and resold and sold again many times, long before any transfer of it was made upon the books of the company.

On the 25th of October, 1881, the three companies presented their petition to the Supreme Court in the suit of The People against The Manhattan Railway Company, at Monticello, Sullivan County, Mr. Justice WESTBROOK presiding, alleging the making of the agreement of October 22d, 1881, whereby all differences between the three companies had been settled and adjusted, and whereby it had been agreed that the Manhattan company should obtain immediate possession of the property in the hands of the receivers, and that such possession was necessary in order that the provisions of said contract of settlement should be carried into effect, and praying a dissolution of the injunction theretofore granted in the action restraining the Manhattan company from exercising any of its functions, and a restoration of the railways and property then in the hands of the receivers, except that the receivers should be permitted to retain such amount of money as might be necessary to defray the costs and expenses of the administration of the trust.

The Attorney-General not opposing, but submitting the matter to the judgment of the court, upon the consent of the attorneys for the three companies, and also of the receivers, an order was made granting the prayer of the

petition, the injunction was dissolved, and all the property in the hands of the receivers was directed to be delivered to the Manhattan company, except the sum of $75,000, which the receivers were directed to retain until the further order of the court.

Prior to this various actions had been commenced against the Mayor, Aldermen and Commonalty of the City of New York to restrain the collection of the taxes imposed, as before mentioned, upon the railway property, upon various grounds, and various sums had been paid into court by the Manhattan company. Except as here stated, none of the taxes have been paid by the Manhattan company, except some amounts of capital tax.

On the 27th of October, 1881, Messrs. Burnham & Berry commenced an action in the Supreme Court, as stockholders of the Metropolitan company, against the three companies, to set aside the agreements of October 22d, 1881, as null and void, upon the ground that the nine directors who approved these agreements had violated their trusts, in promoting the interest, rather of the Manhattan company than of the Metropolitan company; that three of the directors of the Metropolitan company were also directors of the Manhattan company; and because these agreements had never been submitted to the stockholders for ratification.

On November 3d, 1881, Messrs. Gould and Sage were elected directors of the New York company.

On the 9th day of November, 1881, there was held the regular annual meeting of the stockholders of the Manhattan company, at which Mr. Gallaway, on behalf of the directors, reported to the stockholders the commencement of the People's suit, the appointment of the receivers, the petition of the New York company to get back its property, the denial of this motion on the 4th of October, the application of the receivers for leave to sue the New York and Metropolitan companies for $13,000,000; that negotiations were had with a view of settling all differences, and that these negotiations finally culminated in the agreement of October 22d, 1881; and that thereupon the court ordered

the re-delivery of the property into the hands of the company; and that releases had been executed by the Manhattan company to the other two companies; whereupon the following action was taken:

"*Resolved*, That the stockholders of this company hereby ratify and confirm said agreement and supplemental agreement and releases;

"*Resolved further*, That while the stockholders of this company regard with satisfaction the settlement thus made with the New York and Metropolitan companies, they recommend that means be taken to merge into the stock of this company the stock of the said two other companies — that is to say, that a surrender or transfer of the capital stock of the New York and Metropolitan companies be made by their stockholders to this company and accepted by them, and for that purpose they approve and authorize the issue of a like additional amount of stock of this company, not exceeding in aggregate the stocks of the New York and Metropolitan companies, that is to say, thirteen millions of dollars, on such terms and conditions as may be agreed upon by the two companies. Which resolution was carried with unanimous consent."

At this same meeting of shareholders, the following were elected directors of the Manhattan company: Jay Gould, Russell Sage, Samuel Sloan, Sidney Dillon, Wm. R. Garrison, C. W. Field, H. F. Dimock, E. M. Field, Geo. S. Scott, R. M. Gallaway, W. E. Connor, John H. Hall, George J. Gould.

On the 11th day of November, 1881, Benjamin W. Gillette commenced an action in the United States Circuit Court for the Southern District of New York, against the three railway companies, upon a bill filed containing substantially the same allegations as those in the above complaint of Burnham and Berry, and praying for the same relief. An order to show cause for an injunction, with an *ad interim* stay, was granted, which was disposed of at the same time that the motion for an injunction in the action

of Flagg, hereinafter mentioned, was denied, and the defendants duly answered, and the complainant's bill was on the 26th day of April, 1883, dismissed upon his own motion.

On or about the 14th day of November, 1881, an agreement was proposed to the directors of the three companies, for a complete merger of the capital stock of the New York and Metropolitan companies into that of the Manhattan company. This agreement provided that the Manhattan company should take a surrender or transfer of all the shares of stock of the shareholders of the New York and Metropolitan companies, and issue in exchange therefor the like additional amount of shares of the Manhattan company, the shares thus to be issued to the shareholders of the New York company to be called first preferred stock, and to be entitled to the payment of dividends at six per cent. per year, payable out of the net earnings, and if there should be in any year any deficiency, such deficiency was to be made up before any dividends were paid upon any other class of stock. The shares to be issued to the shareholders of the Metropolitan company to be called second preferred stock, and to be entitled to the payment of dividends at six per cent. per year, payable out of the net earnings of the company during the year, after the first preferred shareholders have received full dividends for all time previous; but, if the net earnings in any year, after the payment of dividends to the first preferred shareholders, did not amount to six per cent., the deficiency was not to be made up out of the earnings of any future year, or in any manner whatever. The present shares of the Manhattan company, amounting to $13,000,000, were to be called common stock, and to be entitled to dividends out of the net earnings of the company, after payment of the dividends to the first and second preferred shareholders.

On the 14th of November, 1881, Mr. Cyrus W. Field was elected a director of the Metropolitan company in the place of G. M. Dodge, resigned, and at that meeting the above proposed agreement was read to the board, and the following action was taken:

" On motion of Mr. Washington E. Connor, seconded by Mr. Samuel Sloan, it was *Resolved*, That the agreement now read between this company, the New York Elevated Railroad Company and the Manhattan Railway Company, dated this 14th day of November, 1881, be, and the same is hereby approved and adopted.

" The yeas and the nays being called, Messrs. Sage, Dillon, Field, Connor and Sloan, five directors, voted 'aye;' Mr. Kneeland and Mr. Stout, two directors, voted 'no.' The resolution was carried.

"On motion of Mr. C. W. Field, seconded by Mr. S. Sloan, it was *Resolved*, That the agreement now approved and adopted by this board be executed by the proper officers of this company. That the president and secretary be and they are hereby instructed to subscribe the said tripartite agreement with the corporate name of the company, to attach the corporate seal thereto duly attested, and deliver the same to the New York and Manhattan companies as the acts and deeds of this company, in exchange for a duly executed triplicate of said agreement on the part of the said New York and Manhattan companies: which resolution was carried, Messrs. Sage, Dillon, Field, Connor, and Sloane voting 'aye;' Mr. Kneeland and Mr. Stout voting 'no;' Mr. Jay Gould declined to vote on both resolutions."

On the same day, at a meeting of the board of directors of the Manhattan company, the following action was taken in reference to the merger agreement, as it is called:

" The president stated that this was a special meeting of this board, called for the purpose of considering an agreement to consolidate the New York Elevated Railroad Company, the Metropolitan Elevated Railway Company, and the Manhattan Railway Company, into one company.

" This agreement was then read by David Dudley Field, Esq., when, on motion of Mr. Sloan, seconded by Mr. Sage, it was unanimously *Resolved*, That the said agreement between the three elevated railway companies, bearing date the 14th of November, 1881, and now read in our hearing, be and the same is hereby adopted, ratified and confirmed by the board:

"And *Resolved*, further, That the president of this company be and he is hereby authorized and instructed to sign said agreement on behalf of this company, and the secretary is hereby directed to attach thereto the seal of this company and attest the same, and that the officers of the company be instructed to proceed to carry out the terms of the said agreement.

" The vote was then, on motion, taken on the foregoing resolutions by calling the roll, resulting in the following persons voting aye, viz., President Gould, Vice President Gallaway, Cyrus W. Field, Edward M. Field, Russell Sage, Samuel Sloan, Sidney Dillon, John H. Hall, W. E. Connor and George S. Scott.   Total, ayes 10 ; noes none."

The agreements were duly executed on this day or on the 15th of November, 1881.

On the 21st day of November, 1881, a special meeting of the stockholders of the Manhattan company was held, pursuant to a call issued therefor by the board of directors, for the purpose of taking action upon a proposal to issue $13,000,000 of additional stock of the company in order to carry out the Merger agreement of the 14th of November, and the following resolution adopted by a vote of 92,583 shares in favor, and 500 shares against its adoption.   The following is the resolution :

" *Resolved*, That the stockholders of this company do hereby sanction and authorize the increase of the capital stock of this company by thirteen millions of dollars, making, with the existing capital stock, a total of twenty-six millions of dollars."

On the 24th of December, 1881, the State engineer and surveyor duly approved the above mentioned increase of the capital stock of the Manhattan company, to $26,000,000.

On the 10th of January, 1882, the regular meeting of the shareholders of the New York company was held, at which the following were elected directors :

Cyrus W. Field, David Dows, Jay Gould, Russell Sage, John H. Hall, A. S. Barnes, George S. Scott, J. H. Lane, Jesse Hoyt, Daniel A. Lindley, Edward M. Field, James

D. Smith, and James A. Cowing. The following resolution was then offered by Mr. Cockroft, seconded by Mr. Russell Sage:

"*Resolved*, That the acts of the directors of this company during the past year, including the agreements between this company and the Metropolitan and Manhattan Railway Companies dated respectively October 22d and November 14th, 1881, are approved and ratified by the stockholders of this company."

Which was adopted by a vote of 25,904 in favor of the resolution, and 737 votes against it.

Pursuant to this merger agreement, only 3,296 shares of Metropolitan stock have been converted into Manhattan second preferred; but a large amount of the stock of the New York company has been converted into first preferred Manhattan stock.

On the 17th of November, 1881, the Manhattan company put in a supplemental answer in the People's suit, setting up the agreement of October 22d, and that the company was solvent. On the same day, a trial of the cause was had in the rooms of the Attorney-General at the Delevan House, Albany (the Attorney-General being then confined to his room by illness), some evidence taken, and the Attorney-General being satisfied that by the agreements of October 22d, the Manhattan company had been made solvent, findings of fact were duly made, and a judgment entered, which, after reciting that the said agreements of October 22d were regarded by the court as a just settlement of the controversies between the parties, and removed all question as to the solvency of the Manhattan company, adjudged that said agreements required no ratification thereof by the stockholders of said corporations or either of them, and confirmed and established the same as a final settlement and conclusion of all questions in the action.

On the 8th of October, 1881, Mr. Sage, president of the Metropolitan company, wrote to the attorneys of the company as follows:

"Messrs. Porter, Lowrey, Soren & Stone:

"Dear Sirs—Please send to Messrs. Lawrence and Waeh-

422 COURT OF COMMON PLEAS.

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

ner, 120 Broadway, a consent that they be substituted in your stead, as attorneys for the Metropolitan Elevated Railway Company, in the action of the People, etc., against the Manhattan Railway Company, and in the matters pertaining to that action. Also please send them all papers in and relating to the action. Be kind enough to give this matter your immediate attention."

A consent seems to have been given at this time.

On the 25th of October, Mr. Sage wrote as follows:

"Messrs. Porter, Lowrey, Soren & Stone:

"Dear Sirs—Please consent to discontinuance of action pending in the Superior Court, brought by the New York company, and to the vacating of the injunction therein, as desired by Mr. Bacon:"—which was given October 26th, and an order entered the same day dissolving the injunction.

And on the 26th of October, 1881, Mr. Sage wrote as follows:

"Messrs. Porter, Lowrey, Soren & Stone:

"Gentlemen—Please consent to vacate the injunction, and cancel the undertaking given thereon, in the suit of the New York Elevated Railroad Company against the Manhattan and Metropolitan companies, and cancel consent previously given to discontinue the action:"—which was done; and on the 22d of November, Mr. Sage wrote as follows:

"New York, November 22, 1881.

"Messrs. Porter, Lowrey, Soren & Stone:

"Gentlemen—Will you please deliver to Mr. Body, our secretary, the papers, with consent of substitution from your firm in favor of Lawrence and Waehner, in the case of the New York Elevated Railroad Company v. The Metropolitan Elevated and Manhattan Railway Companies. It is important that the papers be delivered at once, as the suit is expected to be tried soon."

The consent for the substitution was signed the same day, and an order entered substituting Lawrence & Waeh-

ner as attorneys for the Metropolitan company in said Superior Court suit.

On said 22d of November, 1881, in the action in the Superior Court, wherein the New York company was plaintiff and the Manhattan and Metropolitan companies were defendants, hereinbefore mentioned, the Manhattan company put in a supplemental answer, setting up the proceedings had in the People's suit upon the application of the New York company to receive back again its property, and the denial of the application, and that on the 22d of October, 1881, the Manhattan company had entered into an agreement and supplemental agreement with the Metropolitan and New York companies, whereby all the matters and things in dispute between the companies had been finally compromised and adjusted.

On the 8th of December, 1881, the attorneys for the respective companies having appeared before the court, and the facts alleged in the supplemental answer of the Manhattan Railway Company being admitted to be true, the court made certain findings of fact, and entered a judgment thereon, adjudging that the agreements entered into by and between the said three companies on the 22d day of October, 1881, were just and valid agreements between the said three companies, and that the same were thereby established, as a compromise settlement and adjustment of all matters in dispute between them, and a general settlement of all matters therein.

On the 5th day of December, 1881, one George A. Flagg and others filed a bill of complaint in the United States Circuit Court for the Southern District of New York, against the three railway companies, alleging in the bill of complaint facts similar to those stated by Gillette in his bill of complaint, and praying for similar relief, and a motion was duly made for such injunction before Mr. Justice BLATCHFORD and was denied by him, he holding that the October agreements were within the power of the board of directors to make, and that they were valid and binding contracts.

On the 9th day of December, 1881, the Manhattan company brought its action in the Supreme Court against the New York company, the Metropolitan company, Berry & Burnham, and all others who had brought suits against it, and which has been called the bill of peace suit, the complaint, after setting up the fact of the bringing the various actions, asking an injunction against the bringing of any more suits, and that all the matters in controversy should be therein determined. In this action, a preliminary injunction was granted which was made permanent at the Special Term, on the 20th of June, 1882, and vacated by the General Term in February, 1883, upon the ground that the case presented was not one in which a court of equity should interfere by bill *quia timet.*

On the 28th of October, 1882, the Manhattan company paid to the Metropolitan company $339,540, in payment in full of the following account:

" Manhattan Railway Company,
          To Metropolitan Elevated Railway Company
1881.                    *Dr.*
          For amount as per bill attached.
     For the following amounts, payable
        in accordance with the terms of
        agreement, dated October 22d,
        1881:
     6 mos. interest to July 1, 1881, on
        $10,818,000 First M. Bonds, M. E.
        Ry. Co., at 6 per cent. per an.    .  $324,540  00
     6 mos. rental of roads, to July 1,
        1881,    .    .    .    .    .          5,000  00
     6 mos. interest, to Nov. 1, 1881, on
        $2,000,000  Second  M.  Bonds,
        Met.  E.  Ry.  Co., at 6 per cent.
        per an.    .    .    .    .    ..      60,000  00
                                              ─────────
                                           $389,540  00
          Paid on acct.    .    .    .       50,000  00
                                              ─────────
                                           $339,540  00 "

On the 3d of January, 1882, the Manhattan company also paid to the Metropolitan company the sum of $5,000 for the rent of roads, due January 1st, 1882, as per lease and modified agreements. Upon the same day a dividend was paid by the Manhattan company to the holders of its first preferred stock, and on the 14th day of July following an amount equal to a 1½ per cent. dividend, upon the shares of the New York company, which had not been converted, was paid to the New York company, but no dividend was paid to the Metropolitan shareholders or to the holders of the second preferred Manhattan stock.

On the 31st of January, 1882, the following resolution was adopted by the directors of the Manhattan company:

"*Resolved*, That the directors of this Manhattan Railway Company do elect to become *ex-officio* the directors of said New York Elevated Railroad Company.

"*Resolved*, Further, that the directors of this company will now and from henceforth manage and conduct the affairs of said New York Elevated Railroad Company, as provided by law.

"*Resolved*, That a copy of the foregoing be sent to the New York Elevated Railroad Company."

On the 4th of March, 1882, there was a meeting of the directors of the Metropolitan company, at which a proposed agreement between the three companies was submitted to the board, providing that the 4th article of the agreement of the 14th of November, 1881, should be so far modified as to provide that if the net earnings of the Manhattan Railway company, in any year, after the payment of dividends to the first preferred stock-holders, do not amount to six per cent., the deficiency shall be carried forward and paid out of the net earnings of future years, after payment in full of all dividends to the first preferred stockholders, as provided in the said agreement. But nothing herein contained should affect in any manner the New York Elevated Railroad Company, or the agreements heretofore made with it, or the priority of payment of dividends to the first preferred stockholders of the Manhattan Railway Company; nor should it

give to any second preferred stockholder a right to dividends except such as may be earned after he becomes such stockholder.

"Which having been read and duly considered, on motion of Mr. S. Dillon, seconded by Mr. S. Sloan, it was *Resolved*, That the agreement now read between this company and the New York Elevated Railroad Company and the Manhattan Railway Company, dated this fourth day of March, 1882, be and the same is hereby approved and adopted; that the president and secretary be and they are hereby instructed to subscribe the said tripartite agreement with the corporate name of this company, to attach the corporate seal thereto, and deliver the same to the New York and Manhattan companies in exchange for a duly executed triplicate of said agreement, on the part of the said New York and Manhattan companies.

"On the question being put, Mr. Joseph S. Stout declined to vote.

"Messrs. Jay Gould, Russell Sage, Sidney Dillon, G. M. Dodge, Samuel Sloan, and W. E. Connor, being six directors, voted aye, and the resolution was carried."

A similar resolution was on the same day adopted by the Manhattan company. This agreement, however, for some reason, was never executed by the parties.

On the 1st of April, 1882, a quarterly dividend of one and one-half per cent. was paid upon Manhattan first and second preferred, and to the New York company, on the 14th of July, for the New York unconverted stock, but no payment was made to the Metropolitan company for its unconverted stock.

On the 7th day of June, 1882, the directors of the Metropolitan company adopted a resolution postponing the election of directors from the second Tuesday of June, 1882, to the second Wednesday of November, 1882.

On the 1st of July, 1882, a quarterly dividend of one and one-half per cent. was paid on Manhattan first and second preferred, and to the New York company for its non-assenting shareholders, and also $97,500 was paid to the Metro-

politan company, being one and one-half per cent. on its stock, and the Manhattan collected the dividend from the Metropolitan company upon the 3,296 shares of converted stock.

A similar dividend was paid October 1st, 1882, in precisely a similar way.

The Manhattan company has also paid the interest at the rate of six per cent. falling due January 1st and July 1st, on $10,818,000 first mortgage bonds of the Metropolitan company, and also the interest falling due on the 1st of May and the 1st of November, on $2,000,000 second mortgage bonds of the Metropolitan company.

On the 8th of November, 1882, the following were elected directors of the Metropolitan company: "Mr. Joseph S. Stout, Mr. Jacob Berry, Mr. Elijah Smith, Mr. Thomas T. Buckley, Mr. Rufus H. Gilbert, Mr. Sidney Shepherd, Mr. Joseph W. Burnham, Mr. Murillo H. Gillett, Mr. Charles Duggin, Mr. Sylvester H. Kneeland, Mr. Benjamin W. Gillett."

There are several proceedings by the board of directors of the companies during the year 1882, which are not referred to, being immaterial to the controversies in this action.

And in December, 1882, this action was commenced by the Metropolitan company against the Manhattan and New York companies, to set aside the October agreements, upon the following grounds:

1st. Because the Metropolitan directors had no power to modify the original lease and tripartite agreement of May 20th, 1879, without the consent of the shareholders.

2d. Because three Metropolitan directors were at the time of the making of the October agreements also directors of the Manhattan company—one of the contracting parties whose interests were antagonistic to those of the Metropolitan company.

3d. Because the personal interests of several of the Metropolitan directors were opposed to those of that company.

4th. Because of actual fraud upon the part of certain

Metropolitan directors, who entered into a scheme to benefit themselves at the expense of their corporation.

The defendant corporations duly answered denying the allegations of breach of trust, and that the directors of the Metropolitan company had interests hostile to the company, and alleged that the October agreements were entered into in good faith. The answers further set up the merger agreement of November 14th, 1881, as a defense, and the judgment in the People's suit, and also the judgment in the action in the Superior Court suit, as a bar to this action.

Upon the 19th of February, 1883, an order to show cause was duly obtained by the Metropolitan company, represented by new attorneys, from the Superior Court, why the judgment above mentioned, entered in that court on the 8th day of December, 1882, should not be set aside, and why the Metropolitan company should not be let in to answer or demur. The motion thereon was duly heard before Mr. Justice FREEDMAN, on or about the 20th day of March, 1883, and denied with costs, upon the ground that when the cause came on for trial in its regular order, the counsel for the respective companies agreed as to the findings to be made and the judgment to be entered, and the court settled the findings and gave judgment accordingly, and as there was no irregularity or want of jurisdiction, the parties to the judgment were bound by the adjudication made.

The learned court further held, that as the application rested substantially upon the claim that if the application were granted, the Metropolitan company, in consequence of a change of advisers, could present some considerations to the court which were not presented before, and which, if they had been presented, might and possibly would have led to a different result, no ground was shown sufficient to call for the interposition of the equitable powers of the court. That the policy of the law was to end the litigation and to hold parties bound by the result after they had their day in court.

The court further held, that a conclusive answer to the motion was, that at that late day it was impossible to restore

the three corporations to the positions they respectively occupied toward each other at the time of the entry of the judgment.

In April, 1883, the Metropolitan company obtained another order to show cause why they should not have leave to renew the motion to set aside said judgment of December 8th, 1881, or if such leave was denied, why the judgment and findings should not be corrected and amended by striking out the finding of fact that all matters in dispute between the three companies were compromised, settled and adjusted by the agreements of October 22d, and the finding and judgment that said October agreements were valid.

This motion was also heard before Mr. Justice FREEDMAN, and an order was entered denying the motion with costs, August 9th, 1883, from which order an appeal was taken by the Metropolitan company.

[The learned judge before whom the case was tried, who prepared and prefixed to the opinion handed down herein the foregoing statement of the case, added: " The foregoing statement contains, I believe, a substantially correct narrative of the events which led up to the October agreements and which followed them, as nearly as possible in their chronological order; and also sets forth the interests which the various directors of the Metropolitan company, whose action is sought to be attacked, had in the three companies who were parties to those agreements. I may have omitted some of the circumstances attending these transactions, as the evidence and exhibits are very voluminous, and parts of the same transactions are scattered in many different parts of the record, and I have not been aided in any degree by the submission, by either of the parties, of any statement of the facts which are claimed to have been established by the evidence; and it has, therefore, required an immense amount of time to extract from this mass of evidence and exhibits the history of these transactions, as they appear upon the record."]

*James C. Carter, Robert Sewell* and *Francis C. Barlow,* for plaintiff.

*William M. Evarts, David Dudley Field, A. J. Vanderpoel* and *W. A. Duer,* for defendants.

VAN BRUNT, J.—[After stating the facts as above.]—This action is brought by the Metropolitan Railway Company, to set aside the agreements of October 22d, 1881, upon the following grounds:

1st. Because the Metropolitan directors had no power to modify the original leases and tripartite agreement of May 30th, 1879, without the consent of the shareholders.

2d. Because three of the Metropolitan directors were, at the time of the making of the October agreements, also directors of the Manhattan company—one of the contracting parties, whose interests were antagonistic to those of the Metropolitan company.

3d. Because the personal interests of several of the Metropolitan directors were opposed to those of that company.

4th. Because of the actual fraud upon the part of certain Metropolitan directors, who entered into a scheme to benefit themselves at the expense of their corporation.

The defendants admit that the October agreements were not assented to by the stockholders of the Metropolitan company, and claim that such assent was not at all necessary to the validity of the contract. They further admit that three of the Metropolitan directors were also, at the time of the making of the October agreements, directors of the Manhattan company, but they deny that this circumstance in any way invalidated the action taken. They deny that the personal interests of any of the Metropolitan directors were opposed to those of that company; and they also deny that there was any actual fraud; and aver that the agreements of October, 1881, were for the best interests of all the parties concerned, and that they presented the only solution of the difficulties and embarrassments which surrounded the elevated railway system, in the summer and fall of 1881.

In addition to the above defenses, the defendants also presented certain preliminary objections to the maintenance of this action, and also certain affirmative defenses.

The preliminary objections are as follows:

1st. No case is presented in this action for the interference of a court of equity.

2d. If the October agreements are fraudulent, as the plaintiff contends, then the plaintiff itself was a party to the fraud.

3d. The plaintiff, in its complaint, alleges that the agreements and leases of May 20th, 1879, which it seeks to reinstate, were a nullity, being made without authority of law.

4th. That the October agreements have never been disaffirmed by the stockholders of the Metropolitan company in any way, nor even by the directors, by any direct vote.

The fifth and last preliminary objection is the lapse of time and the acquiescence of the plaintiff.

The following affirmative defenses are also urged:

1st. That the Manhattan company had at the time of the commencement of this action already brought its action in the Supreme Court against the New York company, the Metropolitan company, and all the persons who had brought actions to set aside the October agreements, in the nature of the old bill of *quia timet*, asking, in its complaint, that all matters relating to the October agreements should be determined in that action, and that the defendants and all others should be restrained from bringing any actions on account of these agreements.

2d. The judgment of the Supreme Court in the action of The People against The Manhattan Railway Company, entered on the 17th day of November, 1881.

3d. The judgment of the Superior Court of the City of New York, entered on the 8th of December, 1881, in the action wherein the New York Elevated Railroad Company was plaintiff, and the Manhattan Railway Company and the Metropolitan Railway Company were defendants.

4th. That restitution cannot be had.

I will first consider the preliminary objections, and then

the affirmative defenses, and lastly will discuss the four questions upon which the plaintiff bases the right to equitable relief in this action.

The first preliminary objection urged is, that the facts elicited upon this trial do not present a case for the interference of a court of equity.

It is claimed by the defendants that the plaintiff has a complete remedy at law, and, therefore, cannot seek the intervention of a court of equity. That the plaintiff could have sued for the rent, which is claimed to be due, under the leases and agreements of May 20th, 1879, and if the October agreements were set up as a defense, they could have been attacked upon precisely the same grounds as they have been in this action. ·

In *Grand Chute* v. *Winegar* (15 Wall. 373), it was held that a municipal corporation, obligor in a bond, cannot ask in equity that the obligee be enjoined from proceeding at law, and that the bond be surrendered, when the bill alleges that the bond was issued, without authority, in violation of law, and in fraud of the plaintiff; that the obligee knew this when he took it; that the obligee's possession is merely colorable, and that he gave no value for it, and never had any right or·title to it.   Such allegations show a complete defense to the bond at law; and a judgment against the obligee at law would give as full protection in every way to the obligor as a decree in equity.

Mr. Justice HUNT in this case uses language as follows :

"And the result of the argument· is, that wherever a court of law is competent to take cognizance of a right, and has power to proceed to a judgment which affords a plain, adequate, and complete remedy, without the aid of a court of equity, the plaintiff must proceed at law, because the defendant has a constitutional right to a trial by jury. The right to a trial by jury is a great constitutional right, and it is ·only in exceptional cases and for specified causes that a party may be deprived of it."

In *Allerton* v. *Belden* (49 N. Y. 373) it was held that the right to apply to a court of equity to have a contract

annulled exists only when, from the form of the security, the defense cannot be made available at law, or where the instrument sought to be avoided is a cloud upon the title to land, or some other necessity for the interposition of a court of equity is shown.

The opinion of Judge RAPALLO (page 377) has this:

" The allegations in his complaint disclose a perfect defense at law to any action which might be brought against him on his indorsement, and no fact is stated showing any necessity for the interposition of a court of equity, or entitling the plaintiff to become an actor in the matter. . . . . . The most usual ground for going into equity in such cases formerly was the necessity for a discovery to prove the usury.

" Bills of discovery being now abolished, some ground which formerly would have justified the filing of a bill for relief must appear in the complaint, or it shows no right of action. . . . . . No authority has been cited sustaining an equitable action on such grounds; but on the contrary, it has been uniformly held, that where a perfect remedy, both as to the discovery and relief, can be had at law, an action in equity cannot be maintained, and that this objection is available on demurrer."

In *The Town of Venice* v. *Woodruff* (62 N. Y. 462), the court said (at page 467):

" Whether, therefore, the question be regarded as one of jurisdiction or practice, it is established by the later decisions that some special ground for equitable relief must be shown, and that the mere fact that the instrument ought not to be enforced is insufficient, standing alone, to justify a resort to an equitable action."

In *Fowler* v. *Palmer* (Id. 533), which was the case of an action to compel the surrender of a note past due, on the ground that it had been paid, but not taken up, the court held that the action could not be maintained in equity, that the defense of payment was perfectly available to the plaintiff in an action upon the note, and no transfer could prejudice it.

In *Globe Mutual Life Ins. Co.* v. *Reals* (79 N. Y. 202), it was held that an action to procure the cancellation of a written instrument cannot be maintained unless some special circumstance exists establishing the necessity of a resort to equity, to prevent an injury which might be irreparable, and which equity alone is competent to avert. It is not sufficient that a defense exists against the instrument, or that evidence may be lost.

In the case of *Troy and Boston R. Co.* v. *Boston, Hoosac Tunnel, &c. R. Co.* (86 N. Y. 107, 127), it is said by the court, Mr. Justice DANFORTH speaking:

" Although the form of actions and suits, and the distinction between actions at law and suits in equity has been abolished, a party, to entitle himself to the equitable remedy by injunction, must still make such a case as would, while the distinction existed, have made an equitable cause of action. This is well settled."

In *Hamilton* v. *Cummings* (1 Johns. Ch. 517), the Chancellor states, as his conclusion from the authorities, that a resort to equity to compel the cancellation of written obligations, to be sustained, must be expedient either because the instrument is liable to abuse from its negotiable nature, or because the defense, not arising upon its face, may be difficult or uncertain at law, or from some other circumstances peculiar to the case, and rendering a resort to a court of equity highly proper and clear of all suspicion of any design to promote expense and litigation.

These authorities seem to establish, with great distinctness, the rule which has obtained in our courts since the practice of allowing equitable defenses in actions at law has been established, and none of the cases cited by the plaintiff at all conflict with it.

In the case of *Gould* v. *Cayuga County Nat. Bank* (86 N. Y. 75, 82), it is true that the court say that the party might have brought his action in equity to rescind the contract, and in that action might have had full relief; but in the next paragraph of the opinion the necessity of bringing in other parties is adverted to, which was to be the basis of,

the relief to be granted by a court of equity, and which could not be done in a court of law.

The *Aberdeen Railway Case* (1 Macq. H. L. Cas.), has no application to the question now under discussion, as equitable defenses were not available in actions at law in the English courts.

Equity jurisdiction of the court was applied in the case of *McHenry* v. *Hazard* (45 N. Y. 580), because the rights of all the parties could not be determined in any one action at law, and also because the defendants could not be allowed at their election to postpone the litigation of the question, and subject the plaintiff to the vexation of a litigation at a distant period when the means of defense might be lost or impaired, and when he might be disabled from contesting the validity of the claim with the same ability as at the present time. The latter ground for the entertaining of jurisdiction does not at all apply to the case at bar, because the plaintiff here can sue at once to recover rent, under the May agreements. The defendants have no rights to be enforced against the plaintiff, but the plaintiff, the aggrieved party, can at any time enforce the rights which they think they have. In order to test the question as to the validity of the October agreements, the plaintiff has only to bring its action for the rent due under the May agreements, and the matter is at once brought up. Equitable jurisdiction cannot be entertained in this case upon the ground that otherwise there will be a multiplicity of suits. No such result would ensue. If an action had been brought upon the May agreements for rent due since the making of the October agreements, and a final recovery had been had for the amount of rent due, according to the terms of the May agreements, that final judgment would have ended, as far as the Manhattan company is concerned, the October agreements as effectually as any final judgment which can be rendered in this action can do. The fact that the agreements extend over a long period of years, does not alter the question. A final recovery is just as effectual, whether it be in a court of law or a court of equity.

Even if I, however, should find that there was no ground for equitable relief, yet, if the facts proven showed that the party was entitled to legal relief, the bill could not be dismissed (*Sternberger* v. *McGovern*, 56 N. Y. 12).

But there is another ground upon which the bill in equity can be sustained, and that is, that there could be no determination as to the validity of the October agreements without the presence of the New York company, a party to them. The New York company had a right to be heard upon the question. One party cannot be released by legal proceedings from a tripartite agreement, in an action against one other party. All the parties must be brought before the court, as all have a right to be heard upon the question as to whether the agreement which is mutual shall be broken up. Therefore, the New York company is a necessary party to any action seeking to avoid the October agreements, that company being one of the parties to them. If an action was brought upon the lease of May 20th, 1879, the New York company could not have been brought in as has been done in this case, and which was the reason given in *Gould* v. *Cayuga County Nat. Bank*, for the entertaining a bill for rescission. It seems, therefore, that the first preliminary objection is not well taken.

The second preliminary objection is, that if the October agreement is fraudulent, as the plaintiff contends, then the plaintiff itself was a party to the fraud.

The defendants claim, that as this is not a suit by a stockholder to set aside an agreement which is chargeable with fraud, but a suit by the corporation itself—one of the parties to the fraud—a court of equity will not interfere; and we are referred to the opinion of Mr. Justice MCCRARY, in the case of *Lewis* v. *Meyer* (14 Fed. Rep. 311, 312, 313), as an authority to sustain the proposition. The case cited, however, is not analogous to the one at bar.

That action was to avoid railroad bonds in the hands of innocent holders, upon the ground that the directors had issued them fraudulently. The bondholders were innocent parties, and not in any manner privy to the fraud perpetra-

ted by the directors, and had no knowledge of such fraud. A stockholder could not maintain an action to set aside any fraudulent contract made by the corporation, without alleging a refusal, or good reason to suppose that the corporation would not bring any action. If this rule is to prevail, the directors of corporations may act as fraudulently as they please, and it is impossible to redress the wrongs which the corporation may have received at their hands, unless some stockholder is willing to undertake the labor and expense of an action therefor. Such cannot be the rule. Where directors are faithless to their trust, and have acted without any authority, the corporation may repudiate the acts so done, because the stockholders not only may claim but must claim their rights by and through the corporation, unless the corporation refuses to assert such rights. The directors are the agents of the corporation, and if they act without authority in making a contract for their principal, or fraudulently, certainly the principal may repudiate it. That it is the same principal who made the contract that seeks to repudiate it, is no bar to the relief.

The next preliminary objection is, that the plaintiff claims that the agreement and leases of May 20th, 1879, which it seeks to reinstate, were a nullity, being made without authority of law.

I understand that the claim that the agreements and leases of May 20th, 1879, were void, was abandoned upon the argument, it being conceded that under the statute of 1839 a corporation may lease its road.

But this is not at all necessary to answer the objection made. The plaintiff by its complaint does not seek to reinstate anything; it simply asks that the agreement of October 22d, 1881, may be declared null and void; whether such judgment will reinstate anything or not is not a question involved in this action.

The next preliminary objection is, that the October agreements have never been disaffirmed by the stockholders of the Metropolitan company in any way, nor even by the directors, by any direct vote.

438 COURT OF COMMON PLEAS.

Metropolitan Elevated R. R. Co. *v.* Manhattan Elevated R. R. Co.

If the directors had no authority to make the October agreements without the consent of the stockholders, then certainly no expression of dissent was necessary by the stockholders, because the agreements were void unless ratified by the stockholders, or confirmed by action upon the part of the stockholders which amounted to ratification. But if it is sought to set aside these agreements because of the fraud, either actual or constructive, then the contract is a voidable one, and due diligence must be used in electing to avoid it. What constitutes due diligence necessarily depends upon the facts of each particular case. Immediately after these agreements were made, various stockholders commenced their actions to set them aside, and it is well settled, that where one stockholder is asserting by suit the rights of the stockholders as a class, it is not required that each particular stockholder should sue.

In the case of *Boardman* v. *Lake Shore & Michigan Southern R. Co.* (84 N. Y. 157, 183), it is said:

"It was not required that each particular stockholder should sue for his share of the dividends, to preclude the defendant from claiming an acquiescence and estoppel; and it is quite sufficient that it was advised of the character of the claim of the respective stockholders. The plaintiffs and other stockholders were entirely justified in awaiting the results of the suits pending without incurring the hazard of losing their rights on account of the lateness of their demand."

The stockholders had no power to meet and act as a body, except as the statute and the by-laws prescribe, and must be called together in the manner provided by law, otherwise they have no power to act.

In the case at bar, the only way in which the stockholders were required to act was, upon the first opportunity to appoint other agents who would assert their rights, if they had any. Moreover, the Manhattan company, on the 9th day of December, 1881, commenced its bill of peace suit, and all stockholders were enjoined from suing, which injunction continued in force until February, 1883. Can the Man-

hattan company now claim laches, because no other stock holders have brought suit to set aside these agreements, when they were prevented from so doing by reason of the injunction which that company had obtained?

It is urged, that because a new board of directors has been elected, no right is given to impeach the acts of a previous board, as the corporation is the same. I am unable to appreciate the force of this objection. If my agent has entered in my name into a fraudulent agreement, I know of no reason why I may not appoint a new agent and through him repudiate the fraudulent contract. In the case supposed, I am the party acting in both instances. I have never heard that a man was bound by the fraudulent contract made by his agent in his name, because he, the same person in whose name the fraudulent contract was made, sought to set aside the contract. The directors of the corporation are its agents and executive officers. They, as such agents, manage the business and affairs of the corporation, and when the business and affairs of the corporation are to be managed by directors, I do not think that the stockholders can do any act or make any contract, except by the use of the means provided by law, viz.: its directors. Therefore, if one set of agents act beyond their authority, or are recreant to their trust, the principal—that is, the corporation—may appoint a new set of agents and through them seek redress for the wrongs which it has suffered. The corporation being able to act only through its directors, at the very first opportunity after the October agreements were made, the shareholders of the Metropolitan company elected a new board of directors, such change in the board being evidently made because of the fact that the old directors had made these agreements; and within one month thereafter, this action was brought, and within one week after these agreements were executed, shareholders had commenced their actions to set them aside. I do not know how, if the most extreme diligence had been required, any more prompt action could have been taken; and thus is answered the last preliminary objection—that of laches.

We are now brought to the consideration of the four affirmative defenses urged by the defendants.

1st.—That the Manhattan company had at the time of the commencement of this action already brought its action in the Supreme Court against the New York company, the Metropolitan company, and all the persons who had brought actions to set aside the October agreements, in the nature of the old bill of *quia timet*, asking in its complaint that all matters relating to the October agreements should be determined in that action, and that the defendants and all others should be restrained from bringing any actions on account of the October agreements.

The commencement of this action could not in any way interfere with the rights of the Metropolitan company to file its bill for a rescission. The mere filing of the bill by the Manhattan company restrained nobody, and the plaintiffs in that action knew this, because they asked for, and obtained, an injunction preventing the bringing of any more suits, which was set aside by the General Term. Merely because the Manhattan company had filed a bill of peace against all the world in general, and the Metropolitan company and its stockholders in particular, the latter company did not lose any rights which it might acquire to the protection of the court. The Metropolitan company had the right to file its bill for rescission, and the Manhattan company could not deprive it of this right by filing a bill asking the court to adjudicate upon the question involved. Before such an action can restrain anybody's proceedings, the right to an injunction must be established, either preliminarily or by final judgment.

The second affirmative defense is:

The judgment of the Supreme Court in the action of the People against the Manhattan Railway Company, entered on the 17th day of November, 1881.

I have searched in vain in the judgment-roll, in the case of the People against the Manhattan Railway Company, for anything which could in any way operate upon any rights which the Metropolitan company had. This company was

not a party to the action, and in the findings and judgment is not treated as a party. The second finding speaks of agreements made with the defendant by certain other corporations, to wit: The New York Elevated Railroad Company and Metropolitan Railway Company. So also in the fifth finding, similar language is used. In the judgment, also, the New York company and the Metropolitan company are treated as strangers to the record, and they evidently were so considered by the court. The only question at issue in that action was the solvency of the Manhattan company; with that issue the New York and Metropolitan companies had nothing to do. That question was one existing between the People on the one side, and the Manhattan company on the other, and nobody else had any interest in it. It is true that this question of solvency depended upon the October agreements, but an adjudication by the court in that action could only affect the parties to it, and as to them only to the extent of the question involved.

But it is said that the three companies united in a petition to have the property delivered back to the Manhattan company. The order of restoration made upon that petition in no way adjudicated upon the question of the validity of the October agreements. No such question was presented to the court. The union of the New York company and the Metropolitan company in that petition operated only as a consent upon their part that restoration might be made. And no order that the court did make, in that proceeding, could have had the force of an adjudication, because the doctrine of *res adjudicata* does not apply to interlocutory judgments or orders which the court that rendered them has power to vacate or modify at any time. The order of restoration in the People's case expressly reserved to the court the power of alteration and modification. These companies did not become parties to the record, and as has already been shown, they were not treated by the court, in its findings and judgment, as parties whose rights were being determined. Therefore, the judgment in that action barred no rights which this plaintiff might have.

The third affirmative defense rests upon the judgment of the Superior Court of the City of New York entered on the 8th day of December, 1881, in the action wherein the New York Elevated Railroad Company was plaintiff, and the Manhattan Railway Company and the Metropolitan Railway Company were defendants.

In considering this question, it is necessary that we should have plainly before our minds the facts relating to that action and the proceedings therein.

The action was commenced upon the 2d of July, by the New York company against the Manhattan company and the Metropolitan company; and the plaintiff claimed the right to recover possession of its property from the Manhattan company, because of its breach of the terms of the lease between the New York and Manhattan companies, and no relief whatever is asked for against the Metropolitan company. The Metropolitan company, in its answer, denied the right of the New York company to get back its road, and the Manhattan company put in a similar plea.

On the 22d day of November, 1881, the October agreements having then been made, the Manhattan company put in a supplemental answer, setting up the proceedings in the People's suit, and also the October agreements above mentioned, alleging them to be an adjustment of all the controversies between the parties to the action. The parties then went before the court, and without the plaintiff offering any proof whatever, the parties admitting the facts alleged in the supplemental answer of the Manhattan company to be true, obtained certain findings of fact and conclusions of law, all of which are expressly stated to be founded on the admissions of the parties, adjudging these October agreements valid, and a judgment to the same effect is entered thereon.

I fail to see how this judgment can operate as a bar to the rights of the Metropolitan company to contest the validity of the October agreements. If those agreements are fraudulent, and this judgment should be held to preclude the Metropolitan company from rescinding them, then

the law would be used for the purpose of fortifying a wrong, and not for the purpose for which it was instituted, viz: the redress of wrongs. When such a manifest injustice would result from the application of any rule of law as that a fraud would be protected, we may be sure that there is something wrong in our premises if they lead to such a conclusion, as equity and justice go hand in hand together.

If this judgment of the Superior Court is a bar to the right of this plaintiff to maintain this action, we have this state of things, as a necessary result: directors of a company may make an agreement which is absolutely void, and in the making of which there has been a plain violation of duty, and if their corporation is sued upon it, the same board of directors being in office—their term not having expired—may confess judgment, and then there is no power in any court to redress the wrong. The mere statement of the proposition, it seems to me, shows that such cannot be the law, and it is not the law.

In order that a judgment may be a bar, there must be a real controversy. There was no controversy in the Superior Court. The Manhattan company alleged the making of the October agreements, and that they adjusted all matters in difference. The New York company and the Metropolitan company say, "we agree that that is true," and the judgment is entered. This was nothing more than a judgment by consent. All the parties to the action consented that these agreements had been made and had adjusted the differences, and the court so ordered. If these agreements were voidable for want of power in the directors to make them, or fraudulent, then the obtaining a judgment affirming these agreements by the same directors who made them, was a fraud upon the court, not necessarily an intentional fraud, but a fraud in law; and such a judgment binds no court, and its nullity upon that ground, though it has not been set aside or reversed, may be established in another action (*Webster* v. *Reid*, 11 How. U.. S. 437).

In *Earl of Bandon* v. *Becher* (3 Clark & Fin. 479, 510), Lord BROUGHAM adopts the language of WEDDERBURN, in the Duchess of Kingston's case, as follows:

"A sentence is a judicial determination of a cause agitated between real parties, upon which a real interest has been settled. In order to make a sentence there must be a real interest, a real argument, a real prosecution, a real defense, a real decision. Of all these requisites, not one takes place in the case of a fraudulent and collusive suit; there is no judge, but a person invested with the ensigns of a judicial office is misemployed in listening to a fictitious cause proposed to him; there is no party litigating, there is no party defendant; no real interest brought into question."

In the case of *Gaines* v. *Relf* (12 How. U. S. 472), the principle was distinctly enunciated that in order that a judgment should be a bar there must be a real controversy, and that a judgment entered by consent to be used in the future cannot affect the parties to it, because there was no controversy carried on in earnest. In that case the defendant admitted the decree, but contended—

"That said decree was designed as no honest exposition of the merits of the case, but was brought about, allowed, and consented to for the purpose of pleading the same as *res adjudicata* upon points in litigation not honestly contended."

The court say:

"That this proceeding on the part of Patterson and General and Mrs. Gaines was amicable, and that no earnest litigation was had, is too manifest for controversy. They agreed to go to trial at once, on the depositions found in the Probate Court; and as Patterson was to lose nothing by the event, he was, of course, indifferent as to what evidence might be introduced on the hearing.

"It also appears by his evidence that when a decree was obtained in the Circuit Court against him, his name was used to carry up an appeal to this court; but it was in fact brought up by General and Mrs. Gaines. Patterson employed counsel here, who, of course, had to take the record as they found it, and make the best of it they could; and it is conceded on all hands they did so, and made the best exertions for Patterson they could do, on the record brought

up by him, as they supposed.   Nevertheless, an affirmance of the decree was had in this court.   It could hardly be otherwise, in a case managed as this was; the object of the complainants below being to obtain a favorable opinion and decree on the law and facts of a case made up at their own discretion."

In the case of *Moses* v. *McDivitt* (88 N. Y. 62, 68), the same principle is enunciated.   The court say:

" The judgment does not stand upon the same footing as a judgment obtained in the usual course, in a hostile suit in which the defense of usury was either overruled or omitted to be interposed.   It was a mere arrangement between the parties, put by their mutual consent in the form of a judgment, for the purpose of evading the statute."

It seems, from the evidence in this case, that the judgment in the Superior court was obtained for future use.   Claims had then been advanced by shareholders, that these October agreements were fraudulent and void, and this judgment would appear to have been obtained by and with the consent of the very directors whose acts were attacked in the suits by the shareholders, in order that it might be interposed as a bar to any relief to which the shareholder might show his corporation was entitled.

The denial of the motion to vacate the judgment, before Mr. Justice FREEDMAN, gave such judgment no greater force or effect than it had before.   It left the judgment in precisely the same position that it was before, with the same force it before had and no more (*Schrauth* v. *The Dry Dock Savings Bank*, 86 N. Y. 390, 395).

The judgment, therefore, of the Superior Court does not operate in any way as a bar to the assertion of its rights by the Metropolitan company in this action.

The fourth and last affirmative defense is that restitution cannot be had.

It is claimed, that because, by any judgment in this case, the receivers cannot be put again in possession of the property of the Manhattan company ;

That because the People's suit in the Supreme Court cannot be restored to the condition in which it then stood ;

Metropolitan Elevated R. R. Co. *v.* Manhattan Elevated R. R. Co.

That because we cannot restore the bondholders' suit to the position it then had, with its injunction;

That because the Superior Court suit cannot be restored to the condition it would have occupied had not so much time been lost; that, therefore, no rescission can be had.

It is urged that we would have to undo the "increase of Manhattan stock. That it has been proved that this stock has been increased with the sanction of the State engineer and surveyor, pursuant to law, from thirteen millions to twenty-six millions of dollars. What can we do with that? Shall we reduce it? What will we do with the stockholders who hold it? Shall they be paid, or will we take their stock away without payment? Then we would have to re-exchange the first preferred stock for New York stock, and the second preferred stock for Metropolitan stock. How is that to be done? Then we would have to dismiss the Burnham suit, and the *quia timet* suit, and the merger suit; enter an order denying the New York application in the People's suit, take an appeal from the order, put it on the calendar of the General Term for argument; pay back the interest which the Manhattan company had paid on the mortgage bond of the other two companies; make a question of the insolvency of the Manhattan company; restore to the other two companies their earnings since October, 1881; in short, undo everything that has been done since October 22d, 1881, pursuant to the settlement. But that is impossible. The New York company cannot be restored to the condition it then held. It parted with its whole earnings, and if they could be ascertained and received back, there is no corporation or person to pay them; a portion of them have been paid over to the Metropolitan company and distributed to its bondholders and stockholders; they are not parties to any pending suit, and, if they were, they are under no obligation to pay back. Each company has been released from the six and a half million claim; that release must be cancelled, but it cannot be cancelled without imperilling the interests of the stockholders of the constituent companies."

NEW YORK—APRIL, 1884.          447

Metropolitan Elevated R. R. Co. *v.* Manhattan Elevated R. R. Co.

Certainly, if all these things are to be done, as a condition of relief, then the plaintiff in this action is remediless, because it would be impossible for the plaintiff to comply with such a judgment.

But I do not understand the rule to be, that a plaintiff is deprived of all relief, because he cannot restore the other parties to the same position which they occupied before they entered into the void or voidable agreements, when the other parties to the agreement have put themselves in the position in which they find themselves, with full knowledge that the other party claims the agreement to be void and fraudulent, and every means had been taken at once, by those who have the right to question the legality of the proceedings, to restrain the wrong.

Long before any of these things were done, in respect to which restoration may now be impossible, suits had been brought by more than one stockholder seeking to avoid the October agreements, and indeed the first suit was begun within one week after the agreements had been made, by a stockholder to annul them and to have them declared void. These suits multiplied so rapidly that as early as December 9th, 1881, the Manhattan company filed its bill of peace, for the purpose of restraining the increase of this cloud of suits, with which it was threatened by stockholders of the Metropolitan company. The Metropolitan company could commence no action itself, because it was in the hands of the very directors who, it was claimed, had either exceeded their powers or acted fraudulently in fact or in law in the making of these agreements; and the stockholders, therefore, necessarily were required to assert their own rights. If, in the face of all these facts, the other parties to the agreement went on and acted in such a way that they cannot get back to the position which they occupied at the time of the making of the alleged fraudulent agreements, it certainly is not the fault of the plaintiff or of the court. They have only themselves to blame. Their heedlessness cannot deprive the plaintiff of any rights to which it otherwise would be entitled. If this is not the rule, then all

that a party has to do, who has procured the execution of an agreement by fraud, even after the fraud has been discovered and the party defrauded has informed him that as soon as possible an action for rescission will be begun, to defeat such an action, is to hasten and put himself in such a position that his steps cannot be retraced. I do not understand this to be the rule. Where, however, a party has, without any knowledge of any intention to rescind and for no ulterior purpose, acted upon the faith of the agreement, and has lost rights thereby, and such rights cannot be restored, the injured party can obtain no relief except such imperfect reparation as his action at law to recover the damages occasioned by the fraudulent deceit will afford. The court would, however, compel the plaintiff to do everything that lay in its power to restore the then *statu quo*.

As to the People's suit, I do not know that the Manhattan company is in any respect harmed by the discontinuance of a suit brought against it on account of insolvency, nor is it injured in any degree by not being in the possession of receivers.

As to the bondholders' suit, it was not discontinued because of the October agreements; the discontinuance having taken place October 6th, more than two weeks before the agreements were made.

As to the Superior Court suit, the judgment and findings can be vacated, the injunction restored, and then the action will be in the same condition in which it was at the time of the October agreements.

With the increase of the capital stock of the Manhattan company and the result flowing therefrom, this plaintiff has nothing to do; all those things were done by the defendants with full knowledge of the claim presented in this action, and they acted at their peril.

As to the payment back of the moneys which have been received: before disposing of that part of the question, it will be necessary to examine a few of the authorities upon this question of rescission.

The principles upon which rescission must proceed, are laid down with great distinctness in the case of *Gould* against *The Cayuga County Nat. Bank* (86 N. Y. 75). The court holds that " one who seeks to rescind a compromise of a disputed claim, upon the ground of fraud, must promptly upon the discovery of the fraud restore or offer to restore to the other party whatever he has received by virtue of it, if any, in full; the tender must be without qualifications or conditions."

· The court makes a distinction in this case, which should be borne in mind, between a suit in equity to rescind, and a suit at law upon a rescission, holding, that if you sue at law you must offer to restore before you bring suit; if you sue in equity you may make the offer in your complaint. The defrauded party has ample remedies. One situated as the plaintiff was in that case, can rescind by tendering or restoring what he has received, and then commencing his action; he may keep what he has received, and sue to recover damages for the fraud; or he may commence an action to rescind or for equitable relief, and offer to restore, in case he is not entitled to retain what he has received. If, however, the plaintiff cannot restore absolutely, he cannot come into a court of equity for relief. This rule is illustrated by the learned court, in its opinion, by the following:

· · " Suppose A. goes abroad, leaving in the hands of his agents debts to be collected, against various debtors, among whom is B., a debtor for $1000, and before his return his agent dies. Upon his return he finds among his papers no evidence that B. paid his agent, and then he calls upon B. and he claims that he paid the agent the whole debt. A. disputes this, and they finally agree to compromise the dispute, B. paying $500. Afterward A. concludes that B. did not, in fact, pay his agent, and claims that he was induced by fraud to enter into the compromise. So long as the compromise remains in force, no action, based upon the original indebtedness, can be maintained. The bar can be removed only by rescinding the compromise agreement, and that can be rescinded only by a restoration of the $500, so that they

can resume their dispute upon a footing of equality, just where they left it before they entered into the compromise. When A. sues upon the original indebtedness, B. must be permitted to renew his dispute, and set up payment of the entire debt to A.'s agent. If he can establish that, the $500 will be again in his hands, where it belongs. If he fails, A. will recover his whole debt. If A. can maintain his suit without first returning the $500, he will have all the game in his own hands. If he wins the suit he will retain the $500 and get $500 more. If he loses the suit, in consequence of proof that the whole debt has been paid to his agent, he will still have the $500. He will thus, in effect, hold B. to the compromise, but himself be released. Such inequality and injustice cannot be tolerated by correct principles of law."

It is plainly stated in the above case that the reason why restoration is made a condition of rescission is that the retaining of that which has been received is inconsistent with the abrogation of the contract.

But the rule that if any party to the agreement has done anything which cannot be undone, or has omitted to do anything which he might have done, no rescission can be had, does not apply to things done or left undone by such party to the agreement, who has knowledge before anything is done or omitted to be done, that the agreement is repudiated either by the other party or by those who have a right to contest its validity on his behalf.

It is claimed that as a condition of rescission, all the moneys paid out since October 22d, 1881, by the Manhattan company, both to the bondholders and shareholders of the New York company, must be restored; that the New York company cannot be restored to the condition it then held; that it has parted with its whole earnings, and they cannot be got together again and paid back; they have been paid out and distributed to bondholders and shareholders who are not parties to this action, and if they were they are under no obligation to pay back.

As far as the distribution of the earnings of the New.

York company by the Manhattan company is concerned, such distribution was not only permitted but connived at by the New York company—they well knowing of the claim that was made by the Metropolitan shareholders, that the October agreements were void or voidable, and that they would not be accepted by the stockholders of the latter company.

I say that the distribution of its earnings was connived at by the New York company, because, with the full knowledge above stated, they consented to the dismissal of the action in the Superior Court, and to the entry of a judgment in that court affirming the validity of the October agreements. They did all those things, not in ignorance, but with full knowledge of every claim which has ever been advanced affecting the validity of these agreements. Therefore, if they have empowered the Manhattan company to distribute their earnings, and they cannot now get them back, it has not been done in reliance upon anything which the plaintiff has done—in ignorance that there was any claim of wrong affecting the validity of those agreements. They knowingly took the risk of the success of the attacks upon these agreements, and they cannot now complain if they have lost the battle.

Upon the question of the restoration of the money received by the Metropolitan company, it will be necessary to advert again to the rule governing restoration upon rescission.

The rule is very distinctly laid down, that to retain any part of what has been received upon a contract is incompatible with its rescission (*Cobb* v. *Hatfield*, 46 N. Y. 533, 537).

To retain the whole, or a part only, of what has been received upon the contract, is incompatible with its rescission, and hence the necessity of restoring what has been received upon it (*Masson* v. *Bovet*, 1 Denio 69, 74).

The same rule was held in the case of *Gould* v. *Cayuga County Bank* (*supra*).

In all these cases, however, there was but one contract,

and the right to retain the money received depended entirely upon the contract which it was sought to avoid, and, therefore, its retention was incompatible with its rescission. But this rule does not apply where, if the contract sought to be rescinded had never been made, the plaintiff would have been entitled to receive more than the payments made under the said contract. In such a case no offer to return is necessary, nor is it proper for the court to order restitution. This principle was distinctly held in the case of *Allerton* v. *Allerton* (50 N. Y. 670). In that case, the complaint alleged that plaintiffs, defendant, and one McPherson were partners in conducting certain stockyards at Pittsburg, Pennsylvania; that plaintiffs, induced by the fraudulent representation of defendant (who had the management of the business), that the business was not profitable, and that he, in conjunction with them, would sell out to McPherson, consented to unite with him in such sale upon being refunded the amount invested by them, and that thereafter the defendant represented that he had sold out, and paid to plaintiffs the money advanced by them; that in fact defendant did not sell, but retained his interest and subsequently acquired McPherson's interest; that the business had been profitable, and defendant had received large gains and profits. Plaintiffs asked that the sale be declared void, that defendant account for all moneys received by him, and that they have judgment for their portion of the profits under the co-partnership agreement, less the amount they had received. The case was tried by the court, who found the fraud as alleged, and decided that the plaintiffs were entitled to the share of the profits which they could have originally claimed, less the amount received by them on the sale; and that the defendants execute a re-transfer to plaintiff of the interest they had prior to the sale. Judgment was entered upon the decision, which was reversed by the General Term upon the ground that no fraud was shown; that McPherson or his representatives should have been joined as defendants, and that the plaintiffs should have tendered back the sums received by them on the sale. The Court of Appeals

reversed the judgment of the General Term, and affirmed that of the Special Term, holding that the fraud alleged was established; that no tender of the amount received was necessary before suit brought, as the judgment sought for and given, allowed it to the defendant, and this was, in fact, an actual return of the consideration paid; that the question as to misjoinder or non-joinder of parties, not having been raised by the pleadings or upon the trial, could not be raised upon appeal. The principle contended for was clearly applied in the above case.

If the plaintiff is entitled to recover the money of the defendant, contract rescinded or not, no tender or offer to return is necessary. It is only where the plaintiff has no claim to the money received, except by force of the rescinded contract, and, therefore, its retention is incompatible with the rescission, that a return or offer to return is deemed to be necessary.

I am of the opinion, therefore, that there are no obstacles which prevent the plaintiff from making all the restitution which the law requires in case it has been shown that the plaintiff is entitled to relief in this action.

It is now necessary to consider the grounds upon which the plaintiff claims relief.

The questions of law involved are of the greatest importance to the community at large, to the innumerable trading corporations with which our country is filled, and to such of our citizens as hold the shares of stock of such corporations. The respective rights, duties and obligations of both directors and shareholders in these corporations must be determined, unaided by any authoritative adjudications in our own state upon the subject.

Before, however, considering the legal questions presented, I shall endeavor to dispose of the only question of fact presented by the evidence, which bears, in any degree, upon the right of the plaintiff to relief; and that is:

Was there any actual fraud upon the part of the Metropolitan directors; and did they enter into a scheme to benefit themselves at the expense of their corporation?

Upon the evidence in this case, I am clearly of the opinion that no charge of fraud can be sustained. In view of the elaborate arguments which have been advanced by the counsel for the plaintiff in this case, in support of an affirmative answer to this question, and their evident belief that they have established their right to such answer, it is necessary that I should consider the various points raised by them, somewhat in detail.

Upon an examination of the evidence in this case, and the arguments of counsel thereon, I have had forced upon my mind the conclusion, that their belief in the verity of their position was brought about by asking themselves the question: " Can any good thing come out of Nazareth? " by imputing bad motives when the moving cause may have been good; by considering past transactions by the light and knowledge which subsequent events have developed; by taking that view of the future of these properties, whether supported most strongly by the evidence or not, which best accords with their desires, rather than by according to the defendants the right of a different judgment which they might in good faith entertain, than by placing themselves in the position of the defendants with no knowledge of the future, than by imputing good motives and meeting the question with the idea that the directors of the Metropolitan company intended to do their duty by that corporation.

Let us review, for a moment, the situation of affairs during the spring, summer and fall of 1881, and see what difficulties had to be overcome and what obstacles removed in order that the elevated railroad system, that these properties should be relieved from the incubus and dangers of this receivership (an invention of the courts in modern times, by which the enforcement of vested rights, rights secured by contract and by law, are arbitrarily and indefinitely stayed). It was soon ascertained, after the execution of the leases and tripartite agreements, that great miscalculations had been made as to the cost of completing the various lines, and that the net income derived from the

business of the roads would fall far below the sanguine anticipations of the parties interested; and that the properties of these corporations were subject to taxation to an extent which had not at all entered into the calculations fixing the rental which should be paid, to say nothing of the dangers which were threatened, in view of the decision of the Court of Appeals, that the owners of private property had some rights which even these corporations were bound to respect. The cost of the completing of the Metropolitan structure absorbed over four millions more of money than had been anticipated. The cost of operating these roads had greatly increased, and the amount of travel, especially upon the Metropolitan system, fell far below what had been anticipated. (I am aware the plaintiff claims that unjust discriminations have been made against the Metropolitan company. These, however, I will consider later.) And taxation to a very large amount had been levied upon the property of these companies. That the dangers which subsequently overwhelmed the Manhattan company and certainly threatened the interests of the holders of the stock of the Metropolitan company, were foreseen and deemed inevitable long before the final catastrophe, seems to me to be evidenced very strongly by the fact that as early as the spring of 1880, the necessity of a complete consolidation of all interests in those properties was keenly felt by the then directors and managers of both the New York and Metropolitan companies, and led to the efforts to bring about such consolidation, which seems to have been defeated because of the greatly divergent views of the owners of the various properties as to their value, even after a commission of their own choosing had, after hearing both parties, fixed the equitable basis upon which such consolidation should be founded. It was the object, undoubtedly, of those urging the consolidation to fix the union of the elevated railroad system beyond a doubt, feeling, as they did, that united they could stand, but that divided it might be a much more difficult task. They anticipated the uncertainty, confusion and danger to union which must neces-

sarily arise in the event of the Manhattan company being unable to comply with the leases, which event they plainly saw foreshadowed. But, for the reason above stated, no merger of interest could be agreed upon, and events were allowed to take their course.

In April, 1881, the president of the Manhattan company confessed the hopeless condition of the Manhattan company, unless relieved from the load of taxation. The Attorney-General thereupon commenced his first action the latter part of May for the dissolution of the corporation and the appointment of a receiver. This was long before there was any idea advanced of Mr. Gould becoming a director of the Metropolitan company. In July the Manhattan company was unable to pay the interest on the bonds of the New York and Metropolitan companies falling due on the first, as well as the rental then due. Some friends of the companies advanced the moneys requisite to pay the interest on the bonds. Shortly prior to this time, Mr. Kneeland, a holder of a considerable amount of Metropolitan stock, and also of a number of the proxies of Metropolitan shareholders, went to Mr. Sage to ask him about making up a board of directors, and it was suggested that it would be desirable to get Mr. Gould into the board; and Mr. Kneeland asked Mr. Gould to become a member of the board, and he finally consented to do so, if certain of his friends would also consent to go into the direction. There is not a scintilla of evidence that Mr. Gould desired to get into the board of directors of the Metropolitan company, that he made the slightest effort to get into that board, but on the contrary the evidence shows that he placed conditions upon his going into that board, which Mr. Kneeland, who was to elect him, refused to accept, and which he did not accept until almost the very day of election; and yet I am asked to find, that as early as May, Mr. Gould had formed the plan of ruining the Metropolitan to build up the Manhattan, and that in furtherance of that plan he caused the Attorney-General's action to be brought, and the bondholders' action against the Metropolitan company, Mr. Lawrence, the attorney for

NEW YORK—APRIL, 1884.          457

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

the bondholder, being a friend of Mr. Connor, who was a partner of Mr. Gould.

It is further urged, as an evidence of the fraudulent intent of Mr. Gould, that he insisted upon having certain of his friends go into the direction with him.    May I ask, is there any crime in this?    Mr. Gould's presence in the board was desired, either because of his financial and executive ability, or because his appearance in the board of directors would add strength to the management of the corporation.    It is true that Mr. Gould says he did not expect, when he went in, to give much attention to its business, but if his presence was considered so desirable, he had the right to say who his associates should be.    If his presence was not wanted with this condition, then why did Mr. Kneeland consent to his terms?    Can there be any impropriety, under such circumstances, in a man protecting himself from factious opposition, or from being overwhelmed by expedients worse than useless?

I am unable to see any unfavorable deduction to be derived from this feature of the case.    Indeed, one of the badges of fraud urged by one of the learned counsel for the plaintiff is that, although Mr. Gould is notorious for sustaining properties in which he is interested with his means and exertions, he did not advance a dollar, or take any action, to preserve the leases, and to maintain the Metropolitan company in its then condition.    That is, because Mr. Gould did not advance his own money to support the Metropolitan company, although he may honestly have believed that the charges reserved in the leases could not be earned for years to come, he is to be charged with fraud!    There is no rule of law which requires a director to use his own money to support a corporation in which he is a director. In fact a use of his money by a director for such a purpose puts him in a very different position from an ordinary creditor.    In case of disaster he is liable to much greater hindrances in the collection of his debt, and means of protection of which the ordinary creditor can avail himself are closed to the director who has advanced his money to sup-

port the corporation. If Mr. Gould is notorious for sustaining properties in which he is interested, as counsel say, then if he did not at once step to the relief of the Metropolitan company we must necessarily conclude that he fully realized the hopelessness of the task under the then existing arrangements.

On the 30th day of June, Mr. Kneeland made his liberal proposition to the directors of the Manhattan company, that if the board of directors of the Manhattan company would surrender the control of that corporation to him and his associates, they would take one million of the income bonds of the Manhattan company at sixty cents on the dollar. If it was such an evidence of guilt in Mr. Gould requiring the presence of his friends in the Metropolitan board as a condition of his acting as a director, what are we to think of Mr. Kneeland's proposition to take possession of the Manhattan company and lend it $600,000 upon a promise to pay back $1,000,000 with interest out of its income? That Mr. Gould had anything to do with the rejection of this proposition, or even knew of it, there is not the slightest evidence. He was not then a director in either of the companies, nor did he own any stock in either.

But, suppose he had been a director in the Metropolitan and Manhattan companies, and had held stock in the Manhattan, and he had come forward and said: I will take these bonds at sixty: would there be any doubt but that such a ruinous transaction would have been at once impeached, and the first to cry fraud would have been these very Metropolitan stockholders who now claim that Mr. Gould was guilty of fraud because he did not advance his money to support the Metropolitan company? The acceptance of such a proposition by the directors of the Manhattan company, the borrowing of money at such ruinous rates and upon such conditions, would be justifiable only if it could be made to appear that by no other means could the peril be warded off, and that it was thereby successfully averted. But, in fact, the sum of $600,000 would have put

off the evil day but little, if any more than six months, and shortly after the first of the next January, the Manhattan company would have found itself again confronted by its creditors with no money to pay their claims, and four hundred thousand dollars deeper in debt than it was before.

On the 2d of July, the Attorney-General had commenced the second action, and on the 13th of July, the receivers were appointed of the Manhattan company, and the New York company had commenced its action in the Superior Court to get possession of its road, upon the ground of the insolvency of the Manhattan company. The New York company, also, on the 22d of July, presented its petition to the court in the second People's suit, setting forth the hopeless insolvency of the Manhattan company and asking that the court give it back its property. In August, the $13,000,000 claim was started. Judge Emott, an eminent lawyer of this bar, had given it as his opinion, that the Manhattan company had a valid claim against the New York and Metropolitan companies. In this view, Messrs. Allison & Shaw concurred; and Mr. Justice WESTBROOK intimated subsequently, that it was not to be brushed away without thought.

On September 1st Mr. John C. Watson, of Boston, a stockholder of the Manhattan company, commenced his action in the United States Circuit Court against the New York and Metropolitan companies, for the purpose of testing this claim. The adviser of Mr. Watson, in this city, was Mr. Ashley, secretary and transfer agent of the Wabash, St. Louis & Pacific Railway Company, of which Mr. Gould was a director. When Mr. Ashley was in the banking business here, Mr. Watson had been his Boston correspondent. Mr. Watson wrote to him asking him what to do. Mr. Ashley consulted his son and a Mr. Wheeler, lawyers, and then he advised Mr. Watson to bring suit. Mr. Ashley states he never spoke to Mr. Gould on this subject until after this suit was brought, when he simply showed him the complaint in the cars; that Mr. Gould had no connection with the action in any manner, way or shape; and

yet it is claimed in the face of this evidence, given by an unimpeached witness, whose manner of testifying gave every evidence of honesty, that Mr. Watson's suit was one of the schemes of Mr. Gould to cover up his design to ruin the Metropolitan company. The time was now drawing near when the ninety-day forfeiture clause in the leases would become operative, and the directors of the Manhattan company feared to allow a forfeiture to attach, lest the leases would be broken and the New York company get its property back. Accordingly, the device of receivers' certificates was resorted to in order to bridge over the difficulty, and the receivers made an application to the court to be allowed to issue receivers' certificates bearing twelve per cent. interest; and these certificates were, as I understand it, expected to be a first lien upon the properties held by the Manhattan company. (This kind of certificate is another of those modern improvements in reference to the administration of the affairs of an insolvent corporation, by which the first lien given by his contract to a creditor loaning his money to a corporation, is made by the court subordinate to a subsequent creditor. I suppose the courts which grant such extraordinary relief look upon them as a sort of bottomry bond, the proceeds of which are to be devoted to keeping the sinking corporation afloat until it can be piloted by means of the operation of the court's stay law under the guise of a receiver, into a safe harbor.)

Mr. Gould, Mr. Sage and Mr. Conner made affidavits opposing the application, upon the ground that it would be only a temporary expedient, and serve simply to prolong for a little while a hopeless struggle. In this opposition they were clearly right, as shown by subsequent events. The difficulties under which the Manhattan company labored were not of a temporary nature; they were radical and could not be overcome by any temporary expedients. The revenues of the elevated railways have never, up to this time, yielded enough to pay the enormous burdens which the Manhattan company had assumed by the leases and tripartite agreement of May 20th, 1879; and when they

will, depends upon the development of the earning capacity of the Metropolitan roads in the future, as the Third Avenue road of the New York system has about reached the limit of its capacity.

To this point I shall again revert.

If the roads had been kept in the hands of the receivers and forfeiture prevented by the issuing of these bottomry bonds, one upon the other, the end would inevitably have been, that although the bondholders would have received their interest and the stockholders their dividends, and thus a forfeiture averted, eventually the holders of the bottomry bonds would have owned the whole property, and the bondholders and stockholders would have had no interest therein. I can see no fraud in preventing such financiering. The court wisely refused to give its sanction to such a violation of vested rights, and simply authorized the receivers to borrow money upon certificates at legal rates, and none of the certificates were negotiated.

In the meantime the motion of the New York company to get back its road, made in the People's suit, was argued, and on the 30th of September, the ninety days' grace having elapsed, the New York company presented a supplemental petition, setting up the forfeiture, to reinforce its demand for its property. Negotiations for a settlement had been begun some time before, and Mr. Gould now began to purchase Manhattan stock, and also bought his Metropolitan and New York stock. About October 1st the necessity of a settlement upon some basis seems to have been generally conceded. It was apparent that some solution would be arrived at by which the Manhattan company could remain in possession of the property. Negotiations were carried on; conference committees appointed; that some concessions must necessarily be made was obvious; to what extent, and in what order, were the only subjects of discussion. The old controversy as to the relative values of the New York and Metropolitan properties was renewed; the $13,000,000 suit was held up *in terrorem*. (It may be doubtful whether anybody was very much frightened by it.)

And finally the rentals were reduced to six per cent., with a preference to the New York company; and this contract was not submitted to the stockholders of the Metropolitan company. Mr. Gould had, at this time, purchased twenty thousand shares of Manhattan, and held twenty-five hundred shares of the Metropolitan, and five thousand shares of New York.

If the New York company was presenting itself before the court, I might understand how such a settlement might be considered disadvantageous to it; and the fact that not only the board of directors but the stockholders of that company approved this settlement, seems to be conclusive evidence that at that time the settlement was deemed wise and proper by all unprejudiced minds.

But it may be said that this result was brought about by the fact that the New York company was to have a preference in the payment of dividends. That the New York company should have such a preference was inevitable. There is not the slightest doubt that if at any time there was a deficiency in dividends, it would arise from the fact that the Metropolitan roads did not earn them; and further, that the New York company would earn much more than sufficient to pay the rental dividends upon its lease, long before the Metropolitan company could possibly hope to earn rental dividends upon its lease.

I am aware of the fact that these conclusions are disputed by the plaintiff; but it seems to me very plain that the plaintiff's deductions are based upon a greatly exaggerated view of the immediate future of the Metropolitan roads.

It is undoubtedly true that the Metropolitan roads might be run so as to show greater gross earnings; but that such a change in the running of the trains would result in an increase in the net earnings of the roads, is, in my judgment, far from being established. The idea of running heavy surface engines and trains over the Second Avenue line to Twenty-third Street, even if the structure would permit, is too conjectural to need much comment. This structure, in consequence of its great height, is inaccessible, and the

only reason which will cause its earnings to be increased to any extent, is the fact that the Third Avenue road cannot accommodate any more travel.

Again, the Sixth Avenue road cannot be as profitable as the Third. From Fifty-ninth Street up to the terminus at the Harlem River, it runs through a sparsely settled portion of the city, and it is compelled to run each train a much greater distance than the Third Avenue is required, and this has increased the cost of transportation of its passengers. Below Fifty-third Street this road has also nearly reached its limit of accommodation, and the result of an increase of travel above Fifty-ninth Street would be to deprive it of local travel below Fifty-third Street, and consequently the cost of transportation of its passengers would be increased in proportion to the greater distance each passenger travels.

For these reasons, it does not seem to me that the future of the Metropolitian properties is nearly so brilliant as its stockholders imagine, and that its net earnings will not for years, if ever, equal those of the New York company. Therefore, as far as the preference given to the New York road is concerned, no unjust discrimination was observed.

It may be said that Mr. Field, who was also interested in the Manhattan company, carried this settlement through the New York board. He undoubtedly urged it; but that the other directors were under his influence, or that they subserved any other purpose than the interest of their company, is not by any means shown, but upon the contrary, the evidence shows that the proposition was vigorously canvassed and finally approved as the best solution of existing controversies, by men unbiased by any adverse interest.

Much has been said about that bugbear of the $13,000,-000 claim. This claim may have no foundation; it may be frivolous. As to this, I do not express any opinion, but respectable counsel had given it their sanction and it was a good thing to get it out of the way. It might have given trouble when least expected, and that it had no

464 COURT OF COMMON PLEAS.

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

foundation in law, in the opinion of the eminent counsel for the plaintiff, does not alter the fact that it was very desirable to dispose of it if possible.

I have had brought under my notice a case which illustrates how dangerous it is to leave outstanding a claim which is declared without foundation by the most eminent counsel.

Not very many years ago, a suit was to be begun to have actual partition of certain real estate in this city, amongst the numerous tenants in common. It being a very important action, and as it would involve the title to a very large and valuable property, the most eminent counsel then at the New York bar was retained to supervise the proceeding. During the preparation of the complaint, a question arose as to whether it would not be desirable to make a person, who had been appointed an assignee in bankruptcy in 1841 of a party through whom an interest in the property descended, a party, to save all question. The attorneys favored it, although they were of the opinion that such assignee had no interest, upon the ground that it was best to make any or everybody a party in a partition suit, who not only could have or by the slightest possibility could claim to have, any interest; the eminent counsel examined the question and was firmly convinced that any claim by the assignee would be of the most frivolous character, and the attorneys pressing the view that it was best anyhow to make this assignee a party, to save all question, the eminent counsel declared that he would retire from the case if any such unnecessary parties were made defendants. The assignee in bankruptcy was not made a party. The action went on, the property was partitioned, a large amount of it sold, title taken, upon the eminent counsel's opinion as to the regularity of the proceedings. Sometime afterwards the Court of Appeals decided that by the assignment in bankruptcy in 1841, the whole title to that share in the real estate, claimed through the bankrupt, had passed to the assignee, and, as a result, the title to the whole of the property partitioned was defective. I therefore say, that no matter what any lawyer's

opinion may be as to the invalidity of a claim of the character of the $13,000,000 claim, no matter how frivolous in the opinion of some it may be, it is no evidence of fraud that its existence was recognized in this settlement.

That this claim, of itself, was the moving cause of the reduction in the rentals to be paid to the companies by the Manhattan, cannot, I think, with verity be asserted; or that it was a very potent factor in determining the terms of the new arrangement; but that it was thought advisable to get rid of this claim, and that it was taken into consideration with the many other things necessary to a determination as to the advisability of any particular action, is undoubtedly true.

The necessity of keeping the properties under the control of one management was recognized, and that the Manhattan afforded the best means of attaining that end was acknowledged, and how this result could be achieved without the dangers of the disastrous failure which had followed the making the leases of May 20th, 1879, was the problem to be solved. It was solved by the October agreements, to the satisfaction of the directors and stockholders of the New York company, none of whom, except one, had any interest whatever in the Manhattan company—the New York company being called upon, in my judgment, to make much greater sacrifices than were called for from the Metropolitan company.

At the time the October settlement was made, by the terms of the lease of May 20th, 1879, the New York company was absolutely entitled to the possession of its road. There is not a pretense that there was any defense to its claim; and yet it is urged that it was the duty of the directors of the Manhattan and Metropolitan companies to resist this claim, and, because they admitted its validity and negotiated upon that basis, they are guilty of fraud.

The counsel say:

"The New York company would have been powerless, for many months, to break up the lease, because of their non-payment.

Vol. XI.—30

466 COURT OF COMMON PLEAS.

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

" At the expiration of the ninety days' grace provided by the original lease, the New York company would have to bring an action of ejectment to obtain possession of the road.

" That suit, with the two trials given as a matter of right to the Manhattan company by the statute, would have lasted months, if not years, and would have given the lessee ample opportunity to provide for its liabilities by its rapidly increasing earnings, to say nothing of raising the necessary funds in other ways."

That is, by putting in defenses under oath having no foundation in fact, taking new trials and paying the costs of a previous trial, with the absolute assurance of a no better result, the New York company might have been delayed in the assertion of its rights for months, if not for years, so as to have given the Manhattan company time out of increased earnings to pay its past indebtedness; and because the directors of the Manhattan and Metropolitan companies did not resort to these (I had almost said questionable, but there is no question as to their impropriety) devices, that, therefore, they are to be charged with the betrayal of their trusts. It is the first time, I imagine, that a court of equity has ever been asked to give its sanction to such a claim as this.

Indeed, if the directors of the Manhattan and Metropolitan companies had taken this course and incurred expenses in such litigation and paid costs upon the obtaining of such new trials, and these expenses and costs had been paid out of the funds of the respective companies, they could have been charged personally against such directors as disbursements incurred in proceedings which they had carried on in bad faith, in violation of their duty. It is no duty of a director to resist lawful claims against his corporation, and if legal forms are susceptible of abuse by the unscrupulous, a director is not censurable for not availing himself of such improper methods to sustain his corporation.

The conduct of the Metropolitan directors, after the making of the October agreements, is claimed to be strong evi-

NEW YORK—APRIL, 1884.            467

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

dence of the fraudulent intent and bad faith with which these agreements were made. That the procuring of the judgment in the People's suit and also in the action in the Superior Court, the adoption of the merger agreement of November 14th, and its terms, and the manner in which dividends were declared, was an attempt to use the forms of law to coerce the stockholders of the Metropolitan and New York companies into a ratification of the merger agreement is to my mind certainly apparent, but these facts are not sufficient to establish an original fraudulent intent.

In order that a fraudulent intent in the original act may be deduced from subsequent acts they must be inconsistent with anything but a fraudulent intent originally, and not relate to any subsequent fraudulent intent; because a fraudulent intent formed after an agreement has been executed and delivered, although formed for the purpose of aiding the carrying into effect the terms of the agreement, cannot relate back to the original agreement.

Great opposition to the October and November agreements had been manifested by some of the stockholders, and the endeavor was made to crush out this opposition, but these efforts by no means implied that any improper purpose was indulged in at the time of the making of the agreements themselves.

The absence of Mr. Connor, and the non-production of the books, are to my mind a very suspicious circumstance; and were it not for the rule laid down in *Bleecker* v. *Johnston* (69 N. Y. 309), I should necessarily conclude that their absence justified the strongest inference to be indulged in against the defendants. But as this rule is held by the court, in that case, only to apply to cases where it is shown that a party has resorted to improper means to get or keep witnesses away from the trial, my own opinion must conform. Although we may imagine a great many things in connection with this matter, yet unless our deductions are supported by some evidence, they cannot form the foundation of a legal judgment.

There are other minor points which have been urged by

counsel upon this question; but this opinion has already grown to such an inordinate length, that I am warned to take up no more time or space in the discussion of this point.

The next question to be considered is—

Had the Metropolitan directors the power to modify the original leases and tripartite agreement of May 20th, 1879, without the consent of the shareholders?

In the disposition of this important question, I am but little aided by any authorities in the courts of this state or of the United States.

It is true that Mr. Justice BLATCHFORD, in the United States Circuit Court, in the case of *Flagg*, held that these October agreements were valid, upon the authority of *Hoyt* v. *Thompson* (19 N. Y. 207), and *McCullough* v. *Moss* (5 Denio 566); and that the General Term of this Department sustained the same in the case of *Content* (26 Hun 82), upon the ground that the October agreements were nothing more than a compromise and adjustment of claims which the Metropolitan and New York companies held against the Manhattan, and that the boards of directors having charge of the management of the affairs of a corporation, can always exercise this power of adjustment in the administration of the affairs of their corporation. The weight to be given to the decision by Mr. Justice BLATCHFORD has been much shaken by opinions given in our own courts; and the ground upon which the decision of the Content case was based does not seem to be relied upon by the counsel for the defendants in the case at bar, although the case is presented as an authority in their favor. If the October agreements are to be held to be simply as a compromise and adjustment of an existing claim, then I am clearly of the opinion that the board of directors of the Metropolitan company, without the assent of its stockholders, had the power to make them, within the principle involved in the case of *Hoyt* v. *Thompson* (19 N. Y. 207). But, in my opinion, these agreements are not susceptible of any such limitation. They are rather new agreements radically modifying and changing previous

agreements, which for the purposes of the discussion in the present view, it must be conceded the directors of the Metropolitan company had no power to make without the consent of the shareholders, and as to all the terms and provisions of which such shareholders had been consulted, and to which they had given their assent. It appears to necessarily follow that, if the directors have no power to lease without the assent of the shareholders, such shareholders might determine the terms and conditions of the lease to be given. If their consent is necessary, it must be because they are to be consulted as to the advisability and desirability of leasing their property, and that question depends almost always upon the terms and conditions of the lease proposed. Therefore, how can they intelligibly act unless they know what is to be done? They might give their assent to a lease upon certain terms and refuse it upon other conditions. The stockholders could, if they chose, give a power to lease to their directors, leaving the latter to determine the terms and conditions; but that was not done in respect to the agreements and leases of May 20th, 1879. The stockholders approved of these instruments after they were executed and after they had been read and considered. They consented to lease upon those terms and no other, and to say, that if the board of directors had no original power to lease they could, whenever they thought the exigency or the situation required, radically change and alter the terms and conditions of a lease granted by authority of shareholders, would be to deprive the shareholders of intelligent action.

If these agreements had merely been a settlement of existing claims due, or about speedily to become due, they might be considered as mere compromise agreements, but when they change in many substantial particulars the leases of May 20th, 1879, and that, too, for a period of over nine hundred years, I cannot see how they can be called mere compromise agreements.

But it is urged, " that, conceding the fact that shareholders have a voice as to the transaction of extraordinary

business, the extraordinary business of leasing the railroad for nine hundred and ninety-nine years had been approved by the shareholders.

"This action settled the question of parting with the possession of the property for nine hundred and ninety-nine years. This having been done, what business, ordinary or extraordinary, was then left for the directors of the lessor road to do? They had no railroad to run or manage. The usual ordinary business of the directors of a railroad as such had ended. Those in office and those afterward elected were empowered, and, in fact, employed in looking after the affairs and interests of the lessor under the lease, and nothing else. Although called directors of a railroad company, they had no railroad to direct; all the property of the railroad company having passed into other hands for a long period of time, with the assent of its shareholders. The ordinary business which remained for the directors to attend to was the collection and distribution of the rents falling due under the lease. Would it be extraordinary business, and in excess of their powers, to accept and receive a less amount than that reserved in the lease, if unexpected difficulties and complications arose? In other words, to waive part of a demand if it appeared clear that the interests of their principals called for it. Although leasing may be extraordinary business, the element of leasing did not enter into the October agreements, and, therefore, were not the subsequent modifications as to rent, etc., a mere matter relating to money affairs and ordinary "business," as that term is generally understood? It clearly appearing that the carrying out of the terms of the lease as to the amount of rent to be paid had become an impossibility, what was to be done? A modification was necessary, and the October agreements were simply modifications.

"If it be said that if the lessee could not perform, it was the duty of the directors of the lessor to have insisted upon the taking possession of the property, and to do anything else was extraordinary and not within the power, it must be remembered that all parties had agreed that the running of

the roads under one management was a necessity; that they could not be run otherwise, except at the risk of inconvenience and delay to the public and danger to human life.

"To insist upon breaking up the lease because the lessor could not pay the full rent; to resume the old status which all concerned had agreed could not be maintained, except at the risk above mentioned, would have been directly opposed to the expressed views of the shareholders. Therefore, if the lessee was unable to pay all, it was the part of wisdom to agree to take less, when to maintain the former agreements was an impossibility; and was fairly within the meaning of ordinary business."

That there is great force in the above argument must be conceded, but I think that its fallacy arises from overlooking the fact that, if the shareholders had the right to determine the terms and conditions upon which their property was to be parted with, such terms and conditions form the consideration for the assent, and the consideration cannot be taken away without destroying the assent. The assent depended upon and was supported by the terms and conditions, it sprang from such terms and conditions, and when they were removed the foundation of the whole structure upon which the assent rested was removed and the assent necessarily fell. Although it might have been within the powers of the directors to have made temporary arrangements for relief from the difficulties, and such arrangements would be called ordinary business, yet they could not make radical changes in the terms and conditions of the lease as to which the stockholders had never been consulted.

The result of the October agreements certainly was a permanent and radical change in the terms and conditions of the lease.

If the board of directors could not make a new lease upon definite terms and conditions, then, clearly, they could not radically modify the old lease.

If they could not make a new lease directly, then they could not in effect make a new lease by striking out of the old

lease substantial covenants upon the part of the lessee and inserting others; what would be unlawful, if done directly, cannot be legal because done indirectly.

It is undoubtedly true that directors may compromise a debt due to their corporation; but the October agreement went much further than this. They changed the lease in many radical and substantial particulars, and took away rights which may have been the very things that induced the shareholders to assent to a leasing of their property, and without the presence of which such assent would never have been given.

It is true that all conceded the necessity of united management, and this concession might have justified the directors in the making of temporary arrangements to continue such management if the lease could not be complied with, until they had an opportunity to consult with their principals; but such concession could not possibly have given the directors power to radically change the old lease for all time, which was in effect done by the October agreements, simply because the corporation, through its shareholders, had consented to the leasing of its road upon certain other specified terms.

Directors, as I shall hereafter attempt to establish, are the agents of the corporation, having, as such, exclusive authority to act within their sphere. But they are also, in some respects, merely the executive agents of the shareholders, and as such may perform certain other acts, if specially authorized thereto by their principals, and in respect to such action they are simply the agents of the shareholders, as well as of the corporation. The shareholders, the principals, having fixed the terms and conditions, which they had a right to do, upon which the directors, their agents, were authorized to part with the possession of the property in their charge, and to commit the possession and management thereof into other hands; what right have the agents to radically change or alter these terms and conditions without consulting their principals?

Suppose an agent parts with his principal's property upon

NEW YORK—APRIL, 1884.                    473

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

certain terms, which have been determined upon by his principal, and the principal has the right to recover back his property if these terms are not complied with; can it be said that the agent, simply because he has a general authority to compromise debts due to his principal, would have the right to alter the terms upon which his principal had authorized him to part with his property, and which were the inducements, and the only ones, which led the principal to give such authority?

In other words, in case of a failure to comply with the terms upon which the property had been parted with, who is to elect whether the property shall be taken back or not? Is it not the principal? How can the agent claim any power to make this election, simply because he has a general authority to compromise debts?

This would be exercising a widely different authority in the name of the principal from that which would be called into action by the mere taking of a smaller sum in settlement of a larger sum due.

The principal might much prefer to have his property back again rather than to take a smaller sum for it, and he would have the right to determine that question himself.

So in the case at bar; the Metropolitan shareholders fixed the terms upon which they would consent to part with their property, and they stipulated that in case those terms were not complied with they should be entitled to recover back their property. Can there be any doubt but that, in case of a failure to comply with the terms which they have fixed, it is a question for them to determine whether they would prefer to take their property again into their own possession and manage it for themselves, rather than to accept different terms from those which had originally induced them to part with their property?

But it is not necessary to pursue further the discussion of this question, because I do not understand that the defendants base their claim of the validity of these agreements upon any such ground; but that they insist that the direc-

tors of the New York company and those of the Metropolitan company did make and had the right to make these leases of May 20th, 1879, without any assent upon the part of the stockholders of their respective companies, and that the subsequent submission of the leases to the stockholders was merely to obtain their moral support.

That the directors of a corporation are agents, seems to be clearly recognized in all the cases in which the relations of directors and shareholders to their corporation have been discussed.

It is said in *Twin Lick Oil Co.* v. *Marbury* (91 U. S. 587, 589), that the directors are the officers or agents of the corporation, and represent the interests of that abstract legal entity, and of those who own the shares of its stock.

In *Cumberland Coal &c. Co.* v. *Sherman* (30 Barb. 553, 571), the court say : " There can be no question at the present time that a director of a corporation is the agent or trustee of the stockholders."

In Angell and Ames on Corporations, § 771, it is stated that, " The stockholders compose the company, and the managers, directors or officers are their agents, necessary for the management of the affairs of the company, but they are not essential to its existence as such, not forming one of the integral parts."

In *Abbott* v. *American Hard Rubber Co.* (33 Barb. 578), the court say, at foot of page 591 : " Boards of directors are agents of the corporation to manage its affairs, and carry out the purpose and object of its formation."

The directors thus being the agents of the corporation, what are their powers and from whence are they derived, and how must corporate powers residing in the corporation, the right to exercise which is not vested in the directors, be brought into operation ?  These questions are so intimately connected that they must be disposed of together.

The powers of directors are such as are conferred by the charter of their corporation and the laws pertaining thereto, and such corporate powers as are not conferred by law upon the directors, remain in the corporation to be exercised, or

at least set in motion by its component parts, the share-holders.

In the case at bar, the charter provided that the directors were to manage the business and affairs of the company; and the question involved in this branch of the case is, whether this language conferred the right to exercise every corporate power possessed by the corporation, or merely to manage the ordinary business and affairs of the company for the carrying on of which it was organized, leaving the right remaining in the shareholders composing the company to set in motion or confirm corporate action within the limits of its powers, but extraordinary and unusual in its nature.

Within the sphere of their duties, the right of the directors to act is undoubtedly exclusive, and further, all corporate acts must be done through them, as they are the exclusive executive and administrative authority, but, nevertheless, all corporate powers do not reside in the board of directors.

It is true that the court say, in *McCullough* v. *Moss* (5 Denio 567, 575), that: "When a charter invests a board with the power to manage the concerns of a corporation, the power is exclusive in its character. The corporators have no right to interfere with it, and courts will not, even on a petition of a majority, compel the board to do an act contrary to its judgment."

That case was an action to recover upon a promissory note, which the corporation in the exercise of its legitimate business could have made, and the question presented was whether execution was proved. The note was signed by the president and secretary of the company, but no authority from the board of directors, who, by the charter, were to conduct the affairs of the company, to the president and secretary, was shown. Some resolution of the shareholders was shown, but it had no relation to this question, and then the court uses the language above quoted. This case nowhere decides that the directors are clothed with all the corporate powers. It may be cited as an authority for the

proposition that the shareholders cannot compel the directors to act in any manner against their judgment in the exercise of a corporate power which remains in the corporation.

For example, if the power to lease was vested in the corporation, but the directors could not, because of the limitation in the charter, exercise this power, the shareholders could not cause the lease to be executed and delivered, nor could they compel the directors to execute and deliver the same against their own judgment; all that the shareholders could do would be to authorize the directors to act or confirm an act of the directors which would be incomplete without such ratification.

The case of *Hoyt* v. *Thompson* (19 N. Y. 207), is also claimed to be an authority against the suggestion made above ; but upon an examination it will be seen that much is said in respect to the relation of directors to their corporation, and their rights and powers, and the sources from which they are derived, which was not at all necessary to the decision of the question involved, and is directly contrary to the principles announced in the United States Supreme Court, in a case where the direct question was presented.

The adjudication in the case of *Hoyt* v. *Thompson* had necessarily to be put upon the ground that the act under investigation was "ordinary business," and in that case a distinction was plainly recognized between "ordinary business," and such as was within the corporate powers, but unusual and not coming within the general business of the corporation. The court held, that although the charter of the corporation declared that its powers should be exercised by a board of directors, consisting of a specified number, yet the board might delegate its authority to agents or to a quorum of less than a majority of the number.

The court further held, that when a by-law of the corporation declared that five directors should be a quorum for the transaction of "ordinary business," the general business of the corporation was embraced in the authority thus

delegated, including as incident thereto, the power of pledging or assigning assets of the corporation for the purpose of securing a debt, it appearing that such pledge was made for the purpose of enabling the corporation to continue its business; and this is all that this case decides which is pertinent to the questions involved in the case at bar.

It is true that the learned judge who wrote the opinion in the case of *Hoyt* v. *Thompson,* uses the following language :

" The board of directors of a corporation do not stand in the same relation to the corporate body which a private agent holds toward his principal. In the strict relation of principal and agent, all the authority of the latter is derived by delegation from the former, and if the power of substitution is not conferred in the appointment, it cannot exist at all. But in corporate bodies the powers of the board of directors are, in a very important sense, original and undelegated. The stockholders do not confer nor can they revoke these powers. They are derivative only in the sense of being received from the state in the act of incorporation. The directors convened as a board are the primary possessors of all the powers which the charter confers."

The whole of this argument was devoted to establishing the power of the board of directors to delegate the authority to manage the ordinary business of the corporation to five of their number, and had no other purpose.

That the directors convened as a board, are *not* the primary possessors of all the powers which the charter confers, is expressly held by the United States Supreme Court, in the case of the *Railway Company* v. *Allerton* (85 U. S. [18 Wall.] 233). In that case the charter provided as follows :

" Section 3. The capital stock of said corporation shall be one hundred thousand dollars, and may be increased from time to time at the pleasure of said corporation.

" Section 4. All the corporate powers of said corporation shall be vested in and exercised by a board of directors, and such officers and agents as said board shall appoint."

An increase of the capital stock of the corporation by the directors, without the assent of the stockholders, was held to be void, as beyond the power of the board of directors, although the charter provided that all the corporate powers of the corporation should be vested in and exercised by a board of directors, etc., and that the powers thus granted to the directors refer only to the ordinary business transactions of the corporation. The necessary conclusion to be drawn from the reasoning employed in that case is, that the board of directors are the managers of the business which the corporation is chartered to carry on, and they have the control and management of that business; but that they have no power to effect organic and fundamental changes in the corporation or its business without the consent of the corporation. The Metropolitan company was chartered for the purpose of making, constructing, maintaining and operating a railway upon certain streets, avenues, thoroughfares and places in the City of New York. This was its business, and this was all the business upon the execution of which it entered. Could it be imagined that a change more fundamental could possibly be made, than that a corporation, chartered for the above purpose, should lease its road and properties to another corporation and deliver possession of the same for all time, and thus change its business from that of making, constructing, maintaining and operating a railroad, to that of receiving rent for the use of such road?

In considering this question, it is not at all improper to look for a moment at the result arising from a rule, that the directors are the primary possessors of all the powers which the charter confers. If the board of directors have the power, without the assent of the shareholders, to lease the properties of the corporation for all time, then the shareholders may be deprived of, not only the administration of their property through its agents, the directors, but its very possession, without a moment's warning. A board of directors are elected for one year, to manage the business and affairs of the corporation, such business being the operating

and maintaining a railroad. At the time of their election, the shareholders have no intimation that anything else is to be done by the directors, and the expectation is that such directors, at the end of their year in office, will turn over the property committed to them to their successors in office, with an account of their stewardship. Can it be possible that this board, elected for only one year, without any notice or warning, has the power to terminate the business of the corporation, and transfer all the properties to another corporation? It seems to me, clearly not. This is not the management of the business of the corporation. It is terminating the business, to carry on which it was incorporated. It is just as fundamental and radical a change as an increase of its capital stock, or the entering upon a new business by a corporation authorized by its charter, can possibly be. Although I have not intended to quote as authority any decision except those of our own State, or of the United States Supreme Court, I must refer to the language used by the learned court in the case of *Cass* v. *Manchester* (13 Rep. 167), in which it was held that directors had no power to make a lease, even for five years, without the consent of the shareholders. The court says :

"But if this conclusion is the result of too strict a construction of the charter, we are of the opinion that the power in question is not exercisable independently of the judgments of the stockholders. The directors and officers of a corporation are its exclusive executive agents, and, as it can only act by and through them, the powers vested in the corporation are deemed to be conferred upon its representatives, but they are, nevertheless, trustees for the stockholders. The law recognizes the stockholders as the ultimately controlling power in the corporation, because they may, at each authorized election, entirely change the organization, and may at any time keep the trustees within the line of faithful administration, by an appeal to a court of equity. Hence, it has been held that the directors of a corporation cannot alone increase its capital stock, where such increase was authorized by its charter 'at the pleasure of

said corporation,' and where it was provided that ' all powers of such corporation shall be vested in and exercised by a board of directors,' etc.; and this for the reason that the general power to perform all corporate acts, refers to the ordinary business transactions of ' the corporation,' and not to a change so fundamental and organic (18 Wall. 234).

" The change proposed is not organic, but it is thorough and fundamental, as it affects the administration of the company's affairs. It involves a withdrawal from the control and management of the stockholders of the entire property of the corporation for at least five years; it will preclude, for a like period, the exercise by the stockholders of their judgment as to the particular character and method of conducting the business affairs of the corporation; and it denies to the stockholders any right of suggestion or disapproval of the conditions, when such a relinquishment of important corporate faculties may be conceded. Surely a power which will be attended with such consequences does not relate ' to the ordinary business transactions,' nor ' to the orderly and proper administration of the affairs ' of the company ; and hence cannot be exercised by the directors without express authority to them."

In opposition to this view is cited by the learned counsel for the defendants, the case of *The Excelsior Fire Ins. Co.* (16 Abb. Pr. 8, 14), in which it was said:

" The statute says ' the company is authorized to reduce the number of its directors,' etc. It makes no provision for a meeting of the stockholders for that purpose. In the absence of any provision of that character, the power is vested in the board of directors. Stockholders, as such, possess no powers in the management of a corporation, except specially authorized so to do by their charter. Their power ends with the election of the directors."

Also in *Elwell* v. *Dodge* (33 Barb. 336, 339), the court says:

"A general resolution of the directors delegating the power to transfer property or choses in action to meet the exigencies of the company, or a ratification of this particu-

NEW YORK—APRIL, 1884.          481

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

lar transfer by act or resolution of the board, or acceptance and appropriation of the fruits of the transaction, if a special resolution authorizing the transfer and use of this note was wanting, would be sufficient to sustain the indorsement as the act of the company, even as against the company, and might have been proved had the precise point now made been then taken."

The language of Judge SELDEN, in the case of *Robertson* v. *Bullions* (11 N. Y. 243, 250), is also referred to. He says :

" What, then, are the powers, rights and obligations of this class of corporate officers, and to what extent has this court jurisdiction over them? . . . . . These officers are trustees in the same sense with the president and directors of a bank or of a railroad company. They are the officers of the corporation to whom is delegated the power of managing its concerns, for the common benefit of themselves and all other corporators, and over whom the body corporate retains control, through its power to supersede them at every recurring election."

In the *Matter of St. Ann's Church* (23 How. Pr. 285), Judge EMOTT says:

" The officers thus chosen are not trustees in the sense in which an individual becomes or is made a private trustee ; they are simply officers of the corporation. As such officers, they represent the corporation ; they are its managing agents, and they may act for the corporation as fully as the directors or agents of an ordinary corporation may act in its behalf. A corporation ordinarily acts through its officers, and through them only. The power of managing its concerns is delegated to its officers, and they are to manage them for the common benefit of themselves and all the other corporators. These officers are liable, it may be, to judicial proceedings to control their action, where it is fraudulent or destructive of the rights and interests of the corporation. They are responsible, however, more directly and practically to the corporate body itself, through the power of the corporators to supersede them at their elections."

In the case of *Dana* v. *The Bank of the United States* (5 Watts & S. [Pa.] 223, 246), the following passage occurs:

"This, I take (that is to say, the election), is the utmost that the stockholders can do according to the tenor and design of the act under which they must all act until an election of the directors shall come around, when the former, if dissatisfied with the conduct of the latter in managing the affairs of the bank, may turn any one, or more, or the whole of them, out of the direction, and place it in other hands."

The claim made by virtue of these decisions is that the stockholders have no power to do anything in relation to any matter whatever pertaining to their corporation, except that if dissatisfied with the conduct of their directors in managing the affairs of the corporation they may turn them out at the next election; and this is certainly the language of all the above decisions. But how inapplicable is such remedy to an act of the directors which has terminated the business of the corporation, and placed all its property in other hands for a thousand years; will that give back the property to the corporation; will that set right any maladministration if the directors had the power to thus act? Clearly not, and the language was intended to apply to cases where the action taken was neither radical nor fundamental in its character. For mismanagement of the ordinary business of the company, the turning out of the directors is a reasonably adequate redress; but when the directors have divested the company of all its property, it is difficult to see how any remedy is afforded by turning them out. Further, the courts of this state, as has already been seen, expressly recognize the fact, notwithstanding the decision above mentioned, that the shareholders have certain other rights and privileges beside that of electing directors; viz: the right to be consulted in respect to change of business, increase of capital stock, dissolving and winding up the affairs of the corporation, sale of any portion of its property necessary for the transaction of its business, etc.

It need hardly, therefore, be necessary, in view of the principles which have controlled the decisions already quoted,

to discuss further the question that there are powers reserved
to the corporation which cannot be exercised by the direct-
ors without the assent of the shareholders, and that the
shareholders, under some circumstances at least, may exer-
cise other functions than simply those of electing their board
of directors.    Nor is it necessary now to dwell upon the
scope of the act of 1839, or to attempt to show that by this
act the Metropolitan Railway Company had the power to
lease its road and properties.    That such power existed is
now conceded by the counsel for the plaintiff, in view of the
decision of the Court of Appeals in the case of *Woodruff* v.
*The Erie R. Co.* (93 N. Y. 609).

It is claimed by the counsel for the defendants that as far
as this state is concerned, at least, the power of a board of
directors to lease without the assent of shareholders, has
been expressly recognized by the legislature of this state,
and various acts of the legislature are cited, in which leases
of railroads and consolidations of railroads are authorized to
be made as the directors shall determine.    It seems to me,
that instead of these acts being an evidence of a legislative
construction that, under the act of 1839, directors had the
power to lease without the assent of the shareholders, it was
only because such acts could not be performed by the direct-
ors alone that it was thought necessary to confer express
powers upon the directors.    If the power was conferred
upon the corporation, the directors alone could not exercise
it, and, therefore, the legislature conferred the power ex-
pressly upon the directors.

Attention has also been called to various cases where the
assent of stockholders is provided for as a condition of
corporate action.

It will be seen that in every case it is a limitation upon
corporate action by requiring more than a majority of stock-
holders to assent, or the conferring of a new power upon
corporations and affixing the conditions upon which such
power is to be exercised.

I fail to see that legislation of this character in any way
aids us in the determination of this question.    If, however,

a solution of the problem is to be reached by the light of legislative interpretation, chapter 349 of the Laws of 1880 seems to clearly indicate the necessity of stockholders' assent, given at a stockholders' meeting, to the leasing of the property of a railroad corporation; otherwise, what necessity for legislative intervention in the terms of the act referred to?

The cases of *Fisher* v. *New York Central &c. R. R. Co.* (46 N. Y. 644), and *The Central Cross Town R. R. Co.* v. *The Twenty-third Street R. R. Co.* (54 How. Pr. 183), are cited as deciding that a lease may be made without the assent of the shareholders. I have failed to find any such adjudication in either of those cases. All that can be claimed for those cases is that they decide that a lease of its road, made by a railroad corporation, is not *ultra vires*, and they decide nothing more upon the question of power.

No question is raised or discussed as to the manner of the exercise of its power by the corporation. There was no person before the court seeking to impeach the lease, who could be heard upon the question of stockholders' assent. The only question was whether the lease was not actually void, not voidable.

There is no question, but that admitting that a board of directors alone have no power to lease the property of their corporation, and if such lease is executed by the directors without the assent of the stockholders, such stockholders may accept the lease or repudiate it; and that if they allow the parties to the lease to go on under the lease without any action being taken in respect thereto, within a reasonable time, they will be held to have acquiesced in the lease and ratified it. Therefore, conceding that the corporation has the power to lease, when the action is taken and the stockholders have acquiesced, no third party can raise the objection that the stockholders have not formally assented.

In the cases cited the leases had long been in operation, and the time for dissent had long passed, and, therefore, the only question that could be raised was the power of the corporation to act at all. After an examination of the rea-

soning in all the adjudicated cases (which has been by no means cursory), after a consideration of the principles governing the relations of shareholders of a corporation and its directors, conceding that a corporation can do no act unless specially authorized thereto, except through its board of directors, I am irresistibly brought to the conclusion that acts making organic or fundamental changes in the character or business of the corporation, cannot be done either by the directors alone, or by the shareholders alone; but that both the executive and administrative officers of the corporation must unite with the shareholders of the corporation, who confer the right to act upon the individuals intrusted with the office of directors; that directors are merely temporary officers of the corporation, by virtue of their office entitled to manage the business and affairs of the corporation during their term of office, without interference from the stockholders, but they cannot say that a new board of directors, although duly elected by the stockholders, shall never thereafter interfere with the management of the properties of the corporation, because they have placed their possession and management into other hands forever.

This brings me to the consideration of the remaining question:

Were the agreements voidable at the option of the Metropolitan company, because three of its directors were also directors of the Manhattan company; or because Metropolitan directors held also stock in the Manhattan company?

In considering this question, it must be conceded at the outset that the interests of the Manhattan company were directly antagonistic to those of the Metropolitan company.

In the negotiations which resulted in the October agreements, it was for the interest of the Manhattan company to get as large a reduction of rental as possible; and it was the interest of the Metropolitan company to secure as advantageous terms as the Manhattan company could comply with, and a similar interest pertained to the New York company; but it was to the interest of neither to secure

such terms as would bring about again the disasters under which the whole elevated system was then suffering.

Three propositions are urged in answer to the claim of the plaintiff, that the conflicting interests rendered the October agreements voidable. The first is, that although conflicting interests may disqualify an agent, strictly so called, from acting, that this rule does not apply to trading corporations, so many of whom have common directors. Secondly, if such conflicting interest induces any incapacity, it is not fatal to the agreement, if such agreement can be proven just and fair; and thirdly, that if any of the directors were disqualified because of an adverse interest, enough voted for the adoption of the agreement who were not disqualified, to have carried the measure, even if all the disqualified directors had voted no.

It will not be denied, I imagine, that as between natural persons, where an agent or trustee has a personal interest opposed to that of the principal, or where a man acts as agent of both parties to the contract, although he may have no personal interest on either side, the principal or *cestui que trust* may avoid the contract at will, even if there be no actual fraud or damage.

The cases in this state and in England seem to be very explicit upon this point, and it might perhaps be necessary only to refer to the language of the chancellor, used in the case of *Davoue* v. *Fanning* (2 Johns. Ch. 252, 260), which sets forth in the clearest language the principle upon which that rule is founded. He says:

"However innocent the purchaser may be in the given case, it is poisonous in its consequences. The *cestui que trust* is not bound to prove, nor is the court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power distinctly and clearly to show it. There may be fraud, as Lord HARDWICKE observed, and the party not able to prove it. It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule does and will permit the *cestui que trust*

NEW YORK—APRIL, 1884.           487

Metropolitan Elevated R. R. Co. *v.* Manhattan Elevated R. R. Co.

to come, at his own option, and without showing actual injury, and insist upon having the experiment of another sale. This is a remedy which goes deep, and touches the very root of the evil."

In *Taussig* v. *Hart* (58 N. Y. 425, 428), the court say:

"It is no answer that the intention was honest, and that the brokers did better for their principal by selling him their own stock than they could have done by going into the open market. The rule is inflexible, and although its violation in this particular case caused no damage to the principal, he cannot be compelled to adopt the purchase."

In *New York Central Ins. Co.* v. *National Protection Ins. Co.* (14 N. Y. 85, 91), it was said:

"It is not necessary for a party seeking to avoid a contract on this ground to show that an improper advantage has been gained over him. It is at his option to repudiate or to affirm the contract irrespective of any proof of actual fraud."

In *Conkey* v. *Bond* (36 N. Y. 427, 429), it was said:

"It is not material to inquire whether the defendant had any actual fraudulent purpose. The making of a purchase from himself without authority from the plaintiff was a constructive fraud, in view of the fiduciary relation which existed between the parties. In such a case the law delivers the agent from temptation by a *presumptio juris et de jure*, which good intentions are unavailing to repel."

In the case of *Greenlaw* v. *King* (3 Beav. 49, 61), Lord ELDON says:

"If a trustee can buy in an honest case, he may in a case having that appearance, but which, from the infirmity of human testimony, may be grossly otherwise. The impossibility of detecting the conduct of parties placed in such situations, is the reason which imposes upon the court a necessity, which I believe has always been acted on, of saying that such transactions shall not stand at all. You have not the means of finding out all the modes in which advantage can be taken, and therefore it is safer, and the interests

of society require that you should forbid such transactions altogether."

Also, in *Ex parte James* (8 Vesey 337, 344):

" This doctrine as to purchases by trustees, assignees, and persons having a confidential character, stands much more upon general principle than upon the circumstances of any individual case. It rests upon this, that the purchase is not permitted in any case, however honest the circumstances; the general interests of justice requiring it to be destroyed in every instance, as no court is equal to the examination and ascertainment of the truth in much the greater number of cases."

In *Gillet* v. *Peppercorne* (3 Beav. 78, 84), it is said:

" It is not necessary to show that fraud was intended, or that loss afterwards took place in consequence of these transactions, because the defendant, though he might have entertained no intention whatever of fraud, was placed in such a situation of trust with regard to the plaintiff, that the transaction cannot, in the contemplation of this court, be considered valid."

We might multiply authorities upon this point, but these are sufficient to show how stringently the rule has always been applied, and that under no circumstances should it be departed from.

It was intimated, that although this rule was so stringent as to purchases and sales, yet that it was not applied with the same rigor to other contracts. I have failed to find any foundation for this distinction either upon principle or authority. It may be true that most of the adjudicated cases have arisen in reference to purchases and sales, but no distinction has been made by any court between contracts of this nature and any others which were tainted with the same infirmity. There is no reason for any such limitation, and I do not find that it has ever been attempted to be enforced.

In the case of *The Aberdeen Railway Company* v. *Blaikie Brothers* (1 Macq. H. L. Cas. 461), the same point was suggested, and the court say upon this point:

"It is true that the questions have generally arisen on agreements for purchase or lease of land, and not as here on a contract of a mercantile character. But that can make no difference in principle. The inability to contract depends, not on the subject matter of the agreement, but on the fiduciary character of the contracting party, and I cannot entertain a doubt of its being applicable to the case of a party who is acting as manager of a mercantile or trading business for the benefit of others, no less than to that of an agent or trustee employed in selling or letting land."

But it is urged that this incapacity does not apply to the directors of a corporation; that the director of a corporation may contract with his corporation, and such contract will be held valid if such contract is shown to be just and fair, because a director of a corporation is not an agent or trustee in the ordinary sense. He is not a trustee of the shareholders, but a trustee of the corporation; and in support of this proposition attention is called to the language used in the case of *Duncomb* v. *The New York, Housatonic & Northern R. R. Co.* (84 N. Y. 190, 198). The court says:

"Whether a director of a corporation is to be called a trustee or not, in a strict sense, there can be no doubt that his character is fiduciary . . . . . and that he falls, therefore, within the doctrine by which equity requires that confidence shall not be abused by the party in whom it is reposed. . . . . . But the rule was adopted to secure justice, not to work injustice; to prevent a wrong, not to substitute one wrong for another; and hence have arisen limitations upon its operation, calculated to guard it against evil results as inequitable as those it was designed to prevent."

This language must be interpreted having in view the facts of the case under consideration, and what wrong it was proposed to commit under the alleged forms of law. The court was speaking in reference to a claim made by the defendant of its right to keep the money loaned by the director to the corporation, and to avoid the security given for its repayment. The court adds, "Thus, the beneficiary

may avoid the act of the trustee, but cannot do so without restoring what he has received," and applied the rule, that before it could repudiate its contract of security, it must return that which it had received.

Reference is further made to the language used in Angell & Ames on Corporations § 233, which is as follows:

"By the common law, and by the Civil Code, too, as a corporation aggregate may contract with persons who are not members, so it may contract with persons who are members of it; and the contract is not on this account invalid; a member of a corporation contracting with it being regarded, as to that contract, a stranger. Hence, a vote of the corporation affecting a contract between it and a member cannot bind the member without his assent to it. And though the member of the corporation be also one of the trustees of the corporation, it would seem that this would not incapacitate him from contracting with it; but he may recover against the corporation for his services rendered under a contract with the other trustees, in a case where there is no evidence of such gross partiality in the contract as amounts to fraud. And where the members of three distinct corporations were the same, yet, in *The Proprietors of the Canal Bridge* v. *Gordon*, it was held by the Supreme Court of Massachusetts, that contracts between the several corporations were valid, and might even be implied from corporate acts. The banking associations of New York, under the general bank law of 1838, are to be regarded for this purpose as bodies corporate; and hence, in a suit at law by such an association against one of its members for debt, the fact of membership presents no objection to recovery."

And also the case of *Jackson* v. *The New York Central R. R. Co.* (2 Thomp. & C. 653), and affirmed in the Court of Appeals upon the opinion of the court below (58 N. Y. 623), in which a director was allowed to recover from the corporation for the value of certain professional services outside of and beyond those pertaining to his office, rendered to the corporation of which he was a director. This latter case may be sustained upon the ground that as the corpora-

tion had received the services of this director, had availed themselves of them, and *could not restore*, it was bound to pay their value.   No such ground is mentioned in the opinion of the learned court which decided this case, but there is no statement of the principle upon which the right to a recovery rests, and the judgment of the court was founded probably entirely upon the concession of counsel.   It is true that the court say that the authorities are quite clear upon the subject; but in those cited, no such question was involved, except in the case of *Chandler* v. *Monmouth Bank* (1 Green [N. J.] 255), which asserts the law, but does not define in any way upon what principle it is founded.   The view that a contract between a director and his corporation is voidable absolutely, is distinctly held in the case of *Cumberland Coal &c. Co.* v. *Sherman* (30 Barb. 553, 563), where the court says: "The cases relating to the dealings of an agent or trustee with the property in reference to which his agency or trust exists, may be arranged into two classes:   First— Cases in which a trustee buys or contracts with himself, or several trustees of which he is one, or a board of trustees of which he is one; and it will be seen by reference to the authorities hereinafter cited, that the incapacity to purchase applies to all these cases.   Second—Cases in which a trustee buys or contracts with his *cestui que trust*, who is *sui juris*, and is competent to deal independently of the trustees in respect to the trust estate.

"As to the first class of cases, the purchase or contract is voidable at the option of the *cestui que trust*, without reference to the fairness or unfairness of the purchase or contract.   For the reasons before given, the disqualification of the party purchasing or contracting is a conclusion of law, and is absolute."

Some confusion seems to have arisen in the enunciation of the principle under discussion, because of a failure to distinguish between the two classes of cases, the disability as to dealings between trustee and *cestui que trust* being absolute, while that in respect to dealings between attorney and client is less strict.   Story, in his Equity Jurispru-

dence § 311, says: " In this respect there is said to be a dis-
tinction between the case of an attorney and client, and that
of a trustee and *cestui que trust.* In the former, if the
attorney, retaining his connection, contracts with his client,
he is subject to the onus of proving that no advantage has
been taken of the situation of the latter. But in the case
of 'a trustee, it is not sufficient to show that no advantage
has been taken, but the *cestui que trust* may set aside the
transaction at his own option."

The ground upon which the decision of the case of *Jack-
son* v. *The New York Central R. R. Co.* (*supra*), may well
have proceeded, is well stated in the opinion in the case of
*Gardner* v. *Butler* (30 N. J. Eq. 702), where it is said :

" The rule is, that the trustee cannot fortify himself by a
contract which he makes with himself or for his own in-
terest, and set it up, either at law or in equity, as a valid
obligation. It is of no binding force as a contract, and the
*cestui que trust* may repudiate it at will. The agreements,
therefore, which the directors made with themselves, must
be pronounced to be illegal, and can furnish no support to
their defense as contracts. But while the express under-
taking is without legal force, the directors of a company
have a right to serve it in the capacity of officers, agents or
employés, and for such services the law will enable them
to recover a just and reasonable compensation. The law
restrains them from making a contract where their own
gain intervenes between their exercise of judgment and
their duty as trustees, but it does not operate to deprive
the company of the service of those who, in many cases,
may alone possess the skill requisite to the successful man-
agement and conduct of the corporate business, and who
may have the chiefest interest in its prosperity. Stock-
holders, because they are directors, are not compelled to
commit the success of their company to strangers, or else
render their own services gratuitously. No claim which
they may make against their company can acquire any sup-
port or validity from the fact that they have expressly
sanctioned it; it must rest exclusively upon its fairness and

justice, and be enforced upon the *quantum meruit.* That such is the full scope and effect of the rule, and the extent to which the transaction is annulled, will be found by an examination of the cases. . . . . . .

"The same principle must apply, whether it is property conveyed or services rendered to the company. The cupiddity and avarice of the trustee is guarded against by giving the *cestui que trust* the right to repudiate the contract at all times, where it is executory, and to allow simply a just remuneration, without reference to the contract price where it is executed. The trustee thus derives no advantage from his breach of duty, and the company can 'suffer no detriment from his service in their behalf."

In the case of *Thomas* v. *The Brownville, Fort Kearney & Pacific R. R. Co.*, decided in the Supreme Court of the United States in October last, the right to recover upon a *quantum meruit* for services rendered and materials furnished under a voidable contract, is distinctly enunciated. The court says:

"But we are asked to reverse the decree so far as to permit the trustee in this case to recover such a sum as the construction company actually earned in building the road. The matter was referred to· a master, who, on this hypothesis, reported that the contractors had done work for the railroad company, which it had accepted to the value of $205,947.66, beyond what they had received payment for, except as it was paid by these bonds. He also reported that this work was of that much advantage to the company, and its value or cost is estimated on a *quantum meruit*, without regard to the prices fixed by the contract.

"We are of the opinion that the appellant's view of this part of the transaction is sound.

"The bonds and mortgage in the hands of the trustee were issued in payment of this work. To the extent of $205,947.66, the consideration is good, and no sound principle is seen on which they cannot to that extent be enforced. To this extent they do not rest on the original contract, but on work, labor and material actually fur-

nished to the company and received by it. These services and materials are not estimated by the prices named in the contract, but by their real value to the company."

In the case of *Wardell* v. *The Union Pacific R. R. Co.* (103 U. S. 651, 659), the incapacity of a director to contract with the company is recognized, and also his right to recover for services and materials upon a *quantum meruit.*

The language used in the above section quoted from Angell & Ames on Corporations is certainly broad enough to cover the proposition in question; but I have examined, with care, the authorities cited to sustain the broad language of the text, and none go so far as to hold that a corporation may contract with one of its directors, or that two corporations, having common directors, may contract with each other.

In the case of *The Proprietors of the Canal Bridge* v. *Gordon* (1 Pick. 297), which is the authority cited, the question decided was that a contract might be implied from corporate acts and nothing more. But in any event the contrary rule seems to be clearly established by the decisions of this state, founded upon the rule as laid down in the English courts and the United States Supreme Court.

In the case of *Hoyle* v. *Plattsburgh & Montreal R. R. Co.* (54 N. Y. 314, 328), it was held that the office of director of a railroad company is fiduciary in its character, and, as a consequence, he is incapacitated from dealing in his own behalf in respect to the corporate property or in respect to any matter involving his powers and duties as such director: that this incapacity is not limited to the particular times when he is acting as director, but continues during the period of his directorship, and that therefore, a director (considering that relationship only) cannot become purchaser of the property of the corporation upon a sale under an execution against it, except subject to the right to disaffirm and demand a re-sale. Actual fraud or actual advantage in such case need not be shown.

The foregoing rule is approved in the case of *Duncomb* v. *The New York, Housatonic & Northern R. R. Co.* (84 N. Y.

190, 198), above referred to.   The court uses the following language :

"It is not intended to deny or question the rule that whether a director of a corporation is to be called a trustee, or not, in a strict sense, there can be no doubt that his character is fiduciary, being intrusted by others with powers which are to be exercised for the common and general interests of the corporation, and not for his own private interests, and that he falls, therefore, within the doctrine by which equity requires that confidence shall not be abused by the party in whom it is reposed, and which it enforces by imposing a disability, either partial or complete, upon the party intrusted to deal, on his own behalf (*Hoyle* v. *Plattsburgh & Montreal R. R. Co.*, 54 N. Y. 328; *Gardner* v. *Ogden*, 22 N. Y. 327 ; *Twin Lock Oil Co.* v. *Marbury*, 91 U. S. 587 ; *Smith* v. *Lansing*, 22 N. Y. 531 ; *Aberdeen R. R. Co.* v. *Blaikie*, 1 Macq. H. L. Cas. 461). Nor is it at all questioned that, in such cases, the right of the beneficiary, or those claiming through him, to avoidance, does not depend upon the question whether the trustee in fact has acted fraudulently or in good faith and honestly, but is founded upon the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties in his fiduciary character."

In the case of *Barnes* v. *Brown* (80 N. Y. 527, 535), the question as to the inability of a director to contract with his corporation was distinctly presented, and it was claimed in that case that the disability went so far that an assignment of an interest in a contract made to an independent party was absolutely void, and that such director could not transfer any title by a subsequent assignment.. The court say, referring to this point:

"We must assume, therefore, here, that it was, when made, a legal contract, such as the corporation could make. It is claimed, however, that the assignment of the interest in that contract to the plaintiff while he was a director was void as being contrary to public policy.   It is true that the

plaintiff, while acting as director of the corporation, held a fiduciary relation to it. He was a trustee of the corporation, and was under the *same disability which attaches to all trustees in dealing with trust property, and in transacting the business pertaining to the trust.* He could not act as trustee and for himself at the same time, and he would not be permitted to make a profit to himself in his dealings with the corporation. It is against public policy to allow persons occupying fiduciary relations to be placed in such positions as that there will be constant danger of a betrayal of trust by the vigorous operation of selfish motives. The rules upon this subject are illustrated in many cases, but few of which are here cited (*Risley* v. *Indianapolis B. & W. R. R. Co.,* 62 N. Y. 240; *Butts* v. *Wood,* 37 N. Y. 317; *Stewart* v. *The Lehigh Valley R. R. Co.,* 9 Vroom [N. J.] 506; *Gardner* v. *Butler,* 30 N. J. Eq. 703; *Foster* v. *The Oxford W. & W. R. Co.,* 14 Eng. L. and Eq. 306; *Aberdeen R. Co.* v. *Blaikie,* 1 Macq. H. L. Cas. 461).

"The assignment of a portion of the Byrne contract to the plaintiff did not render that contract void. There was nothing done under the contract. If the plaintiff had attempted to do anything under it, so that his interest under it might come in conflict with his duty as trustee, then the principle of the above cases could have been invoked against him. The corporation could have permitted him and Byrne to perform the contract, and then could make him account to it for all the profits he made by such performance. If he had attempted to perform the contract while he was director, the shareholders could probably have intervened, by some suit in equity adapted to the nature of the case, to nullify the contract as to him, or to restrain him from the performance thereof, or to compel him to elect to resign his office of director or to give up the contract. In any view of the case, the assignment to him was not absolutely void; it was at most simply voidable at the election of the corporation or its stockholders. Besides, the assignment to him did not destroy the Byrne contract, and before he attempted with Byrne to perform it, and before any ob-

jection was made by the corporation or any of its stockholders to his connection with it, he assigned, as he was perfectly competent to do, all his interest therein to Brown and Seligman, who were perfectly competent to take."

In *Aberdeen Railway Company* v. *Blaikie Bros.* (1 Macq. H. L. Cas. 461), which is the leading case in England upon this point, the question was as to the validity of a contract made by the plaintiff with the defendants, a firm, one of whose members was a director in the railway company; and the court say:

"The directors are a body to whom is delegated the duty of managing the general affairs of the company. A corporate body can only act by agents, and it is, of course, the duty of those agents so to act as best to promote the interests of the corporation whose affairs they are conducting. Such agents have duties to discharge of a fiduciary nature towards their principal, and it is a rule of universal application, that no one having such duties to discharge shall be allowed to enter into engagements in which he has or can have a personal interest conflicting, or which possibly may conflict with the interests of those whom he is bound to protect.

"So strictly is this principle adhered to that no question is allowed to be raised as to the fairness or unfairness of a contract so entered into. It obviously is, or may be, impossible to demonstrate how far, in any particular case, the terms of such a contract have been the best for the interest of the *cestui que trust* which it was possible to obtain.

"It may sometimes happen that the terms on which a trustee has dealt or attempted to deal with the estate or interests of those for whom he is a trustee, have been as good as could be obtained from any other person; they may even at the time have been better.

"But still so inflexible is the rule that no inquiry on that subject is permitted. The English authorities on this subject are numerous and uniform."

The decision in this case seems to me to have been based upon principle, and not upon the 85th, 86th and 87th sec-

tions of the Act of 8 & 9 Vic. c. 16, which provide that "No person interested in any contract with the company shall be capable of being a director, and no director shall be capable of being interested in any contract with the company during the time he shall be a director;" and that "if any director at any time subsequent to his election be either directly or indirectly concerned in any contract with the company, then the office of such director shall become vacant, and he shall cease from voting or acting as a director;" and that "no person being a shareholder or member of any incorporated joint stock company shall be disqualified or prevented from acting as a director by reason of any contract entered into between such joint stock company and the company incorporated by the special act; but no such director, being a shareholder or member of any such joint company, shall vote on any question as to any contract with such joint stock company." In the case of *Foster* v. *Oxford, &c., Railway Co.* (13 Com. B. 200), this act was construed as imposing *at law* the penalties prescribed in the act, viz.: the loss of his office by any director becoming or being interested in any contract with the corporation during his term of office. The contracts being valid at law, no greater penalty could be imposed by a law court than was provided by the act.

In the case of *The Aberdeen Railway Company* v. *Blaikie Bros.* (*supra*) this case is referred to, and the decision is sustained upon the ground that at law the contract was valid, while in equity it was voidable. The lord chancellor says:

"The statute, *i. e.*, the Companies Clauses Act, it was argued, has impliedly, if not expressly, recognized the validity of the contract by enacting that its effect shall be to remove the director from his office, indicating thereby that a binding obligation would have been created which would render the longer tenure of the office of director inexpedient, and reference was made to the case of *Foster* v. *The Oxford, Western & Wolverhampton Railway Company.* This was an action for breach of a contract under seal, whereby

the defendants covenanted with the plaintiffs to purchase from them a quantity of iron. The defendants pleaded that at the time of the contract one of the plaintiffs was a director of their company, and to this plea there was a general demurrer. That such a contract would in this country be good at common law, is certain. The rule which we have been discussing is a mere equitable rule, and therefore all that the Court of Common Pleas had to consider was how far the contract was affected by the statute. The decision was that the statute left the contract untouched, and that its operation was only to remove the director from his office. The 85th and 86th sections of the English statute, 8 & 9 Vic. ch. 16, on which the court proceeded, are in the same words as the 88th and 89th sections of the Scotch statute, and the counsel relied on this decision as being strictly applicable to the acts now under appeal; but there is a clear distinction between them. In Scotland there is no technical division of law and equity; the whole question, equitable as well as legal, was before the Court of Session. All that the Court of Common Pleas decided was that a contract clearly good at law was not made void by an enactment that its effect should be to deprive one of the contracting parties of an office. This decision will not help the respondents unless they can go further and show that the statute has had the effect of making valid a contract which is bad on general principles, that is to say, principles enforceable *here* only in equity, and not recognized in our courts of common law."

Lord BROUGHAM, in his opinion, states:

"I also concur with my noble and learned friend that the decision in the case of *Foster* v. *The Wolverhampton Company*, in the Court of Common Pleas, upon which great reliance was placed, and which appears, to a certain degree at least, to have been the ruling decision in the court below, does not apply to this case, because there the transaction was past all doubt valid at common law, though not in equity. But had the Court of Common Pleas had an equitable jurisdiction as well as a common law jurisdiction, the

anomaly could never have happened of a transaction being found legal and valid in that court which could not stand an examination on the other side of Westminster Hall."

The language used by the court in its opinion in *Twin Lock Oil Co.* v. *Marbury* (91 U. S. 587), *seems*, certainly, to sustain the views of the learned counsel for the defendants upon this point.    The court says:

" That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, . . . . . is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others (*Koehler* v. *Black River Falls Iron Co.*, 2 Black. 715; *Drury* v. *Cross*, 7 Wall. 299; *Luxemberg R. R. Co.* v. *Maquay*, 25 Beav. 586; *The Cumberland Coal &c. Co.* v. *Sherman*, 30 Barb. 553; 16 Md. 456).    The general doctrine, however, in regard to contracts of this class is, not that they are absolutely void, but that they are voidable at the election of the party whose interest has been so represented by the party claiming under it.    We say, this is the general rule; for there may be cases where such contracts would be void *ab initio;* as when an agent to sell buys of himself, and by his power of attorney conveys to himself that which he was authorized to sell. But, even here, acts which amount to a ratification by the principal may validate the sale.

" The present case is not one of that class.    While it is true that the defendant, as a director of the corporation, was bound by all those rules of conscientious fairness which courts of equity have imposed as the guides for dealing in such cases, it cannot be maintained that any rule forbids one director among several from loaning money to the corporation when the money is needed, and the transaction is open and otherwise free from blame.    No adjudged case has gone so far as this.    Such a doctrine, while it would afford little protection to the corporation against actual fraud or oppression, would deprive it of the aid of those most inter-

ested in giving aid judiciously, and best qualified to judge of the necessity of that aid, and of the extent to which it may safely be given.

"There are in such a transaction three distinct parties whose interest is affected by it; namely, the lender, the corporation, and the stockholders of the corporation.

"The directors are the officers or agents of the corporation, and represent the interests of that abstract legal entity, and of those who own the shares of its stocks. One of the objects of creating a corporation by law, is to enable it to make contracts; and these contracts may be made with its stockholders as well as with others. In some classes of corporations, as in mutual insurance companies, the main object of the act of incorporation is to enable the company to make contracts with its stockholders, or with persons who become stockholders by the very act of making the contract of insurance. It is very true, that as a stockholder, in making a contract of any kind with the corporation of which he is a member, is in some sense dealing with a creature of which he is a part, and holds a common interest with the other stockholders, who, with him, constitute the whole of that artificial entity, he is properly held to a larger measure of candor and good faith than if he were not a stockholder. So, when the lender is a director, charged, with others, with the control and management of the affairs of the corporation, representing in this regard the aggregated interest of all the stockholders, his obligation, if he becomes a party to a contract with the company, to candor and fair dealing, is increased in the precise degree that his representative character has given him power and control derived from the confidence reposed in him by the stockholders who appointed him their agent. If he should be a sole director, or one of a smaller number vested with certain powers, this obligation would be still stronger, and his acts subject to more severe scrutiny, and their validity determined by more rigid principles of morality and freedom from motives of selfishness. All this falls far short, however, of holding that no such contract can be made which will be valid; and we

entertain no doubt that the defendant in this case could make a loan of money to the company; and, as we have already said that the evidence shows it to have been an honest transaction, for the benefit of the corporation and its shareholders, both in the rate of interest and in the security taken, we think it was valid originally, whether liable to be avoided afterwards by the company or not."

But I think that a careful examination of this case will show that the learned court's language was intended to show that such a contract was not absolutely void, so as not under any circumstances to afford the basis for future action or subsequent rights. The last clause of the language above quoted seems clearly to indicate this, which is: "We think it was valid originally, whether liable to be avoided afterwards by the company or not." In other words, it was valid at law, but subject to avoidance in equity by the company, if such right was exercised within a reasonable time; and the sale in that case was upheld expressly upon the ground of laches. One of the grounds upon which it was sought to set aside the sale was because of certain declarations made by the defendant that he only designed to purchase the property for the benefit of all or a part of the shareholders; and the court says: "But we need not decide whether any of these declarations raised a legal obligation to do so or not, nor whether, without such declarations, the sale and deed were *voidable* at the election of the complainant—a proposition which is entitled to more consideration, resting solely on the fiduciary relations of the defendant to the plaintiff, than on the evidence in this case of the declarations alluded to. We need not decide either of these propositions, because plaintiff comes too late with the offer to avoid the sale."

This language is entirely consistent with the view that the court did consider such contracts, although valid at law, voidable in equity at the option of the corporation, and the decision, as above stated, is put distinctly upon the ground of laches. This case, therefore, decides nothing whatever which is in any respect in hostility to the rule as laid down

by the decisions in the courts of our own state. The learned court, in its language referring to the fact that a contract to repay money loaned made by a corporation with one of its directors, has been held to be valid, seems to have overlooked the fact, that in any event such a contract could not be repudiated by the corporation without the return of the money received by it, and, therefore, the result would be precisely the same if the transaction was open and free from blame, whether the contract was held to be voidable or binding, as the corporation could not disaffirm without returning the money loaned to it, and this seems to be the foundation of those cases holding such contracts valid.

I think, therefore, that the undoubted rule of law in this state is, that every contract entered into by a director with his corporation may be avoided by the corporation within a reasonable time, irrespective of the merits of the contract itself.

But we are asked, does this disability extend to the case of a contract between two corporations, some of whose directors hold that office in each corporation ?

I can see no difference in principle between the case of a director contracting with his corporation and that of directors of one corporation contracting with themselves as directors of another corporation. The evils to be avoided are the same ; the temptations to a breach of trust are the same ; the want of independent action exists, and the divided allegiance is just as apparent. The fact that there is no such distinction is expressly stated in the case of *Wallace* v. *Long Island R. R. Co.* (12 Hun 460, 464). The court says :

" The rule that persons acting in a fiduciary capacity shall not, directly or indirectly, make any profit by means of such acts, or be interested in contracts made by their principals, undoubtedly applies to directors of corporations. It is a valuable principle, and ought not to be impaired by any subtle or refined distinctions. Still, the mere fact that the same persons were directors of the corporation which made the lease, and of that which took it, is not of itself

sufficient to avoid the contract at the instance of one or more *stockholders*, against the will of the corporation. That fact alone might entitle either corporation to avoid the lease, but I apprehend it does not give that right to a stockholder."

The principle is here recognized that the majority of the shareholders may ratify a lease made by the directors, and that a majority cannot disaffirm. That, therefore, it must be the majority of the shareholders acting through the corporation who repudiate, and no shareholder has the power to exercise that right against the will of the majority.

The case of *The United States Rolling Stock Co.* v. *The Atlantic & Great Western Railroad Co.* (34 Ohio St. 450), is relied upon by the defendants' counsel as conclusive upon this point. It seems to be necessary that this case should be referred to at length, as it is claimed to decide, and upon a cursory examination appears to decide, much more than was intended by the court:

" The action below was brought by the plaintiff against the defendant, to recover the sum of $985,934.02, most of which sum was a balance alleged to be due the plaintiff from the defendant for the use of the rolling stock furnished by the former to the latter from February, 1872, to December 10th, 1874, under an express contract. It appears from the record that the plaintiff was incorporated under the laws of New York, on the 31st day of October, 1871, with a board of five directors, empowered to manage its affairs; and that on December 11th, 1871, the defendant was organized as a consolidated railroad company under the laws of New York, Pennsylvania, and Ohio, with a board of thirteen directors; that at the date of the organization of the railroad company the five directors of the Rolling Stock Company, George B. McClellan, Samuel L. M. Barlow, James B. Hodgkins, William Butler Duncan, and Lawrence Wells, were elected and became five of the thirteen directors of the railroad company; and that said five persons continued to be the sole members of the plaintiff's board of directors and five of the thirteen members of the defendant's board until

the 11th day of December, 1873, and that one or more of said directors of the plaintiff continued to be directors of defendant until the termination of the contract on which suit was brought. It further appears that on November 6th, 1871, a provisional contract was entered into by James McHenry, purporting to act for plaintiff, and Leonard J. Woodman, purporting to act for and on behalf of the executive committee of the Atlantic and Great Western Railroad Company, by the terms of which the plaintiff agreed to supply to the defendant, and the defendant to receive, at an agreed monthly rental for the period of seven years from January 1st, 1872, the rolling stock mentioned in a schedule thereto annexed.

" On the 19th day of July, 1872, this contract, with a certain modification, was ratified and adopted by the plaintiff's board of directors, and on August 2d, 1872, was, as modified, adopted and confirmed by the defendant's board of directors. It further appears that at the meeting of the defendant's board at which said contract was ratified and confirmed, only eight of the thirteen members were present, two of whom, McClellan and Hodgkins, were the directors of the plaintiff.

".The question presented by the record arises upon the exception to the charge of the court upon the point of the defendant's right to avoid the contract upon which the action was founded. The rule that an agent or trustee, in matters touching his agency or pertaining to his trust, cannot bind the principal or *cestui que trust*, without his consent, by a contract in which the former is adversely interested, rests upon a very satisfactory foundation, and is supported by a great weight of authority ( *Wade* v. *Pettibone*, 11 Ohio 57 ; *Morison* v. *Thompson*, L. R. 9 Q. B. 480 ; 1 Lead. Cas. in Eq. 210).

" In Story on Agency § 210, the rule is said to be founded ' upon the plain and obvious consideration that the principal bargains, in the employment, for the exercise of the disinterested skill, diligence and zeal of the agent for his own exclusive benefit. It is a confidence necessarily re-

posed in the agent, that he will act with a sole regard to the interest of his principal as far as he lawfully may.' And in 2 Kent's Com. 618, the same principle is asserted and in the following language : 'An agent acting as such cannot take upon himself at the same time an incompatible duty. He cannot have an adverse interest or employment. He cannot be both a buyer and seller, for this would expose his fiduciary trust to abuse and fraud.' In Bennett, *ex parte* (10 Ves. 393), Lord ELDON, commenting on a sale of the trust property to the trustee, stated the reason of the rule denying the right of the trustee to buy the trust property to be, 'That it would not be safe, with reference to the administration of justice in the general affairs of the trust, that a trustee should be permitted to purchase ; for human infirmity will, in a very few instances, permit a man to exert against himself that prudence which a vendor ought to exert in order to sell to the best advantage, and which a purchaser is at liberty to exert for himself, in order to purchase at the lowest price. The rule which prevents the agent or trustee from acting for himself, in a matter where his interest would conflict with his duty, also prevents him from acting for another whose interest is adverse to that of the principal ; and in all cases where, without the assent of the principal, the agent has assumed to act in such double capacity, the principal may void the transaction at his election. No question of its fairness or unfairness can be raised. The law holds it constructively fraudulent and voidable at the election of the principal' (*Aberdeen R. Co.* v. *Blaikie*, 1 Macq. H. L. Cas. 461 ; *The York B'ld's. Co.* v. *Mackenzie*, 3 Paton H. L. 378 ; Bispham's Princ. Eq. 106 ; 18 Ohio St. 182).

"But does the present case fall within the operation of this principle ? The right to avoid the contract because the agent has a personal interest in its subject matter adverse to that of the principal, or has assumed an incompatible duty, is one arising in equity for the principal's protection. He may avail himself of the right to avoid the contract, or he may waive it, at his option. That the agent may repre-

## NEW YORK—APRIL, 1884. 507

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

sent two persons, with their assent, in a transaction relating to or embracing a subject matter respecting which their interests may be adverse or conflicting, admits of no doubt. In *The Adams Mining Co.* v. *Senter* (26 Mich. 73), upon the question how far the double agency of one affected his relation to his employer or third persons, it was held that where the same person is made the agent of two mining corporations in the same vicinity, and it becomes necessary for one to deal with the other, he must be presumed to have the same power to act for both that he would be possessed of if there were two agents acting separately, and may dispose of the property in the same way; and such double authority would dispense with such formalities as could not be complied with, where one man acts for both companies. The court, in announcing its opinion, says: 'The authority of agents, where no law is violated, is as large as their employers choose to make it. There are multitudes of cases where the same person acts under power from different principals in their mutual transactions. Every survey of boundaries by a surveyor jointly agreed upon would come within similar difficulties. There can be no presumption that the agent of two parties will deal unfairly with either.'

"So, where the subsequent assent is given to the acts of the agent, the same result follows; that is, if the principal, with full knowledge of all the facts affecting his rights, ratifies the acts of his agent, the right to avoid the contract or transaction is gone."

The learned court then points out that dissent must be made within a reasonable time, and that a principal who has an option to avoid or stand by the contract of his agent, is not permitted to wait the issue of events and then adopt or reject the contract as he may think most for his interest, and that an acceptance of the benefits of a transaction imposes the obligation to assume its burdens, and operates to confirm it as a whole; but that if the contract in question was absolutely void because agents in common of the two corporations participated in making it, there could be no ratification by acquiescence. The learned court then calls

508 COURT OF COMMON PLEAS.

Metropolitan Elevated R. R. Co. v. Manhattan Elevated R. R. Co.

attention to the fact that at common law a contract between two corporations, having common directors, made by their respective boards, or between a corporation and an individual director, or a firm of which he is a member, is valid, and cites the cases of *Foster* v. *The Oxford &c. R. Co.* (*supra*); *Ernst* v. *Nichols* (6 H. L. Cas. 401); and *Murray's Ex'rs Case* (5 De Gex, MacN. & G. 746). This is undoubtedly the rule at common law, but it is equally well settled in equity that all such contracts are voidable at the option of the corporation. The learned court then argues that, conceding the contract was voidable in equity at the election of the company, for the want of the presence at that meeting of a quorum of directors who were not directors of the plaintiff, that "it nevertheless appeared that the board was composed of thirteen persons, a clear majority of whom were affected with no incapacity to act for the best interests of the company, and who sustained no fiduciary relation to the plaintiff whatever. This majority possessed ample power to restrain and control the action of the minority, and, if the contract was voidable at the option of the company, it had full power to express the company's election if it saw fit to avoid the contract. The fact that one of the persons composing this majority might vote with those who were members of both boards, and thereby create a majority in favor of the contract, would in no wise affect the validity of the transaction, nor relieve the board from the duty to move in the matter if they desired the company's escape from liability.

"We have not, upon the most diligent research, been able to find a case holding a contract made between two corporations by their respective boards of directors invalid or voidable at the election of one of the parties thereto, from the mere circumstance that a minority of its board of directors are also directors of the other company. Nor do we think such a rule ought to be adopted. There is no just reason where a quorum of directors, sustaining no relation of trust or duty to the other corporation, are present, participating in the action of the board, why such action should not be

binding upon the company, in the absence of such fraud as would lead a court of equity to undo or set aside the transaction. If the mere fact that a minority of one board are members of the other gives the company an option to avoid the contract, without respect to its fairness, the same result would follow where such minority consists of but one person, and notwithstanding the board might consist of twenty or more. In our judgment, where a majority of the board are not adversely interested, and have no adverse employment, the right to avoid the contract or transaction does not exist without proof of fraud or unfairness; and hence the fact that five of the defendant's board of directors were members of the plaintiff's board, whatever may have been its effect on the defendant's right to disaffirm or repudiate the contract if exercised within a reasonable time, did not disable the defendant from subsequently affirming the contract if satisfied with its terms, or rejecting it if not, nor did it relieve it from the duty to exercise its election to avoid or rescind within a reasonable time, if not willing to abide by its terms.

"That it did not do this, nor take any steps towards disaffirmance, but continued to act under it for nearly two years and a half, receiving the rolling stock for the use of which it stipulated and with which it operated its road for the whole of said period, making payments for such in accordance with the rate fixed by the contract, very clearly appears from the admitted facts."

It will be observed that no question as to a minority of common directors was involved in that case, and the discussion was based entirely upon failure to repudiate within a reasonable time, and in the discussion of the minority question the learned court overlooked the principle, which seems to me to be well established by authority, as I shall attempt to show hereafter, that the corporation is entitled to all the knowledge and skill which each and every director can bring to bear upon the subject before the directors of such corporation.

The court further says, that "the instruction given by

the court to the jury as applied to the undisputed facts was therefore erroneous." Why? Because "the jury were told that the fact that the said directors of the plaintiff were five of the thirteen directors of the defendant, with the further fact that two of said five were two of the quorum of eight directors of the defendant who confirmed the contract, rendered such contract in law invalid and voidable at the election of the defendant, irrespective of the motive of the directors participating. This was intended and understood to mean that such election could *then* be made, notwithstanding the admitted facts, constituting in law a complete affirmance of the contract." In other words, although the contract was voidable in equity for the reasons given in the instruction above stated, yet it not having been repudiated within a reasonable time that right had been lost. And all that was decided in the above case was that such a contract, although voidable in equity, was valid at law, and unless repudiated within a reasonable time could be enforced.

Attention is also called to *Ashurst's Appeal*, (60 Pa. St. 290), in which it is said:

"I come, then, to consider the facts that the purchasers were the same persons as those who as directors sold, and as stockholders authorized the sale. It is often said, and truly, that the same persons cannot be both buyers and sellers in one transaction. They were not strictly in this. All the purchasers were not directors who made the sale. But I make no account of that. Still, why may not directors of a corporation sell to themselves? Each director has an interest distinct and antagonistic to his interest as a mere man. There is identity of person, but not of interest. There must be many things which directors can do for their individual benefit which are binding upon a corporation of which they are directors. If they have advanced money, I cannot doubt they may pay themselves with corporate funds. If they have become liable as sureties for the corporation, they may provide for their indemnity. And though ordinarily the law frowns upon contracts made by them in their representative character with themselves as private persons,

such contracts are not necessarily void. They are carefully watched, and their fairness must be shown. But I repeat the question, why may not directors sell to themselves in any case? It is because of the danger that the stockholders may suffer if such sales be permitted, for want of antagonism between the parties to the contract. But such sales are supported in equity where the fiduciary relations of the purchaser have ceased before the purchase, when the purchase was made with full consent of the stockholders, or where stockholders have by their acquiescence debarred themselves from questioning the transaction."

The doctrine here is again enunciated that such contracts are valid in law, and although voidable in equity may be affirmed by actual ratification or acquiescence.

In the case of *Bill* v. *The Western Union Tel. Co.*, the same distinction is taken, and it is nowhere held that such a contract is not voidable in equity, even if valid at law.

The case of *Booth* v. *Robinson* (55 Md. 419), it is claimed also decides that a contract is not voidable between corporations because of common directors. That case was an action brought by the stockholders of a corporation against some of its directors who were common directors in another corporation, upon an allegation that they, with an intent to cripple the corporation in which the plaintiffs were stockholders, made certain arrangements with another corporation in which they were directors, and in which the plaintiffs were not stockholders. The corporations were made parties defendant upon an allegation that these directors had control of the corporations, and by means of that control they could frustrate and defeat any attempt to induce the corporation to take action for the redress of the wrongs alleged. The court in that case says:

"In these cases the proper and primary party to complain and call the directors to an account in a court of equity for fraud or breaches of trust in the management of the affairs of the corporation, is the corporation itself, because the duty is owing and the wrong is done directly to the corporation and only indirectly to the shareholders; and, there-

fore, to enable a shareholder, either for himself alone, or for himself and others, to maintain a bill against directors for such fraud or breaches of trust, he must allege and show not only the violations of duty or breaches of trust on the part of the directors, but that he as a stockholder had been damnified thereby, and that the corporation has failed or refused to take the proper legal steps for the redress of the wrong."

The nature of the action, it will thus be seen was entirely different from that which is now before the court. It was an attempt upon the part of stockholders to assert their individual rights independent of the corporation, upon the ground of absolute fraud and mismanagement of the affairs of the corporation by certain of its directors. The fact that these directors held also the same offices in the other company, had nothing whatever to do with the cause of action involved, because independent of that fact a cause of action existed, if such fraud and gross mismanagement were shown. It is clearly stated in that case that the fraud must be proven, and that mere indiscretion, want of skill or deceit or mistake of judgment in the conduct of the affairs of the corporation affords no ground of personal liability on the part of directors. The court, therefore, says that two directors representing both corporations, this fact alone, while it should subject their conduct to rigid scrutiny by the court, does not afford ground of presumption against the legality and fairness of the dealings and transactions between the two companies. In other words, that upon the issue of fraud—actual fraud and gross mismanagement, the fact that these two directors had conflicting interests would be considered in determining that issue, and nothing else was meant by the court in the use of this language. The court then goes on and says:

" The two companies were certainly competent to contract the one with the other, and the two directors whose conduct is in question were interested in both companies, and by their relation to and official position in them, they owed duties and were bound to be faithful alike to both; there-

fore, while acting within the scope of the affairs delegated to them by the stockholders of the corporation, there is no presumption of illegality or unfairness in their dealings and transactions as between the two companies. They were the chosen agents of both, and to be successful in any attempt to impeach the validity of their acts, with a view of making them personally responsible either to the corporation or to the stockholders, there must be distinct charges of misconduct fully supported by proof" (*Adams Mining Co. v. Senter*, 26 Mich. 73; *United States Rolling Stock Co. v. Atlantic and Great Western R. Co.*, 34 Ohio St. 450). Thus it will be seen that the court, in the use of this language, had in mind only the fact, that in order to make trustees personably responsible, it was necessary to prove actual misconduct, and that the mere fact that some of the directors of the two contracting corporations. were common directors, did not necessarily establish that proposition. It must be fully supported by proof. And in support of this proposition, are cited the cases to which reference has previously been had—the one of which referred to the fact that an agent might act for both parties where his agency was known and his action approved, and the other that the mere fact that two contracting corporations had common directors did not make their contract void in law but simply voidable in equity, which right might be lost by lapse of time. The court goes on and says:

" This case is altogether unlike that of a trusted agent or director bargaining in a matter of personal advantage to himself, individually, with the party reposing the confidence in him, and where it is incumbent on him to show that a fair and reasonable use has been made of that confidence, as in the case of *The Hoffman Steam Coal Co. v. Cumberland Coal and Iron Co.* (16 Md. 456); *Cumberland Coal and Iron Co. v. Parrish* (42 Md. 598); *Jackson v. Ludeling* (21 Wall. 616); and other cases of that class to which reference might be made. In that class of cases the law proceeds upon the principle of constructive fraud irrespective of fraud in fact; and hence the onus of proof is upon the

party seeking to maintain the transaction. But in a case like the present, where the effort is to make the defendants *personally liable* for alleged injuries occasioned by conduct wilfully fraudulent, in intent and purpose amounting to breaches of trust, the proof in support of the allegations must be other than mere constructive fraud or breaches of trust; there must be affirmative proof of the misconduct charged, going to establish the fraud in fact."

Therefore, all that seems to be established by the case above cited is that in order to hold directors personally responsible, affirmative proof of fraud, absolute fraud, is requisite. The power of corporations having common directors to loan and borrow money one from the other, and to give and to receive security therefor, is recognized and upheld, the court, however, not referring to the fact that such contracts, although voidable in equity, cannot be repudiated without the return of the money borrowed, and, therefore, the contract is allowed to stand, as there can be no object in entertaining an action for rescission, the borrower having a right upon tender of the money received to get its securities back without the intervention of a court of equity, which is all the relief a court of equity can give.

These cases, therefore, cannot be held to overcome the adjudications of our own state, nor should they be held to have, in the slightest degree, shaken a principle so deeply imbedded in the rules governing the action of trustees with their *cestuis que trust*. In none of the cases has there been any attempt, as far as I have been able to discover, to distinguish between the disqualification of interest, as applicable to contracts between a director and his corporation, and such disqualification as applicable to contracts made between two corporations having common directors, they being treated as resting upon the same basis. It seems to me that it has been conclusively shown by the authorities, both in England and this state, that any contract which may be entered into between a corporation with one of its directors is voidable at the option of the corporation, although it may be entirely valid at law. The question as

to what the condition of affairs may be, in case a contract is entered into between two corporations, one or more of the directors of one of which might have been at the time of the contract a director of the other, has not been so distinctly met or disposed of by any adjudications to which I have referred. But the principle seems to me to be the same, as has been already suggested, and the dangers to be overcome and to be met are of an analogous character, and the only rule which can be adopted by the court in dealing with such contracts is to apply that which has always obtained in the cases of contracts between a director and his corporation.

It may be urged that the position of a director in a corporation does not give him the same degree of personal interest in its success as would be the fact were he simply entering into the contract to be personally benefited thereby; that he is one of many, his interests are divided with those of the other shareholders, and his influence may be counteracted by his co-directors. But the fact that he has an adverse interest to the one or the other of the corporations is apparent, and that he is attempting to serve two masters is also equally plain. It must necessarily happen, according to the rules which have been laid down by the courts of equity in reference to the action of agents, that he will in nine cases out of ten serve the interests of the one principal and betray those of the other ; and in order to remove persons so situated from all temptation, in order that there may be no uncertainty in the law in reference to such contracts, courts of equity have held that where there is such a conflict of interests between an individual and a corporation, or between corporations having common directors, that the contract shall be voidable as matter of equity without any evidence whatever of misconduct upon the part of the agent or director. If the rule is to be so far relaxed that common directors may participate in the contracts between corporations, or if common directors may allow contracts to be made between the two corporations that they represent, it would present the same field of speculation and the same

uncertainty of result, for courts to attempt to investigate the motives of the common directors; to determine the influences which they had upon their associates, or which they failed to exert upon their associates; to determine the fairness and reasonableness of the contract; to investigate all the influences which were at work which led to the entering into the contract, which has been so severely condemned by the cases passing upon the rights of *cestuis que trust* in reference to contracts made by common trustees. Contracts of this kind would be left involved in a sea of doubt, and a prediction as to the result of an investigation as to their fairness and honesty would be the merest speculation. It was to relieve the courts from such investigations and to let parties understand precisely the ground upon which they stood, that the stringent rules in regard to agents and principals were adopted, and the same reasons require that, in order that there may be reasonable certainty in reference to the results to be arrived at in investigating the contracts between two corporations who have common directors and therefore conflicting interests and conflicting duties, the same rule must be necessarily adopted, namely, that at the option of the *cestui que trust*, or of the corporation, such contracts may be avoided.

It is urged against this rule that if common directors are disqualified from acting, so are common shareholders incompetent to ratify agreements between their companies, and that the holder of one share of stock in each of the companies could prevent any action at a shareholders' meeting relating to the two companies, no matter how advantageous such action might seem to the holders of every other share of stock. I do not say that the disqualification extends to a shareholder. I can see no reason why it should. The disability rests entirely upon the fiduciary relationship. A shareholder is trustee for nobody; he has only his own interests to look after as such shareholder, closely connected as they undoubtedly are in practice with the interests of the other shareholders, but he holds no such fiduciary relation to the corporation as pertains to the office of director,

and I think that it is carrying the rule to a much greater length than the reasons which have given it existence require, and in this respect the New Hampshire case of *Pierson* v. *Concord Railway*, extends the disqualification too far and beyond all reason.

This brings us to the consideration of the question, whether this infirmity does exist in the October agreements, a number of uncommon directors sufficient to constitute a majority having voted for them, even if all of the common directors had voted no? No such question as this was presented in the Content case, as it is called, nor was the question of common directors at all discussed.

The general tenor of all the authorities is, that this fact does not cure the infirmity in the contract. It is true that some cases, like those above cited, may be found where such a proposition has been stated; but I can find no adjudication to that effect in any case where the question was directly involved, and where its discussion was necessary to the decision of the case. The foundation of the rule lies in the fact that the corporation, as has been before stated, is entitled to all the knowledge and skill which each and every director can bring to bear upon the subject before the directors of such corporation. This rule is clearly recognized in respect to various statutory boards. In order that valid action may be taken by such a board (unless different provision is made by statute), all the members of the board must meet, although a majority may control the action of the board. The argument being, that the arguments and reasoning of one man of a number may convince, and frequently have convinced, the minds of many associates as to the propriety or impropriety of contemplated action, and whose votes would have undoubtedly been just the opposite of what they were had such member been absent. This was the point upon which turned the decision of the case *In re East Norfolk Tramway Co.* (L. R. 5 Ch. Div. 963). There the articles of association provided that no man should be eligible as a director, unless he was recommended to the shareholders by the board of directors. Six

out of seven of the directors were present at a shareholders' meeting, at which Mr. Barber was chosen a director, and it was claimed that this was a virtual "recommending" of him.    Sir GEORGE JESSEL, Master of the Rolls, says:

"First of all, he was not recommended by the board of directors.    Six directors out of seven met in a friendly capacity, and for a different purpose, and such a meeting does not make them a board of directors. . . . . . It by no means follows that if a board meeting had been summoned, and the seventh had attended, the seven would have come to the same conclusion as the six without him.    People are very apt to change their minds when they hear arguments. . . . . . Then it might well be that the absent director might have known something against the person proposed, and that if he had stated it to the board of directors they would have entirely changed their minds."

Again, in *The Aberdeen Railway Company Case,* upon this point, the Lord Chancellor says :

"I observe that Lord FULLERTON seemed to doubt whether the rule would apply where the party whose act or contract is called in question is only one of a body of directors, not a sole trustee or manager.

"But, with all deference, this appears to me to make no difference.    It was Mr. Blaikie's duty to give to his codirectors, and through them to the company, the full benefit of all the knowledge and skill which he could bring to bear on the subject.    He was bound to assist them in getting the articles contracted for at the cheapest possible rate. As far as related to the advice he should give them, he put his interest in conflict with his duty, and whether he was the sole director, or only one of many, can make no difference in principle."

In the case of *The Imperial Mercantile Credit Association* v. *Coleman* (6 Ch. App. Cas. 588),. this point is also discussed, and the Lord Chancellor says :

" The ordinary operation of the rules of this court lay down firmly that no director of a company can, in the absence of any stipulation to the contrary, be allowed to be a

partaker in any benefit whatever from any contract which requires the sanction of a board of which he is a member. The reasons are given fully by Vice-Chancellor KNIGHT BRUCE, in *Benson* v. *Heathron* (1 Younge & C. 326), cited by the Vice-Chancellor in his judgment, and amount to this: that the company have a right to the services of their directors whom they remunerate by considerable payments; they have a right to their entire services; they have a right to the voice of every director, and to the advice of every director in giving his opinion upon matters which are brought before the board for consideration; and the general rule that no trustee can derive any benefit from dealing with those funds of which he is a trustee, applies with still greater force to the state of things in which the interest of the trustee *deprives* the company of the benefit of his advice and assistance."

In the case of *Paine* v. *Irwin* (16 Hun 390), which came up on a demurrer before me, and which was affirmed at the General Term, this question was distinctly presented, and in respect to the trustee not having voted at the meeting authorizing the contract, it was said:

"I have not thought it necessary to discuss the question as to the defendant's presence at the meeting at which it was resolved to purchase this property; because his presence or absence at such a meeting would in no manner affect his disability to deal with the corporation. This confidential relation existed, whether he was at the meeting which directed the purchase or not."

In the case of *Cumberland Coal and Iron Co.* v. *Sherman* (30 Barb. 553), the court sets forth with great clearness the reasons upon which the rule is founded. It says:

"Neither are the duties or obligations of a director or trustee altered from the circumstance that he is one of a number of directors or trustees, and that this circumstance diminishes his responsibility, or relieves him from any incapacity to deal with the property of his *cestui que trust.* The same principles apply to him as one of a number as if he was acting as a sole trustee. It is not doubted that it

has been shown that the relation of the director to the stockholders is the same as that of the agent to his principal, the trustee to his *cestui que trust;* and out of the identity of these relations necessarily springs . . . . . . the same policy of the law.

"In the language of the plaintiff's counsel, it is justly said: 'Whether it be a director dealing with the board of which he is a member, or a trustee dealing with his co-trustees and himself, the real party in interest, the principal, is absent, the watchful and effective self-interest of the director or trustee seeking a bargain is not counteracted by the equally watchful and effective self-interest of the other party, who is there only by his representatives; and the wise policy of the law treats all such cases as that of a trustee dealing with himself.'

"The number of directors or trustees does not lessen the danger, or insure security that the interests of the *cestui que trust* will be protected. The moment the directors permit one or more of their number to deal with the property of the stockholders, they surrender their own independence and self control. If five directors permit the sixth to purchase the property intrusted to their care, the same thing must be done with the others if they desire it. Increase of the number of the agents in no degree diminishes the danger of unfaithfulness.

"*Whichcote* v. *Lawrence* (3 Vesey 740), was a case of several trustees. In this case Lord LOUGHBOROUGH says: 'There was more opportunity for that species of management which does not betray itself much in the conduct and language of the party, when several trustees are acting together. I am sorry to say there is greater negligence where there is a number of trustees.'"

The fact of the importance of individual influence was recognized in the judiciary amendment to the constitution, wherein it was provided that a judge could not sit in an appellate court in review of his own decision, although he might be only one of seven composing the court.

In *Duryea* v. *Traphagen* (84 N. Y. 652), a judgment of

the General Term was reversed on the ground that Judge BRADY improperly sat in review of his own decision, although he was only one of the three judges in the General Term, and Judges DAVIS and BARRETT (the other judges present), constituted a good court.

In *Regina* v. *Justices* (6 Adol. & Ell. N. S. 753), it was held that the fact that an interested magistrate sat in court, vitiated the decision, even when there was a majority in favor of the decision without counting his vote.

Lord DENMAN says:

" It is contended that, as the majority, without reckoning his vote, was in favor of the confirmation, the order is not vitiated. · But after making every possible deduction from the strength of my opinion, in deference to that of my brother PATTESON, still, in my judgment, a decision is vitiated by any one interested person taking part in it. We cannot enter into an analysis of the different motives which may have produced the decision; it is enough to say that a single interested person has formed part of the court."

 PATTESON, J. —" I suppose that, in *Regina* v. *The Cheltenham Commissioners* (1 Q. B. 467), I was not satisfied that the interference of a single interested party was sufficient to invalidate the decision; in fact, the interference of the interested parties did there turn the majority; and I suppose that I was satisfied with limiting my decision to that ground. But, on consideration, I think this is unsound; I think that it is very dangerous to allow an interested person to join, whether the majority turn on his vote or not. The magistrates discuss the question among themselves; and it is impossible to say what effect that discussion may have on the decision. The real question is, has an interested person taken any part at all ? "

COLERIDGE, J.—" I will merely add, as I was not present at the decision of *Regina* v. *The Cheltenham Commissioners* (1 Q. B. 467), that I agree in the view now taken by my Lord and my brother PATTESON. Whether there is a properly constituted court, is a question which must be

prior to the decision. My brother PATTESON does not appear to have differed very decidedly, in *Regina* v. *The Cheltenham Commissioners*, from our present view; he there intimates that a magistrate who knows that he is interested, and still takes part in the discussion, is not justified in saying that, because so many other magistrates were present, he could not have influenced the decision."

WIGHTMAN, J.—" I agree, and I meant, in *Regina* v. *The Cheltenham Commissioners*, to rest upon the principle on which we are now deciding; that we cannot enter into a discussion as to the extent of the influence exercised by the interested party."

In our own courts, the disqualification of interest is as strictly upheld. A judge, the holder of one share of stock out of one million shares in a corporation, is just as certainly disqualified to sit in a cause in which that corporation is interested as though he held one thousand shares. It is not the amount of the interest which works the disqualification; it is the existence of any interest, however slight.

The rule, therefore, seems to be clearly established that the question of minority cannot be considered in determining the right in equity to avoid a contract. The presence of one disqualified director is just as fatal to action which cannot be repudiated as the existence of a dozen. It being impossible to ascertain the amount of influence which each director exerts, or which he fails to exert in opposition to action in which he is interested, the only rule which can be adopted or which can be applied with any certainty is, that if there is even one director who is disqualified, the whole action of the board is subject to repudiation.

But it is urged that the Metropolitan shareholders knew that at the time Messrs. Garrison, Navarro and Porter were elected directors of the Metropolitan company they were also directors of the Manhattan company.

I have been unable to find proof of any such knowledge, but if they had, I do not see how it can affect the question under consideration.

There is no proof that the shareholders of the Metropol-

itan company had any reason to suppose that any new agreements were to be made between the Metropolitan and the Manhattan companies, by which virtually a new lease was to be made. There is nothing to show that such shareholders in any degree contemplated the making by this board of permanent changes in the terms and conditions by which the Manhattan company was to hold their property. If the shareholders, knowing that new arrangements would have to be made between the Manhattan company and the Metropolitan company, had elected directors, some of whom they knew to be directors of the Manhattan company, then the case presented would have been similar to those cited. But this element of knowledge upon the part of the shareholders of the Metropolitan company that the lease was to be substantially altered to the advantage of the Manhattan company, is entirely absent in the case at bar. They knew nothing of it. They elected a board simply to manage the affairs of the Metropolitan company under the lease, affairs which were of the most limited nature, and not to radically change the whole basis upon which the shareholders had assented to the lease to the Manhattan company. After the leases were made, then all antagonism of interest between the companies had ceased, no more contracts or agreements were to be made between them, and common directors were, therefore, entirely proper. But when unexpected contingencies arose, by which the sharp conflict of interest which existed before the leases was revived, a state of affairs was presented which had not been anticipated by the shareholders; and it is fair to assume, if they had been foreseen, such shareholders would have preferred directors who had no divided allegiance, and whose sole interest would have been to maintain the rights of their company. In order that an agent or trustee may act for two principals, the principals must each know not only that he is the agent of each, but also that action by the agent is contemplated, in which such agent is to represent the hostile interests of both principals, and if such knowledge is not shown the principal may repudiate. None of the cases have gone further than this.

I have, therefore, been led to the conclusion that the directors had no power to modify the leases of May 20th, 1879, in the manner that they did by the October agreements, without the assent of the stockholders; and that even if they had such power, the presence of directors in the Metropolitan board, who were also directors of the Manhattan company at the time of the adoption of these October agreements, gave either company the right, in equity, to repudiate those contracts within a reasonable time, although the contracts may have been perfectly valid at law.

The Metropolitan company certainly did repudiate these agreements within a reasonable time, having commenced this action within one month after the shareholders of that company had an opportunity to elect a new board of directors, who could take action in the matter.

The plaintiff, therefore, is entitled to a judgment relieving all the parties in this action from the October agreements, upon making such restitution as is suggested in a former portion of this opinion.

It has been said that this conclusion, if reached, would cause great confusion and conflict of interest among a vast number of railroads in this country, so many of whom have common directors and also traffic arrangements with each other. This evil is not so great by any means as has been depicted. Agreements of this character are not void, but simply voidable, and if the corporation wishes to avoid them, as has been shown, it must act within a reasonable time. If the shareholders are dissatisfied with the acts of their directors, they must repudiate them within a reasonable time, which in most cases would be held to mean at the next meeting for the election of directors, when they can elect a new board, who can take the necessary action to annul the voidable contract; and it must, therefore, be the dissatisfaction of the majority of the shareholders, and not that of a minority, which can call the power into operation. If the shareholders renew the terms of office of the directors who have made the voidable contract, or if they take no action showing plainly their dissent, the contract will become binding

by acquiescence. As in most corporations boards of directors are elected by the shareholders annually, the right to annul can seldom exist for more than one year. Thus it will be seen that there can be but few cases in which the decision of these questions can affect past action, whatever influence it may have in shaping the proceedings of trading corporations hereafter.

Although it is not necessary for me to decide the question of fact, in reference to Mr. Stout's vote, in view of the conclusion to which I have come above, yet, in order that, if I should have been mistaken in my view, the whole case may be disposed of by the appellate court, I will briefly state why I shall find that Mr. Stout voted in the affirmative on the 22d of October, at the meeting of the board of directors of the Metropolitan company; and, for the purposes of this question, I am willing to concede that every director present supposed that he voted no.

I am satisfied from the evidence that not one of the members of the board present at that meeting remembers the physical fact of hearing Mr. Stout's voice when he voted. I do not think Mr. Stout himself recollects the precise act of voting. It is not a circumstance which he would be likely to recollect. It was at the time, probably, not thought of much consequence how he voted. He was, if he voted with Mr. Kneeland, in a hopeless minority, and he undoubtedly thought it was not of much consequence how he voted, as is shown by his action at the next meeting on the 24th of October. The minutes record his vote as in the affirmative, and at the next meeting of the board, held two days after, when these agreements are being canvassed and all sorts of motives impugned to their supporters, these minutes, in which his vote is recorded in the affirmative, are read in his presence, and that of Mr. Kneeland, the latter of whom had voted "no," and they are approved unanimously. It is not claimed that he or anybody else then voted no. It seems to me that after Mr. Stout has allowed those minutes to be approved, it is too late for him now to say that they are incorrect. He has voted that they are correct. There is no claim

that the minutes of the meeting of October 24th are incorrect. They state the true facts, and it seems to me, under these circumstances, that it would take not only more than two, but more than half a dozen witnesses to prove the record of that vote false, the party himself having voted it correct.

I am referred by the counsel for the plaintiff to the case of *Hun* v. *Cary* (59 How. Pr. 426, 430), as to the effect of a record of a vote in the minutes of a board. The learned justice who wrote the opinion in that case fell into an error as to the effect of the testimony of a party. In that case one of the questions submitted to the jury was, whether the defendant Smith was present at a meeting of directors. The court says:

" There was no evidence, other than the minutes, of his attendance at the meeting which authorized the purchase. He, himself, denied such attendance in the most positive terms, and asserted his entire ignorance of the transaction until after it was closed. We think this entitled Mr. Smith to a dismissal of the complaint. There was no conflict of evidence and nothing to go to the jury. If the secretary or any one else had testified to Mr. Smith's attendance, that, of course, would have involved a conflict. But the *prima facie* case made by the secretary's unsworn declaration contained in the minutes was absolutely overthrown by Mr. Smith's testimony; that is, unless such testimony is to be disregarded. But it cannot be disregarded by either court or jury, for it was not impaired on cross-examination, nor was Mr. Smith's credibility in anywise impeached or affected."

There is no such rule governing the evidence of a party. The evidence of a party may be disregarded by a jury or a court trying questions of fact, although it may in no wise be impeached or affected; a different rule obtaining, however, in respect to the evidence of disinterested witnesses (*Lesser* v. *Wunder*, 9 Daly 70; *Nicholson* v. *Connor*, 8 Daly 212; *Elwood* v. *Western Union Tel. Co.*, 45 N. Y. 549;

*Hodge* v. *City of Buffalo*, 1 Abb. N. C. 356; *Kavanagh* v. *Wilson*, 70 N. Y. 129).

But in the case at bar, we have the positive evidence that Mr. Stout was present at the meeting of October 24th, and that the minutes of the previous meeting were read in his presence and his hearing, and that such minutes were approved without any dissent whatever.

If the records of the proceedings of corporations are to be thus lightly regarded, then no man can be safe in dealing with a corporation. It is impossible for a stranger to prove anything about the minutes; and to say that they can be impeached after they have been regularly approved, by the testimony of the very men who sat by and allowed their approval, would be opening the door wide for the gravest perjury and fraud.

In the case of *Ashurst* v. *Mason* (L. R. 20, Eq. Cas. 225), Vice Chancellor BACON says:

"It would be in the highest degree dangerous to permit directors or other persons having the management of companies to say, when any particular incident arises or there comes to be a pinch upon it, 'At that moment my thoughts were elsewhere! I did not hear it! in fact I was thinking of something else!'"

Stout heard and approved, and now he cannot be allowed to say that he did not.

Therefore, notwithstanding the fact that the learned counsel for the plaintiff believes it to be impossible for the court, on the evidence, to find that Mr. Stout voted aye, I must find, according to every rule of evidence, and according to my own conviction, founded upon the evidence, that he did vote "Aye." Mr. Stout's excuse that he was not permitted to see the minute books, is too flimsy to need much comment. He did not try to see them, and, as far as I know, there was no reason why he should have done so. Even if his vote was wrongly recorded, if his evidence is to be believed, he had no reason to suspect it. His lame attempt to find what he believed to be a necessary excuse for not examining the books, showed a disposition to rely,

where he deemed it important, upon the imagination rather than upon the recollection.

The enormous length of this opinion certainly needs some apology; but I have in vain endeavored to condense it. It has frequently been necessary to make long quotations from cases cited, because it seemed impossible otherwise to present the precise attitude of the court toward the subject under discussion.

I have deemed it proper, in view of the large interests involved, and the magnitude of the questions to be disposed of, and the divergent views entertained by the eminent counsel engaged in the cause, to consider all the questions involved at much greater length than was, perhaps, necessary, because I did not desire that there should be any misunderstanding as to the grounds upon which my decision was based.

After a most laborious and critical examination of all the principles and authorities to which my attention has been called, or which I could find, I have satisfied my own mind, that the conclusions at which I have arrived, are those which must be reached by every impartial mind, upon a careful examination of the questions involved in this action, and that they best accord with those great principles of equity, by which the injustice and hardships of the strict letter of the law are remedied.*

---

* No appeal was taken from this decision. All the parties in interest accepted it as a correct exposition of the law; their various rights were adjusted in accordance with it, and the suit was settled.